UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RACHEL MADDOX, SHANNON MADDOX, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| vs. | ) | NO. 12-1641 |
| | ) | |
| INTEGRO USA, INC., INTEGRO INSURANCE | ) | SECTION "N" |
| BROKERS CHRISTIAN CONGREGATION OF | ) | |
| JEHOVAH'S WITNESSES, WATCHTOWER | ) | MAGISTRATE (1) |
| BIBLE AND TRACT SOCIETY OF NEW YORK, | ) | |
| INC., WATCHTOWER CONGREGATION OF | ) | |
| JEHOVAH'S WITNESSES, INC., PATRICK | ) | |
| VICTOR, KATHY VICTOR | ) | |
| | ) | |
| Defendants. | ) | |

CHRISTIAN CONGREGATION OF JEHOVAH'S WITNESSES, INC.'S
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

Defendant Christian Congregation of Jehovah's Witnesses, Inc. ("CCJW") moves this Court for Summary Judgment dismissing Plaintiffs' claims against it because it owed no duty on the facts Plaintiffs pleaded and discovery will not change that.

I. PROCEDURAL STATUS

Plaintiffs' sued the six defendants for wrongful death and for a survival action in the Twenty-fourth Judicial Court for the State of Louisiana in Jefferson Parish, which was timely removed. This Court denied Plaintiffs' remand motion and dismissed the actions against the local defendants.[1] The operative facts happened in Mobile, Alabama where CCJW leased the Mitchell Center arena for a religious convention at which Patsy Maddox fell. The other

---

[1] For more details of the procedural history, see the contemporaneously filed Motion for Summary Judgment by Watchtower. Old Republic has likewise filed a motion for summary judgment. See also the removal and remand proceedings herein.

1

defendants had nothing to do with operations of the convention. This Motion for Summary Judgment should dispose of all issues in this case.

## II. STATEMENT OF THE ISSUES AND AUTHORITIES

A.   ISSUES

1.   Did CCJW as custodian of the premises owe a duty to Patsy Maddox and those similarly situated (elderly and disabled) to prevent them from exercising reasonable care and good judgment to avoid risks known peculiarly to them because of their conditions and abilities?

2.   Did Patsy Maddox fail to exercise reasonable care and good judgment and thereby cause injury to herself, or were her injuries merely the result of a simple accident for which no fault can be assessed.

B.   AUTHORITIES

1.   Ala. Code §6-5-410. Wrongful death action must be brought in an Alabama court by the estate representative.

2.   *Davidson v. Highlands United Methodist Church*, 673 So.2d 765, 767 (Ala. Civ. App., 1995).  Duty owed to a "licensee" is to avoid creating any "*new hidden danger, pitfall or trap* . . . that a person could not avoid by the use of reasonable care and skill." *Id.* (quoting *Wright v. Alabama Power Co.*, 355 So.2d 322, 325 (Ala.1978) (emphasis in original)).

3.   *Prentiss v. Evergreen Presbyterian Church*, 644 So.2d 475, 477 (Ala. 1994).  A "licensee" is one whose presence benefits, not the landowner, but the one entering the land for some purpose, such as worship. *Id.* (citing *Autry v. Roebuck Park Baptist Church*, 285 Ala. 76, 229 So.2d 469 (1969).  The duty owed to a worshipper is "to abstain from willfully or wantonly injuring the licensee and to avoid negligently injuring the licensee after the landowner

2

discovers a danger to the licensee." *Prentiss,* 644 So.2d at 477.

4. *Autry v. Roebuck Park Baptist Church*, 285 Ala. 76, 229 So.2d 469 (1969).  Worship is a relationship that benefits the worshipper not the custodian of the place of worship. *Id.* at 473-474 (quoting *McNulty v. Hurley*, 97 So.2d 185, 188-189 (Fla. 1957)).

5. *Lafarge N. Am., Inc. v. Nord*, 86 So.3d 326, 336 (Ala. 2011).  Alabama bars recovery when a defendant proves contributory negligence when the plaintiff "1) had knowledge of the condition; 2) had an appreciation of the danger under the surrounding circumstances; and 3) failed to exercise reasonable care."  (On summary judgment, burden remains with defendant to prove affirmative defenses.)

6. La. Civ. Code art. 2323(A) reduces the damages for a plaintiff who is at fault for causing his injuries, and would deny recovery to a plaintiff found 100% at fault. *See Murray v. Ramada Inns, Inc.*, 521 So.2d 1123, 1137 (La. 1988) (Cole, J. concurring).

7 *Lemann v. Essen Lane Daiquiris, Inc*., 05-1095, p. 8 (La. 3/10/06), 923 So. 2d 627, 633 (quoted in *In re Fema Trailer Formaldehyde Prods. Liab. Litig.*, 838 F.Supp.2d 497, 505 (E.D. La. 2012)).  Duty is the threshold issue in any Louisiana negligence case.

8. *Pitre v. Opelousas Gen. Hosp*., 530 So. 2d 1151, 1155 (La. 1988) (quoted in *Fema Trailer* at 505).  Duty is determined by making "a policy decision in light of the unique facts and circumstances presented," including "the relationship and circumstances of the parties."

9. *Pitre v. La. Tech Univ.*, 95-1466, pp. 1, 7, (La. 5/10/96), 673 So.2d 585, 589.  No duty to protect persons against "open and obvious" hazards for activities not "inherently dangerous;" and the costs of protection must be balanced against the likelihood of harm occurring when those at risk use good judgment and exercise reasonable care. *Id.* at 593.

10. *Dupree v. City of New Orleans*, 99-3651, p. 14 (La. 8/31/00), 765 So.2d

1002, 1012. "Not every imperfection or irregularity creates an unreasonable risk of injury."

11. *Gros v. Warren Props., Inc*., No. 12-2184, 2012 WL 5906724 at 14-15 (E.D. La. Nov. 26, 2012) (citing *Dupree* at pp. 6-7, 765 So.2 at 1009). Distinction drawn between negligence under La. Civ. Code art. 2315, based upon the relationship between the parties, and liability under La. Civ. Code arts. 2317 and 2317.1, based upon defendant's status as custodian of the premises.

12. *Lilya v. Greater Gulf State Fair, Inc*., 855 So.2d 1049, 1054 (Ala. 2003). Alabama distinguishes the liability based on status of landowner and relationship with "licensees," "invitees," and "trespassers" from the liability imposed for simple negligence occasioned by some "affirmative act" or "conduct" having nothing to do with the condition of the land or premises. *Id.* (citing *Orr v. Turney*, 535 So.2d 150, 151-154 (Ala. 1988) (grease spilled on licensee had nothing to do with condition of premises)).

### III. THE STANDARD OF REVIEW
### SUMMARY JUDGMENT STANDARD

When the record shows there is no genuine issue of material fact, judgment as a matter of law must be rendered. *Fairfield Royalty Corp. v. Island Operating Co., Inc.*, No. 10-3446, 2012 WL 2716414, at 4-5 (E.D. La. July 9, 2012). The burden shifts to the opponent if the mover shows that no material fact is in dispute. *Id.* at 4 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986)). Inferences must be drawn in a light most favorable for the opponent, but he must present "specific facts" to demonstrate a genuine issue of material fact warranting a trial. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A summary judgment motion need not eliminate the existence of every material fact. *Brown v. Transit Management of Southeast Louisiana, Inc.*, No. 10-2620, 2011 WL 5119017 (E.D. La. Oct. 27, 2011)). It is sufficient to point out the

4

absence of evidence for any key element of the opponent's case. *Id.* at 4-5, (citing *Celotex*, *id.*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986)). The opposition does not demonstrate a genuine issue of material fact by presenting "'some metaphysical doubt as to the material facts,' 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* at 4, (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted)). Evidence must be that upon which "a reasonable jury could return a verdict for the nonmoving party," which estops one from resting on his pleadings alone. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## IV. FACTS

Patsy Maddox fell on stairs accessing seats in the upper level of the Mitchell Center at the University of South Alabama where Jehovah's Witnesses held a religious convention on 1 July 2011. Statement of Uncontested Facts, ¶¶ 1 – 10. Plaintiffs alleged that the stairs posed a hazard for their mother, and elderly and disabled people. *E.g.*, Petition ¶ XIII, p. 4 (unsafe for one like Patsy Maddox), Document 13-1, p. 4 (hereafter referred to as "Petition, ¶ ___, p. __"). Their pleadings, though, demonstrated that the stairs were an "open and obvious" risk for the elderly and disabled, and they pleaded no facts to show anything "inherently dangerous" about climbing stairs. *Id.*, ¶ VIII, p. 3 (disabled seating area); ¶ XVI, p. 5 ("a clearly disabled person" who had "to climb stairs to open seating in elevated" area where "safety for the elderly, infirm and disabled persons was neglected"); ¶ XXII, p. 6 ("such risks were known," and if known to defendants, they were known to Patsy Maddox and those similarly situated because of special seating at conventions).

Plaintiffs pleaded that their mother was frail and disabled. *E.g.*, Petition, ¶ XVIII, p.5 ("fragile and disabled persons, like Patsy L. Maddox"). They pleaded that she was under the

5

care of the defendants. *E.g.*, *id.*, ¶ IV, p. 2 (she and those "similarly situated" under care "by way of church solicitations, planning, organizing, design, programming, and even block room reservations").[2] The contrary, though, was true: She drove her own car, lived alone, and cared for herself without assistance. Document 25-1, pp. 2 ("Declaration of Patrick Victor" in Opposition to Plaintiff's Motion to Remand, ¶ 5) (hereafter referred to as "Victor, ¶ ___, p. __"). She had no history of falling. *Id.,* ¶ 6, p. 2. She stated that climbing the stairs to available seating at the convention was no problem for her. *Id.,* ¶ 10, p. 2. She displayed no trouble ascending or descending the stairs, such as a limp, difficulty seeing or gripping the hand rail, as when she ascended the stairs at the start of the convention or when she descended and ascended them again during the lunch break. *Id.*, ¶¶ 12, 13, p. 3. No one was in charge of her and she was under no one's care; *id.*, ¶ 15, p. 3, she made her own accommodations, was fully capable of caring for herself and making her own decisions, which she did. *Id.*, ¶¶ 17, 18 p. 4. She decided for herself where she would sit and no one made that decision for her; no one directed her to her seat, and she appeared to have no limitations and walked well for someone her age. *Id.*, ¶¶ 18, 20, 22, p. 4.

The issue is not whether Patsy Maddox was strong or frail, able or disabled. The issue is whether she exercised her own volition in sitting where she did because that goes to the essence of Plaintiffs' pleaded cause of action. Plaintiffs alleged that she was "forced" or "required" to sit in an area reachable only by "steep" stairs, Petition, ¶ VIII ("forced," "required"), p. 3 ; ¶ XII ("steep"), p. 4, but they have alleged no facts to demonstrate how Patsy Maddox' free will was overcome by "force" or coercion, *cf.* Victor, ¶ 10, p.2, ¶18, p. 4 (options of looking for other

---

[2] Especially note the allegation that everyone "similarly situated" came under the care of Christian Congregation simply because of the activities associated with organizing a convention. This novel theory would make organizers of public events the insurers of the health and welfare of the attendees who would place themselves under the care of the event organizers during the event.

seats, or leaving and returning the next day), nor how the steepness of the stairs made them 'hazardous' to the public.  Plaintiffs have alleged that their mother was "guided" or "directed" where to sit, Petition, ¶¶ VIII, p.3, XVI, XIX, p. 5, XXII, p. 6, XXIV, p.7 ('directed'), XII, p. 4 ("guided"), but even those allegations are contradicted by their pleading that she was not properly attended by an "usher."  *Id.* XII, p. 4 (no usher).  If CCJW was to be liable under Plaintiffs' novel theory, then the "usher," whose absence they alleged, would have necessarily been present to do the "guiding" and "directing" of their mother to the seat where she experienced the hazard.

## V. ARGUMENT ON THE LAW AND FACTS

### A. ALABAMA LAW REQUIRES DISMISSAL

Plaintiffs sued for wrongful death in Louisiana on facts that occurred in Alabama.  Ala. Code §6-5-410 required that cause of action to be filed in a court of competent jurisdiction in Alabama. The wrongful death case must be dismissed.

Additionally, Plaintiffs have pleaded that Patsy Maddox fell because she should not have been ascending and descending the stairs on which she fell. *Id.*, ¶ VIII, p. 3 (required to sit away from disability seating; "forced" to sit where inappropriate for disabled), *but contra* ¶ IX, p. 3 ("invited" to worship, "promised" a safe environment, not "forced" to sit anywhere); *see also* ¶ XII, p. (required to leave seat to which she was "guided," not "forced," which was at top of steep stairs); *further* ¶ XIII, p. ("navigating steep steps;" "unsafe . . . for this elderly, infirm, disabled person;" "unsafe-for-the-circumstances;" "particularly . . ., like Patsy L. Maddox."). They have pleaded no facts that demonstrate a duty to warn of a *hidden* defect in the design or construction of the stairs, the duty owed to an "invitee," or to avoid creating any "new *hidden* danger, pitfall or trap" that a "licensee" "could not avoid by the use of reasonable care and skill."

7

*Davidson*, 673 So.2d at 767. (Italics added.)

Instead, Plaintiffs pleaded that CCJW had a "heightened duty" as "host" to have a safety program that would have *kept* Patsy Maddox from being on the stairs. *E.g.,* Petition, ¶¶ XVII, p. 5 (safety program for elderly, infirm, disabled), XVIII, p. 5 (attended by elderly, infirm, disabled). The essential element of Plaintiff's theory of liability is that CCJW "invited" Patsy Maddox to the Convention and then "directed" her to sit in an unsafe seat. *Id.* ¶ XVI, p. 5 (inviting and knowingly directing a disabled person to climb stairs). Even if facts supported these contentions, an invitation or direction to a seat does not constitute the failure to warn of a hidden defect or the creation of a hidden danger, pitfall or trap. *Davidson*, 673 So.2d at 767. Nothing in the facts pleaded shows that CCJW breached any duty imposed by the law of Alabama for the safety of those attending religious events devoted to the worship of God. *Prentiss,* 644 So.2d at 477; *Autry*, 229 So.2d at 473-474. Nothing pleaded shows that the defendants committed any affirmative act to injure Patsy Maddox. *Lilya*, 855 So.2d at 1054. The facts do show that Patsy Maddox knew of the condition; appreciated the danger, but failed to exercise reasonable care because she fell with no action by anyone else, and contributory negligence would bar her recovery even if Plaintiffs demonstrated a duty, *Lafarge*, 86 So.3d at 336, or she simply fell because of no one's fault.

### B. LOUISIANA LAW REQUIRES DISMISSAL.

Any alleged hazard was "open and obvious" and Plaintiffs failed to meet their "threshold" burden. *Lemann v. Essen Lane Daiquiris, Inc*., 05-1095, p. 8 (La. 3/10/06), 923 So. 2d 627, 633. Policy on "the unique facts and circumstances" of this case, "given the relationship" between Patsy Maddox and CCJW, militates against the "heightened" duty Plaintiffs would impose on CCJW. *Id*.; *Pitre v. Opelousas Gen. Hosp*., 530 So.2d at 1155. Such

a duty is the least effective means of protecting those similarly situated as Patsy Maddox, but requiring them to exercise reasonable care and good judgment would be the most effective. *Pitre v. La. Tech Univ.*, p. 15, 673 So.2d at 593.

There was no inherent defect in the premises because CCJW had special seating for elderly and disabled. *See Pitre v. La. Tech. Univ.*, p. 21, 673 So.2d 596 (sledding not inherently dangerous because "open and obvious"). The special seating for elderly and disabled worshippers highlighted for them the "open and obvious" risk of climbing stairs identified by the Petition, so climbing stairs could not be inherently dangerous. *Id.* If the special seating sections were full when the program started, Victor, ¶¶8, 9, p. 2, that did not create an unreasonable risk. *Dupree*, p. 14, 765 So.2d at 1012 (not every irregularity an unreasonable risk); *see also Gros*, 2012 WL 5906724 at 14-15 (2315 – relationship, 2317 – defect); *and see Pitre v. La. Tech Univ.*, p. 10, 673 So.2d at 590 (unreasonable risk for premises liability under 2315). Patsy Maddox, and those "similarly situated," remained free to choose any other open seat in the arena, to choose not to attend the convention, to choose to attend on another convention date, or to ask the attendants for assistance, none of which Patsy Maddox did. Victor, ¶ 10, p.2, ¶18, p. 4.[3] Instead, she exercised her judgment and chose to accept the risk of climbing stairs, which would be

---

[3] See also the Declarations of Stanley F. Weigel and Gary N. Breaux incorporated with the Summary judgment motion of Watchtower Bible and Tract Society of New York, Inc. and the exhibits attached to Mr. Breaux's Declaration (*The Watchtower*, March 1, 2010 with 2010 Convention Locations List, *The Watchtower*, March 1, 2011, with notice that convention locations were posted at jw.org as of 2011, and the 2011 Convention Locations List); and see the April 2011 *Our Kingdom Ministry*, attached hereto under Fed R. Evid. 902(6), including the 30-minute part on the April 25, 2011 Service Meeting devoted to covering pages 4-7 with detailed advice for convention attendance. Particularly note ¶ 2, p.4 of the April 2011 *Our Kingdom Ministry*, wherein it admonishes all to make arrangements well in advance to arrive on time to locate seats to be able to attend all of the programs from the start of the music each day. Note too that Stanley Weigel established that no one was compelled to attend any particular convention program and many other programs were available for Patsy Maddox to attend if she considered the lack of elderly seating a hazard for her. The Convention Locations List showed another convention the week following on July 8-10, 2011 in Mobile, Alabama; additionally, Patsy Maddox did not ask any attendant about disability assistance, but chose to climb stairs instead. She obviously did not consider the stairs a hazard for her, exercising her own judgment. *Our Kingdom Ministry*, ¶4, pp. 4-5, addressed the needs of the elderly or others. She knew someone would assist her if she expressed a need. *See* Petition, ¶ III, p. 2 ("life long Jehovah's Witness").

tantamount to 100% fault on her part, following the rejection of assumption-of-the-risk in favor of pure comparative fault. *Murray*, 521 So.2d at 1137 (Cole, J. concurring).

As the college administrators in *Pitre v. La. Tech Univ.*, p. 15, 673 So.2d at 593, *supra*, had no duty to warn Pitre who struck a light pole because the risk of hitting poles while sledding down a snow covered hill was "open and apparent," the "cost to prevent potential harm . . . would be enormous," and "[t]he most effective means of preventing this accident rested with Pitre;" so too CCJW owed no duty to protect Patsy Maddox from any risk associated with climbing stairs to a seat because the most effective means of preventing her accident rested with her. If she was as frail as Plaintiffs alleged she was, she should not have opted to climb stairs.

Lastly, the pleadings have demanded relief upon a "heightened" duty that does not exist under Alabama or Louisiana law. Plaintiffs have no cause of action and further discovery would not produce facts to support a cause of action that does not exist in the law.

## CONCLUSION

This Motion for Summary Judgment should be GRANTED, Christian Congregation of Jehovah's Witnesses, Inc. should be dismissed, and costs taxed to Plaintiffs.

    Respectfully submitted,
    By /s/Ted M. Mitchell
    Ted M. Mitchell    La. Bar No. 20964
    2955 Ridgelake Drive, Suite 207
    Metairie LA 70002
    504-236-3966 – voice
    504-273-2220 – fax

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been electronically filed with the Clerk of Court using the CM/ECF system this 11th day of February 2013 and notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system or by mail.

    /s/Ted M. Mitchell

# Our Kingdom Ministry
## April 2011

**WEEK STARTING APRIL 11**
Song 44 and Prayer

❑ **Congregation Bible Study:**
*bt* chap. 2 ¶8-15 (25 min.)

❑ **Theocratic Ministry School:**
**Bible reading:** Job 21-27 (10 min.)
**No. 1:** Job 25:1–26:14 (4 min. or less)
**No. 2:** Why the Cross Should Not Be Viewed as an Object of Devotion (5 min.)
**No. 3:** Is Jesus Christ the Same Person as Michael the Archangel?—*rs* p. 218 ¶1-3 (5 min.)

❑ **Service Meeting:**
Song 98

**5 min:** Announcements. Inform the congregation of the local progress being made in the Memorial invitation campaign.

**10 min:** Sow Your Seed, and Do Not Let Your Hand Rest. (Eccl. 11:6) Discussion based on the *2011 Yearbook,* page 170, paragraph 2, to page 173, paragraph 4. After discussing each experience, invite audience to comment on the lessons learned.

**10 min:** How to Witness by Letter. Discussion based on the *Ministry School* book, pages 71-73.

**10 min:** "A Powerful Witness Will Be Given." Questions and answers.
Song 8 and Prayer

## A Powerful Witness Will Be Given

¹ When? On the night of the Memorial. Much effort has gone into inviting people to attend with us. What visitors *hear* is not the only thing that may impress them. After attending the Memorial, one woman specifically commented on what she *saw*—the friendliness of everyone and the beautiful, clean building that was constructed and maintained by volunteers. Therefore, all of us, not just the speaker, share in giving a witness on this most important occasion of the year.—Eph. 4:16.

² **Warmly Greet Visitors:** Our warm smile along with a cheerful hello to visitors will give a witness. (John 13:35) Even if you are not able to speak to everyone, you can still warmly introduce yourself to people near you. (Heb. 13:1, 2) Be watchful for visitors who do not seem to know anyone. Likely they received an invitation during the campaign. You might ask, "Is this your first time here?" Invite them to sit with you, and offer to answer any questions they may have. If your congregation must leave quickly so that another congregation can use the facility, you might say: "I'd like to know what you thought of the program. Is there a way that I can contact you?"

³ **Welcome the Inactive:** No doubt, inactive publishers will be present, including some who limit their association with the congregation to their annual attendance at the Memorial. Welcome them, and let them know that you are genuinely happy to see them. (Rom. 15:7) Elders can go by their home soon afterward to encourage them to continue their association with the congregation. It is our prayer that many in attendance will be moved to glorify God not just because of what they hear but also because of what they see 'as a result of our fine works of which they are eyewitnesses.'—1 Pet. 2:12.

---

1. In addition to the talk, what else may impress visitors at the Memorial? Explain.
2. How may each of us give a witness to visitors?
3. How may we welcome those who are inactive?

**WEEK STARTING APRIL 18**
Song 17 and Prayer
❑ **Congregation Bible Study:**
*bt* chap. 2 ¶16-23 (25 min.)
❑ **Theocratic Ministry School:**
**Bible reading:** Job 28-32 (10 min.)
**No. 1:** Job 30:1-23 (4 min. or less)
**No. 2:** *If Someone Says:* "You Don't Believe in Jesus"—*rs* p. 219 ¶1-3 (5 min.)
**No. 3:** Why We Should Think Before We Speak—Prov. 16:23 (5 min.)
❑ **Service Meeting:**
Song 54
**5 min:** Announcements.
**10 min:** When Others Demand an Explanation. Talk based on the *Ministry School* book, page 177, paragraph 2, to the end of page 178. Include a brief demonstration of an unbelieving workmate asking a publisher a question about our beliefs. The publisher soliloquizes a mental outline of how he will respond and then answers the question.
**10 min:** Question Box. Discussion by an elder.
**10 min:** Methods of Preaching the Good News—From House to House. Discussion of *Organized* book, page 92, paragraph 3, to page 95, paragraph 2. Interview one or two publishers who preach from house to house despite obstacles, such as physical infirmities or shyness. How have their efforts been rewarded?
Song 26 and Prayer

## QUESTION BOX

### ■ How long should we study with a progressive Bible student?

It is best to continue studying with a progressive Bible student until he has completed two publications—*What Does the Bible Really Teach?* and *"Keep Yourselves in God's Love."* This is true even if the student gets baptized before finishing both books. After his baptism we may continue to report the time, the return visits, and the study. If a publisher accompanies us and participates in the study, he may also count the time.—See the March 2009 *Our Kingdom Ministry,* page 2.

It is important for new ones to have a good foundation in the truth before they are left on their own. They need to be "rooted" in Christ and "stabilized in the faith" so as to withstand the trials they are sure to face. (Col. 2:6, 7; 2 Tim. 3:12; 1 Pet. 5:8, 9) Additionally, to teach others effectively, they must have "an accurate knowledge of truth." (1 Tim. 2:4) By completing two books with our students, we are helping them attain a solid footing on "the road leading off into life."—Matt. 7:14.

Before approving someone for baptism, elders should ensure that he *clearly understands primary Bible teachings and is living in harmony with them.* Elders should be especially careful when considering a student who has not yet completed the first study book. If someone is not ready for baptism, the elders will make sure that he receives the necessary personal assistance in order to qualify for baptism in the future.—See *Organized to Do Jehovah's Will,* pages 217-218.

> **It is important for new ones to have a good foundation in the truth**

© 2011 Christian Congregation of Jehovah's Witnesses. All rights reserved. *Our Kingdom Ministry* (ISSN 1067-7259) is published monthly by Christian Congregation of Jehovah's Witnesses; C. I. Woody, President; W. H. Nonkes, Secretary-Treasurer; 2821 Route 22, Patterson, NY 12563-2237. Periodicals Postage Paid at Patterson, NY, and at additional mailing offices. **POSTMASTER:** Send address changes to *Our Kingdom Ministry,* 1000 Red Mills Road, **Wallkill, NY 12589-3299.**                    Printed in Canada

**WEEK STARTING APRIL 25**

Song 108 and Prayer

❑ **Congregation Bible Study:**

*bt* chap. 3 ¶1-3, boxes on pp. 23-27 (25 min.)

❑ **Theocratic Ministry School:**

**Bible reading:** Job 33-37 (10 min.)

Theocratic Ministry School Review (20 min.)

❑ **Service Meeting:**

Song 117

**5 min:** Announcements. "Use Them Rather Than Store Them." Talk. Inform audience of any older publications that are overstocked in the congregation.

**30 min:** "Three Days of Spiritual Refreshment." Questions and answers. Discuss "2011 District Convention Reminders." When considering paragraph 5, call on the service overseer to explain local arrangements for distributing the invitations.

Song 119 and Prayer

## Use Them Rather Than Store Them

Many congregations have accumulated a supply of older publications. Why not obtain copies for your personal theocratic library? Of course, likely you already have access to the contents of some of these older publications in *Watchtower Library.* However, there are benefits to having a hard copy too. Are you studying with a progressive Bible student? Then encourage him to obtain these older publications and begin building his personal library. The Theocratic Ministry School overseer should make sure that the Kingdom Hall library contains any older publications that the congregation has in stock. These publications still have value. It is better for us to make use of them than to leave them at the congregation's literature counter!

## Theocratic Ministry School Review

The following questions will be considered at the Theocratic Ministry School during the week beginning April 25, 2011. The school overseer will conduct a 20-minute review based on material covered in assignments for the weeks of March 7 through April 25, 2011.

1. In what sense was it that "many of the peoples of the land were declaring themselves Jews"? (Esther 8:17) [*w06* 3/1 p. 11 par. 3]

2. Why was Satan allowed to enter before Jehovah? (Job 1:6; 2:1) [*w06* 3/15 p. 13 par. 6; *it*-2 p. 16 par. 4]

3. What is implied by Satan's question, "Is it for nothing that Job has feared God"? (Job 1:9) [*w94* 11/15 p. 11 par. 6]

4. Why does knowing that Jehovah is "wise in heart and strong in power" instill confidence in us? (Job 9:4) [*w07* 5/15 p. 25 par. 16; *it*-2 p. 1190 par. 3]

5. In what way did the statement by Eliphaz that a man drinks in "unrighteousness just like water" reflect Satanic thinking? (Job 15:16) [*w10* 2/15 p. 20 pars. 1-2]

6. What can we learn from Job's strong outcry that we read at Job 19:2? [*w94* 10/1 p. 32 pars. 1-5]

7. What helped Job to maintain his integrity? (Job 27:5) [*w09* 4/15 p. 6 par. 17]

8. How can we imitate Job when others have a need? (Job 29:12, 13) [*w02* 5/15 p. 22 par. 19; *w94* 9/15 p. 24 par. 2]

9. In what way was Elihu's counsel different from that of Job's three other companions? (Job 33:1, 6) [*w95* 2/15 p. 29 par. 3]

10. How should reflecting on Jehovah's wonderful works affect us? (Job 37:14) [*w06* 3/15 p. 16 par. 4]

## Three Days of Spiritual Refreshment

[1] In this spiritually scorched land that is Satan's world, Jehovah continues to refresh his servants. (Isa. 58:11) One provision Jehovah uses to invigorate us is the annual district convention. As the convention for this year approaches, how may we prepare to receive and impart spiritual refreshment? —Prov. 21:5.

[2] If you have not already done so, take time now to arrange your personal and secular work schedules to be present for all three days of the convention. Have you calculated the time that you will need to travel to the convention site each day so that you can arrive and locate seating well before the program begins? We would certainly not want to miss any of the invigorating spiritual meal that Jehovah has prepared for us!

> As in the past, three weeks before the start of our convention, we will share in a campaign to invite others to attend

(Isa. 65:13, 14) Have your arrangements for lodging and transportation been completed?

[3] What will help you to keep your mind from wandering during the sessions? If possible, get plenty of rest each night during the convention. Focus your eyes on the speaker. Look up every scripture in your Bible. Take brief notes. Families do well to sit together so that parents can help their children to pay close attention. (Prov. 29:15) Perhaps you can discuss highlights of the program each evening as a family. So that your family can continue to be refreshed even after the convention, time could be allotted during your Family Worship evening to consider specific points for your family to apply.

[4] **Help Others Gain Refreshment:** We want others to receive spiritual refreshment too. Are there elderly publishers or others in

---

1. What can we expect to receive from this year's district convention?
2. What preparations do we need to finalize?
3. What suggestions will help us and our family to benefit fully from the program?
4. How can we help others in our congregation to receive spiritual refreshment?

## 2011 District Convention Reminders

■ **Program Times:** The program will begin at 9:20 a.m. all three days. The doors will open at 8:00 a.m. When the introductory music is announced, all of us should go to our seats so that the program can begin in a dignified manner. The program will conclude at 4:55 p.m. on Friday and Saturday and at 3:40 p.m. on Sunday.

■ **Parking:** At all convention sites where we control the parking, the spaces will be available to attendees at no charge on a first-come, first-served basis. Only those with a state-approved license plate or placard for the disabled will be allowed to park in the area reserved for them. Parking is usually limited, so carpooling should be done to the extent possible.

■ **Seat Saving:** Seats may be saved only for those living in our home or traveling in our vehicle or for our current Bible students.—1 Cor. 13:5.

■ **Noon Meal:** Please bring a lunch rather than leave the convention site to obtain a meal during the noon break. A small cooler that can be placed under a seat may be used. Large family-size picnic coolers and glass containers are not permitted in the convention facility.

■ **Donations:** We can show our appreciation for the convention arrangements by making voluntary contributions to the worldwide work at the convention. Any checks should be made

the congregation who need assistance in order to attend the convention? Are you in a position to help them? (1 John 3:17, 18) Elders, especially group overseers, should see that such publishers receive the needed assistance.

⁵ As in the past, three weeks before the start of our convention, we will share in a campaign to invite others to attend. Congregations should set a goal to distribute their allotment of invitations and cover as much of their territory as possible. Invitations that your family has left over at the end of the campaign should be brought to the convention for you to use when witnessing informally. Further information on this will be provided during the program on Friday. Invitations that your family does not expect to use while in the convention city should be given to an attendant when you enter the facility. Please keep one copy for yourself, as you will need to refer to it during the last talk on Sunday.

⁶ **Good Manners Refresh:** At a time

---

5. How will we distribute invitations to the convention? (See also the box above.)
6. In what ways can we display good manners at the convention?

> **How Will We Offer the Invitation?**
>
> In order to cover our territory, we should be brief. We might say something like this: "Hello. We are sharing in a global effort to distribute this invitation. Here is your copy. You will find more details on the invitation." The front of the invitation is interest-arousing, so hand it to the householder in such a way that he can see it. Be enthusiastic. When sharing in the distribution on the weekends, the magazines should also be offered when appropriate.

when many people are "lovers of themselves" and show a lack of regard for the feelings of others, how refreshing it is to be around fellow Christians who endeavor to display good manners! (2 Tim. 3:2) We show good manners by entering the building in a calm and orderly way when it opens at 8:00 a.m. and by saving seats only for those living in our home or traveling in our vehicle or for our current Bible students. We follow the chairman's direction when he

---

payable to "Christian Congregation of Jehovah's Witnesses."

■ **Accidents and Emergencies:** If a medical emergency arises at the convention site, please contact a nearby attendant, who will immediately notify First Aid so that our qualified first-aid personnel can assess the seriousness of the situation and render assistance. If it is necessary, our first-aid personnel will call 911. This will prevent emergency-response services from receiving many cell-phone calls.

■ **Medication:** If you require prescription medication, please be sure to bring an adequate supply with you, since none will be available at the convention.

■ **Footwear:** Each year a number of injuries occur that are related to footwear. It is best to choose modest, well-fitting shoes that will allow one to walk safely on ramps, stairs, gratings, and so forth.

■ **Hearing Impaired:** The program will be broadcast in the auditorium on an FM radio frequency. To receive it, you will need to bring a small battery-operated FM receiver with earphones.

■ **Baby Strollers and Lawn Chairs:** Baby strollers and lawn chairs should not be brought to the convention site. However, child-safety seats are acceptable if they can be secured in a seat next to the parents.

■ **Fragrances:** Most conventions take place in enclosed areas with mechanical ventilation. Therefore, it would be loving on our part to limit the use of strong fragrances, colognes,

requests that we go to our seats to listen to the musical interlude introducing each session. It shows good manners to set our cell phone or pager so as not to distract others during the program. We also display good manners by not talking, texting, eating, or roaming the corridors needlessly during the program.

⁷ **Refreshing Association:** Conventions give us extended opportunities to enjoy our refreshing Christian unity and brotherhood. (Ps. 133:1-3) Why not take the initiative to "widen out" and meet brothers and sisters who are present from other congregations? (2 Cor. 6:13) You might make it a goal to get to know at least one new person or new family each day. The midday break affords a good opportunity to do this. So bring a light lunch and enjoy eating and associating with others on the premises rather than leaving to purchase food or to eat in a nearby restaurant. This may lead to the blessing of new and lasting friendships.

> **Our dress and grooming at the convention site, at our place of lodging, and at restaurants should honor Jehovah**

───
7. How may we receive and give refreshment while associating with our brothers?

⁸ How refreshing it is to work alongside fellow worshippers in sacred service! Could you volunteer to assist a department or help your congregation with its cleaning assignment? (Ps. 110:3) If you do not already have a work assignment, please consider approaching the Volunteer Service Department at the convention. Many hands make the work joyful and light.

⁹ **Our Conduct Is Refreshing to Observers:** We are convention delegates during all three days of the convention, not just during the program. Those who observe us while we are in the convention city should be able to see a refreshing contrast between us and non-Witnesses. (1 Pet. 2:12) Our dress and grooming at the convention site, at our place of lodging, and at restaurants should honor Jehovah. (1 Tim. 2:9, 10) If we wear our lapel badges, onlookers will be able to

───
8. Why should we volunteer to work at the convention, and how can we do so?
9. Why should we give particular attention to our conduct and appearance during the convention?

───

and perfumes that may cause reactions in persons with respiratory or related problems.—1 Cor. 10:24.

■ *Please Follow Up* **(S-43) Forms:** A *Please Follow Up* form should be used to provide information regarding any interest from informal witnessing during the convention. Publishers should bring one or two forms to the convention. Completed forms may be submitted to the Book Room or given to the congregation secretary on your return.—See the November 2009 *Our Kingdom Ministry,* page 4.

■ **Restaurants:** Honor Jehovah's name by your fine conduct at restaurants. Leave a tip if this is customary.

■ **Hotels:**
(1) Please do not reserve more rooms than you will actually use, and do not have more people stay in your room than what is allowed.
(2) Do not cancel your reservation except for an emergency situation, and notify the hotel as soon as it occurs.—Matt. 5:37.
(3) Take a luggage cart only when you are ready to use it, and return it immediately so that others may use it.
(4) Cook only in rooms where cooking is permitted.
(5) Tip hotel workers when they carry your luggage, and leave a tip for the housekeeper each day.
(6) Do not abuse any complimentary breakfast, coffee, or ice provisions that are made available for guests to use while they are at the hotel.

identify us as Jehovah's Witnesses. This may provide us with an opportunity to tell them about our convention and give a further witness.

[10] How may we cooperate with hotel and restaurant workers? We should not reserve more hotel rooms than we will actually use, as this prevents other delegates from obtaining rooms and makes it very difficult for the hotel to replace the lost business. If the hotel is busy at the time that we check in or check out, we should demonstrate patience and graciousness. (Col. 4:6) We should give the customary tip to servers at restaurants and to hotel workers who carry our bags, clean our room, and provide other services.

[11] What impression does our good conduct during the convention make on others? According to a newspaper article, the manager of one facility used for conventions said this: "The people are very polite. We're excited to have them every year." Last year a non-Witness lost his wallet at a hotel used by convention delegates. When the wallet was returned to the hotel manager with all its contents intact, the manager told the owner: "It was a good thing for you that Jehovah's Witnesses were attending their convention nearby, and the hotel was full of them. Otherwise you would probably not have had the wallet returned."

[12] This year's conventions are fast approaching. Much time and effort have gone into making the program and the convention environment refreshing. Make it your aim to be present all three days, and be prepared for what Jehovah and his organization have in store for you. Be resolved to refresh others through your good manners, joyful association, and fine conduct. Then you and others may feel as did one of last year's delegates who wrote, "I cannot recall a more satisfying experience!"

> **Be resolved to refresh others through your good manners, joyful association, and fine conduct**

---

10. How may we ensure that hotel and restaurant workers have a positive view of our convention?
11. What experiences illustrate the good witness that results from our Christian conduct?
12. As the convention approaches, what should be our aim, and why?

---

(7) Display the fruitage of the spirit in dealing with the hotel staff at all times. They are caring for a large number of guests and appreciate our kindness, patience, and reasonableness.

(8) The room rate shown on the *Recommended Lodging List* is the full price per day, excluding tax. If you are overcharged or billed for things you did not request or use, refuse these charges and inform the Rooming Department at the convention as soon as possible.

(9) If a problem arises with your hotel room, inform the Rooming Department while at the convention so they can assist you.

(10) Please also note that if you use a debit or credit card when registering at a hotel, it is standard practice for a hold to be placed on enough funds in your account to cover your total room cost, plus any possible damages or incidentals during your stay. You will not be able to use any of those funds until your account is settled within a few days after you depart.

■ **Volunteer Service:** The happiness we gain from attending the convention will be even greater if we volunteer to assist with the necessary work involved. (Acts 20:35) Any who wish to do so should report to the Volunteer Service Department at the convention. Children under 16 years of age can also make a fine contribution by working under the direction of a parent or guardian or other adult approved by a parent or guardian.

**WEEK STARTING MAY 2**

Song 99 and Prayer

❑ **Congregation Bible Study:**
*bt* chap. 3 ¶4-11 (25 min.)

❑ **Theocratic Ministry School:**
**Bible reading:** Job 38-42 (10 min.)
**No. 1:** Job 40:1-24 (4 min. or less)
**No. 2:** Benefits From Being Mild-Tempered and Patient (5 min.)
**No. 3:** *If Someone Says:* "**Do You Accept Jesus as Your Personal Savior?**"—*rs* p. 219 ¶4-5 (5 min.)

❑ **Service Meeting:**
Song 82
**10 min:** Announcements. Using the sample presentation on this page, demonstrate how a study may be started on the first Saturday in May. Encourage all to have a share.
**15 min:** Local needs.
**10 min: Prepare to Offer the Magazines in May.** Discussion. Take one or two minutes to review some of the contents of the magazines. Then choose two or three articles, and invite audience to suggest questions and scriptures that could be used in a presentation. Demonstrate how each issue may be offered.
Song 91 and Prayer

## Announcements

■ Literature offer for **April and May:** The *Watchtower* and *Awake!* magazines. Where interest is shown, present the tract *Would You Like to Know the Truth?* and endeavor to start a Bible study. When making return visits on those who attended the Memorial or other theocratic events but who are not actively associating with the congregation, concentrate on starting studies using the *Bible Teach* book. **June:** *What Does the Bible Really Teach?* Endeavor to start Bible studies on the initial call. If householders already have the book, congregations that have a stock of *Knowledge That Leads to Everlasting Life* and *Worship the Only True God* may offer either of these books. Otherwise, offer any older field publications on hand in the congregation. **July:** *Was Life Created?*

■ The meeting schedule for the week preceding your district convention may be adjusted to review counsel and reminders about attending the convention. A month or two following your convention, a local needs part may be used to review convention points that the publishers have found to be helpful in the ministry.

■ Beginning in May, all congregations should use the first Saturday of each month to concentrate on starting Bible studies. The *Watchtower* series "Learn From God's Word" has been designed to help publishers do this. The back page of each issue of *Our Kingdom Ministry* will contain sample presentations for the following month, including a suggestion for starting a Bible study on the first Saturday.

## Sample Presentations

### To Start Bible Studies on the First Saturday in May

"Have you ever wondered why God allows evil and suffering? [Allow for response.] I would like to show you something interesting on this subject." Read together the material under the first subheading on page 16 of the May 1 issue of *The Watchtower* and one of the cited scriptures. Offer the magazines, and arrange to return to consider the answer to the next question.

### THE WATCHTOWER® May 1
ANNOUNCING JEHOVAH'S KINGDOM

Read Psalm 37:10, 11. Then say: "Do you think we will see this promise come true soon? [Allow for response.] This magazine discusses six different Bible prophecies that we are seeing fulfilled right now, prophecies that indicate that the reality of this promise cannot be a long way off."

### Awake!® May

"Some say that humans are simply highly evolved animals. What do you think? [Allow for response. Then read Psalm 139:14.] Of course, the psalmist had limited knowledge of the wonders of the human body. This magazine discusses what we know now, including what sets us apart from animals."

**Field Service Highlights**

In November 2010, the United States reported a new all-time peak of 136,885 regular pioneers. This is an increase of 188 over the previous peak in October 2010. Also, the Turks and Caicos Islands reached a new all-time peak of 35 regular pioneers in November. Bermuda had an increase of 6.1 percent in regular pioneers over the same month last year. What a joy to see Jehovah's people "intensely occupied with the word"!—Acts 18:5.