## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA
## NEW ORLEANS DIVISION

| | | |
|---|---|---|
| RACHEL MADDOX, SHANNON MADDOX, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | NO. 12-1641 |
| INTEGRO USA, INC., INTEGRO INSURANCE | ) | |
| BROKERS, CHRISTIAN CONGREGATION OF | ) | SECTION "N" |
| JEHOVAH'S WITNESSES, WATCHTOWER | ) | |
| BIBLE AND TRACT SOCIETY OF NEW YORK, | ) | MAGISTRATE (1) |
| INC., WESTWEGO CONGREGATION OF | ) | |
| JEHOVAH'S WITNESSES, INC., PATRICK | ) | |
| VICTOR, KATHY VICTOR | ) | |
| | ) | |
| Defendants. | ) | |

## CHRISTIAN CONGREGATION OF JEHOVAH'S WITNESSES'
## MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

**MAY IT PLEASE THE COURT:**

Defendant Christian Congregation of Jehovah's Witnesses seeks an order stopping (1) discovery for Plaintiffs' theory of "clergy malpractice;" (2) discovery of Defendant's financial data, (3) the deposition of Willie Huguley, and (4) any other harassing depositions. Plaintiffs' theory of liability is based upon religious principles, not legal duties. Plaintiffs' are drawing the Court into issues of religious conduct, wasting time and resources, harassing Defendant and others, by seeking a *prima facie* case from **ecclesiastical**, not legal duties. Their pleadings, correspondence with the Court, and questions posed to Willie Huguley, show that they posit a legal duty from Holy Scripture.[1] Defendant's Motion for a Protective order will avoid a violation of the First Amendment and properly limit discovery under Fed. R. Civ. Pro. 26(c).

---

[1] Petition ¶ XXV (Document 1-1) and email to Magistrate's Chambers, 29 April 2013, 11:38 p.m., insisted that Defendant gave Plaintiffs' mother, Patsy Maddox, the Decedent, "assurances of safety, care, custody, and control" (Document 1-1, ¶ XXV), and that Defendants "confuse their **admitted** legal obligations and duties of care, custody and control over the elderly, infirm and disabled (email, emphasis added). See also Transcript of Willie Huguley's deposition (included herewith as document 85-2, page 122, line 25 – page 126, line 6) (reference to 1 John 3:17 as premise for cross examination on duty of elders).

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................2

TABLE OF AUTHORITIES ........................................................................................2, 3

I.     NATURE AND STAGE OF THE PROCEEDINGS ..........................................3

II.    STATEMENT OF ISSUES ................................................................................4

      A.    REASONABLY CALCULATED .............................................................4

            1.    Religious Principles ...................................................................4

            2.    Financial Data ...........................................................................4

            3.    Repetitive Questions .................................................................4

      B.    STANDARD OF REVIEW .....................................................................5

IV.    SUMMARY OF ARGUMENT ...........................................................................5

V.     LAW AND ARGUMENT ...................................................................................6

          A.    NO DISCOVERY INTO RELIGIOUS CONDUCT ...................................6

            1.  Plaintiffs demonstrated their intent to make religion the issue ..............6

                a.  There is no link between Westwego and the Convention ..........6

                b.  There are no facts to base liability on religious principles .......12

            2.  The law forbids discovery into religious conduct ................................15

          B.    NO DISCOVERY INTO FINANCES ......................................................19

            1.  Plaintiffs' written discovery into finances ...........................................19

            2.  Questions about donations in Huguley's deposition...........................19

            3.  The law does not allow discovery into finances ...................................19

          C.    NO REPETITIVE OR HARASSING QUESTIONS ...............................23

VI.    CONCLUSION..................................................................................................24

## TABLE OF AUTHORITIES

**CASES:**

*Bogosian v. Gulf Oil Corp.*, 337 F. Supp. 1228, 1230 (E.D. Pa. 1971).........................................21

*D'Onofrio v. Sfx Sports Group, Inc*., 247 F.R.D. 43, 45 (D.D.C. 2008) .......................................21

*Freeman v. United States*, 556 F.3d 326, 341 (5th Cir. 2009) ......................................20

*Grosek v. Panther Transportation, Inc.*, 251 F.R.D. 162 (M.D. Pa. 2008) ..........................21, 22

*Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) ...................................15

*Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947) ......................................20

*Herbert v. Lando*, 441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979) ..................................20

*Lane v. Capital Acquisitions*, 242 F.R.D. 667 (S.D. Fla. 2005) .............................................20, 21

*Lemann v. Essen Lane Daiquiris, Inc.*, 05-1095 (La. 3/10/06), 923 So. 2d 627 ..........................17

*Malicki v. Doe*, 814 So.2d 347 (Fla. 2002) .................................................................................16

*Nally v. Grace Community Church of the Valley*, 47 Cal.3d 278 (1988) ........................16, 17, 18

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978) ...................................................................................................................20

*Ranney-Brown Distributors, Inc. v. E.T. Barwick Indus., Inc.*, 75 F.R.D. 3 (S.D. Ohio 1977) ...........................................................................................................18, 21

*Robbins v. Camden City Bd. Of Educ.*, 105 F.R.D. 49, 55 (D.N.J. 1985) ....................................20

*Sanders v. Casa View Baptist Church*, 134 F.2d 331 (5th Cir. 1998) ..........................................16

*Schmidt v. Bishop*, 779 F. Supp. 321, 328 (S.D.N.Y. 1991)..............................................16, 17, 18

*Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, (1976)...................................15

*Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974).............................................15

*Surinach v. Pesquera de Busquets*, 604 F. 2d 73 (1st Cir. 1979) .................................................22

*Wilson v. Gillis Advertising Co.*, 145 F.R.D. 578, 582 (N.D. Ala. 1993)....................................21

*Woods-Drake v. Lundy*, 667 F.2d 1198 (5th Cir. 1982) ..............................................................21

**STATUTES**

U. S. Const., Amend. I .........................................................................................1, 5, 15, 16, 23

Fed. R. Civ. P. 26(b)(1)......................................................................................5, 6, 19, 23

Fed. R. Civ. P. 26(c) ........................................................................................1, 5, 11, 19, 20, 24

## I. NATURE AND STAGE OF THE PROCEEDINGS

This case was removed to this Court by defendants from the Twenty-fourth Judicial District Court, Parish of Jefferson (Document 1, *et seq.*); Plaintiffs sought remand (Document 19), which this Court denied, and in the same order dismissed the Louisiana defendants. (Document

26).  After motions and amendments to dismiss and add insurance parties, and a demand for jury

trial, defendants filed summary judgment motions (Documents 59, 60, 61) and the Court dis-

missed Watchtower Bible and Tract Society of New York, Inc., but denied the motions of De-

fendant and its insurer Old Republic to allow Plaintiffs time for discovery (Document 78).  After

motions for more discovery time and a trial continuance, Plaintiffs filed a Motion to Compel the

continuation of Huguley's deposition (Document 83), which Defendant opposes and seeks pro-

tection herein for the reasons assigned, and for other reasons.

## II.  STATEMENT OF ISSUES.

### A.  "REASONABLY CALCULATED."

**1.  Religious Principles.**      Can Plaintiffs' attempted and anticipated discovery

into ***the application of religious principles*** by elders, overseers, and others with regard to prepa-

rations for and operations of a religious gathering be deemed reasonably calculated to lead to the

discovery of admissible evidence when the Constitution of the United States prohibits its courts

from enforcing religious principles as law?

**2.  Financial Data.**    Can Plaintiffs' attempted and anticipated discovery into the

financial affairs of a religious organization such as Defendant and how those finances are han-

dled for the operation of a religious gathering be deemed reasonably calculated to lead to the dis-

covery of admissible evidence when the Constitution of the United States prohibits governmental

interference with the financing of worship?

**3.  Repetitive and Harassing Questions.**    Can Plaintiffs' attempted and antici-

pated discovery by repetitive, argumentative, and harassing questions in depositions of defense

witnesses or those who are aligned with Defendant be deemed reasonably calculated to lead to

the discovery of admissible evidence when the witnesses do not have personal knowledge of the

information sought, would seek the information elsewhere, or have no ability to indicate who

might have such personal knowledge or where documents might be found containing such information?

### B. STANDARD OF REVIEW

The standard of review for the issues stated above is in Fed R. Civ. Pro. 26(c) that protective orders may be issued "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," which by definition would be discovery that goes beyond the scope defined in Fed. R. Civ. Pro. 26(b)(1).  The Court may order (1) that there be no discovery, (2) discovery under specific terms set by the court, (3) another method of discovery, (4) limited discovery, (5) *in camera* inspection, and other methods to assure that the interests of discovery are served while the *bona fide* needs for protection are met.

### III. SUMMARY OF ARGUMENT.

Plaintiffs have gone beyond the scope of discovery allowed under Fed R. Civ. Pro. 26(b)(1) because they seek information that delves into the religious principles guiding the conduct of Christian worship and life and the finance of the Christian ministry.  They have burdened and harassed a Christian minister with questions about the foregoing and about other topics for which he has no knowledge and is not likely to have answers to questions relevant to discovery. Defendant anticipates the likelihood of similar deposition questions.  These topics and methods go beyond discovery that would be reasonably calculated to lead to discovery of admissible evidence because they delve into topics governed by religious principles, not legal duties, and they harass deponents with needlessly repetitive and harassing questions they cannot answer.  To the extent Plaintiffs seek to impose legal liability for what they perceive to be a breach of religious principles there can be no discovery because that would require the Court to engage in ecclesiastical judgments rather than legal ones in violation of the First Amendment.

## IV.  LAW AND ARGUMENT

### A. NO DISCOVERY INTO RELIGIOUS CONDUCT.

#### 1.  Plaintiffs demonstrated their intent to make religion the issue.

Plaintiffs' counsel took the deposition of Willie Huguley on 10 April 2013, arranged by consent with defense counsel.  Plaintiffs' counsel spent three and one-half hours asking questions about the conduct of the elders for the English Congregation of Jehovah's Witnesses, Westwego, Louisiana ("English Congregation, Westwego" identified colloquially as "English Westwego Congregation").  He focused on how the elders fulfilled their Scriptural commission to shepherd the widows, the elderly and the disabled members of the congregation.  Finally, defense counsel called an end to the deposition when he could get no cooperation from Plaintiffs' counsel.  See the transcript of the deposition of Willie Huguley, Document 85-2, page 204, line 1 – page 212, line 16 (referred to hereafter as "Huguley, 85-2, p. ___, l. ___.").

Plaintiffs' deposition questions for Huguley demonstrate two ways in which their discovery focus on religious conduct goes outside the scope allowed by Fed. R. Civ. Pro. 26(b)(1): (1) They seek a link between the operation of the District Convention and former defendant Westwego Congregation of Jehovah's Witnesses, Inc. ("Westwego, Inc.") by confusing the corporation with the ecclesiastical body, and (2) they used religious principles for legal duties.

#### a.  There is no link between Westwego and the Convention.

Plaintiffs' counsel's purpose became obvious when he sought, not information about safety and seating as stated in the Opposition to Defendant's Motion for Summary Judgment (Document 67), but information to establish a link between the operation of the District Convention and Westwego, Inc.  There is no such link.  This Court dismissed Westwego, Inc. on Plaintiff's Motion to Remand (Document 26).  The Court accepted

the affidavit of Willie F. Huguley, the President of Westwego, who states that

Westwego exists solely to own the Kingdom Hall in Westwego. Mr. Huguley denies that Westwego had any role in planning or organizing the District Convention or in arranging Ms. Maddox's attendance thereof. As Westwego did not coordinate with CCJW and Watchtower to coordinate the convention, there is no basis for liability against Westwego for the same reasons articulated above regarding the Victors. Plaintiffs' claims against Westwego are dismissed.

"Order and Reasons," denying Motion to Remand, granting Motions to Dismiss (Document 26, p. 10). Plaintiffs' counsel did not ask Mr. Huguley any questions about his affidavit. He did not ask him any questions about the ownership of the Kingdom Hall.

Counsel for Plaintiffs instead confused the identities of the corporation organized solely for the purpose of owning the Kingdom Hall, Westwego, Inc., with the unincorporated association of worshippers, English Congregation, Westwego, and the corporation that organized the District Convention in Mobile, Alabama July 2011, Christian Congregation of Jehovah's Witnesses, Defendant herein. See generally Huguley, 85-2, p. 17, l. 16 – p. 36, l. 21 for the full extent of counsel's obfuscation despite the witness' statements that he did not know the answers and his plea "can I get back with you on that to make sure?" *Id.*, p. 36, ll. 7 – 8.

Initially, counsel misrepresented a connection between English Congregation, Westwego and Defendant, then wrapped that in another misrepresentation by calling Defendant "Christian Congregation of Jehovah's Witnesses, *Inc.*" which immediately confused Mr. Huguley because of the suffix "Inc."[2] Huguley, 85-2, p. 17, l. 20 – p. 18, l. 6. That triggered a question and answer exchange in which counsel tried to hold the witness to "yes" or "no" answers that made the matter worse and required an enormous amount of time that did nothing for Plaintiffs' case. *Id.* p. 18, l. 6 – p. 36, l. 18.

Counsel moved from the identity of Defendant to the identity of the local congregation,

---

[2] Note that the La. and N.Y. Secretaries of State registrations do not have "Inc." in the corporation name (Documents 85-3 and 85-4). Counsel for Defendant must confess that he has lapsed into adding an "Inc." at the end of his client's name out of lawyerly habit but had the fact driven home for him during the Huguley deposition that the usual suffix is absent in this case.

but had Mr. Huguley so confused he did not know the name of the corporation for which he serves as president.  He had him state that the unincorporated association, English Congregation, Westwego, was a chartered entity by the State of Louisiana. *Id.*, p. 34, l. 19 – p. 35, l. 2.  The Louisiana Secretary of State's database, http://www.sos.la.gov/tabid/819/default.aspx, has no entry for any name containing the words "English," "Westwego," and "Congregation" in any order.  Counsel for Plaintiffs used the correct name for **"*Christian Congregation of Jehovah's Witnesses*,"** without the usual and customary suffix "Inc." on the Citation and Petition (Document 1-1).  He had the Clerk of Court in Jefferson Parish serve Willie Huguley with that Petition as one of the registered agents of **"*Westwego Congregation of Jehovah's Witnesses, Inc.*"** Plaintiffs' counsel knew the correct names of the legal entities, and he knew there was no registered entity with the Secretary of State named "English Westwego Congregation of Jehovah's Witness" or "English Congregation of Jehovah's Witness, Westwego, Louisiana"   because he must be charged with knowledge of information in the public record about the corporations against whom he filed suit on behalf of his clients.

With that knowledge, he purposefully asked Mr. Huguley about his knowledge of Stanley Singletary as a person ***associated*** with Christian Congregation of Jehovah's Witnesses ***in New York*** (Huguley, 85-2, p. 33, ll. 1 – 8) when Mr. Singletary is instead Defendant's registered agent *in Baton Rouge*.  La. Sec. of State Report for Defendant (Document 85-3).  Counsel focused the witness' attention on people in New York to confuse him, not gain information.  *Id.*

Plaintiff's counsel, knowing that Mr. Huguley identified himself as the president of Westwego, Inc. and attached the Secretary of State's webpage to his affidavit, never mentioned that during his examination when Mr. Huguley displayed confusion about the entities for which counsel wanted information, despite Mr. Huguley's offer to "get back with you on that to make sure."  See Huguley, 85-2, p. 36, l. 7. See also p. 33, l. 10 – p. 34, l. 25 wherein counsel asked if

8

the congregation where he worshipped was the former defendant Westwego, Inc. and Huguley answered "yes," but then corrected it to say it was the "English Westwego Congregation" and assented to counsel's prompting that the congregation was a chartered entity.  See also Document 24-1, referenced in this Court's order, Document 26.  Ultimately, Mr. Huguley had to ask "Can I get back with you on that to make sure?"  Counsel then told him to "just tell me what you know," to which Mr. Huguley replied "[w]ell, as far as I know, I don't know that."  Counsel then confirmed the fact, obvious from the beginning, "Okay. You're not sure?" and Mr. Huguley acknowledged, "Right."  *Id.*, p. 36, ll. 7 – 13.

See Defendant's Opposition to Plaintiffs' Motion to Compel for an *exegesis* of how Plaintiffs' counsel used the suffix "Inc." as a tool to rattle his witness.  For the purposes here, note that the nineteen pages of transcript the exchange took between that first question with "Inc." to the ultimate statement by Mr. Huguley that he was not sure, *id.*, p. 17, l. 25 – p. 36, ll. 7 – 13, included this particularly offensive passage:

> Q. Okay. And you don't think it has Inc. on it or anything like that, right?
> A. Well, I don't know. I never seen it.
> Q. Right. To your knowledge. Now, I'm not asking you to speculate. I'm asking you to tell me what you know. It's not a test. ***I just need the truth from you. Fair enough?***
>  A. Yes.
> Q. ***You know you're under oath, right?***
> A. Yes.

*Id.*, p. 28, l. 19 – p. 29, l. 4 (emphasis added).  The exchange progressed further about Defendant's name, but it took counsel another two pages of transcript to establish what he already knew; Defendant is a corporation.  *Id.*, p. 29, l. 5 – p. 31, l. 14.

After identifying finally that Defendant is a New York corporation, counsel asked a final question about religious appointments in the local congregation, *id.*, p. 31, ll. 15 – 20, that summarized his questions at *id.*, p. 12, l. 19 – p. 17, l. 4; p. 24, l. 19 – p. 29, l. 24 as part of his theory

stated in paragraph V of the Petition that

> CCJW, Watchtower and Westwego work together as an integrated national organ-
> ization with, and or for the benefit of, the defendants, as if one organization, with
> a clear and identifiable hierarchal, connected structure. CCJW, Watchtower and
> Westwego routinely solicited in Louisiana for attendance at such *District Conven-
> tions* locally and nationally, through which the attendance of Patsy L. Maddox and
> others similarly situated and/or in similar condition were solicited and/or promot-
> ed.

Document 1-1 (italics in original).  This is nothing but a theory of "clergy malpractice" that seeks to link the former defendants to the present Defendant *via* common religious principles through confusing questions to deponents that can raise no genuine issues of fact but attempt nonetheless to make a legal case out of the fact that people and corporations organized for the purpose of furthering the worship of Jehovah's Witnesses share the same religious principles. This theory ignores the salient fact that these organizations have clearly defined ***separate*** legal and business entities and roles.  As the Court ruled on the Motion to Remand (Document 26), there is no link between the former defendants and the Defendant.

Despite Plaintiffs' allegation that unified principles of worship equate to an "identifiable hierarchal, connected structure," they know this is not true.  They stated in Paragraph III of their Petition that their mother was one of Jehovah's Witnesses her entire life.  *Id*.  That is, they were raised in a household that shared the same religious principles as Jehovah's Witnesses.  They grew up knowing that the worship of Jehovah's Witnesses is supported by individual, voluntary donations of time, money, and effort organized through separate entities.  They grew up knowing that each separate organization is composed of individuals who share the same faith but volun-teer their time to different work.  This is confirmed by their identical affidavit testimony in oppo-sition to Defendants summary judgment motion (Documents 67-3, 67-4, 68-3, 68-4, 69-3, and 69-4, in ¶ 3 of each), in which they admitted to having been active and practicing members of the English Congregation, Westwego from birth until 20 (Rachel) and 21 (Shannon) years of age, or

about half and two-thirds of their lives, respectively.

Defendant's Responses to Plaintiff's Interrogatories, included herewith (Document 85-5), confirm that individual volunteers did the convention work with Defendant responsible for the premises as the lessor.  Responses to Interrogatories Nos. 1 and 7 gave the names of those with oversight for the convention, qualified volunteers from different states and towns.  The Responses to Interrogatories Nos. 9 and 10 showed that the relationship between Defendant, English Congregation, Westwego, and Watchtower Bible and Tract Society of New York, Inc. is merely one of shared religious faith but does not include shared responsibility for organizing any events such as a convention.  The Response to Interrogatory No. 14 explained that the attendants were individual volunteers who chose to work at the convention.  The Response to Interrogatory No. 15(B) explained that all the volunteers responsible for the convention worked without any compensation so there was no "budget."  The Response to Requests for Admission Nos. 10 and 11 denied that Defendant and Westwego, Inc. and Watchtower Bible and Tract Society of New York, Inc. "work together on a national level to organize all conventions for its members."

Response to Request for Production No. 6 explained that no invitations for the convention were sent to "members" of Defendant.  *See also* Responses to Requests for Admission Nos. 2 and 3 ("members" invitations).  That is, Defendant is a membership corporation and its "members" are not what Plaintiffs' counsel understood by the term when he used it because he conceived of Defendant's members as all of Jehovah's Witnesses when they are not and could not conceivably be members of the corporation that is used for the particular work for which it was formed.  To make this particularly clear, Defendant is a New York, non-profit, 501(c)(3) religious corporation (Response to Request for Production No. 8) formed by Jehovah's Witnesses to conduct particular business, which is separate from the unincorporated association of worshippers that constitutes the English Congregation, Westwego, is separate from the non-profit corpo-

ration Watchtower Bible and Tract Society of New York, Inc., and which is separate from the corporation Westwego, Inc., all of which entities serve different purposes but their members share the same faith and are Jehovah's Witnesses. The District Convention was organized by Defendant through the efforts of qualified volunteers from the states and towns in the vicinity of the convention locale. Patsy Maddox' local congregation and the corporation that owned the Kingdom Hall where she worshipped had nothing to do with organizing the District Convention she attended on 1 July 2011 in Mobile, Alabama.

This Court should protect her local elders and members of her congregation from harassing discovery by Plaintiffs in their attempt to make a case where there is none, and for which this Court has already ruled there is none. Rule 26 demands that the scope of discovery be limited by the issues in the case. The English Congregation, Westwego, its members, and Westwego, Inc. are no part of this case and outside the scope of discovery, except those who witnessed something having to do with how Patsy Maddox fell, why she fell, and what the damages might be in this case. Except for those issues, the local congregation members should be "Off Limits."

### b. There are no facts to base liability on religious principles.

Though Plaintiffs hoped to show that the local elders in Westwego had some convention oversight merely by their role as elders in the local congregation, there is no such proof. They know that is not the case and Willie Huguley, the local coordinating elder, knows no names of anyone responsible for organizing the convention in Mobile. Huguley, 85-2, p. 50, l. 11 – p. 53, l. 8. If anyone of the local elders had any convention oversight responsibilities he would logically have been involved, but, as he testified, the congregation's only assignment was to help clean afterwards, and if any wanted to serve as attendants they could, but he knew of none for sure who did. *Id.*, p. 137, l. 23 – p. 143, l. 12.

These facts establish no more than *voluntary* fulfillment of religious principles as set out

in "Huguley Exhibit 1" that is also Document 59-1, pp. 11 – 17 of 18.  That exhibit provides the scriptural basis for volunteer service at the convention on p. 17 of 18, stating that happiness gained from attendance would be greater from volunteering with the work needed by reporting to the Volunteer Service Department and children could volunteer too with their parents.

Contrary to these facts, and his clients own admissions that they lived their entire childhood and early adulthood as Jehovah's Witnesses, Plaintiffs' counsel revealed that his theory-of-the-case was not based upon the breach of a legal duty, but was tied to the way elders fulfilled their Scriptural commission to assist Patsy Maddox and others.  Focusing on "Exhibit 1" (Document 59-1, pp. 11 – 18 of 18), counsel asked Mr. Huguley about the commission to assist those in need, citing 1 John 3:17, 18.  Huguley, 85-2, p. 122, l. 23 – p. 123, l. 23.  From Mr. Huguley's answer, he then sought to derive a duty to assure that Patsy Maddox got to the Convention.  *Id.*, p. 123, l. 24 – p. 125, l. 6.

Defendant determined the ministry territory for the local congregation.  *Id.*, p. 125, l. 7 – p. 129, l. 10.  Counsel asked about the adequacy of seats for the elderly.  *Id.*, p. 129, ll. 11 – 17.  He asked about donations, found that congregations received none from conventions, and that Huguley knew not where they went.  *Id.*, p. 129, l. 18 – p. 130, l. 5.  He asked about the materials for identifying convention risks but Mr. Huguley had nothing to offer.  *Id.*, p. 130, ll. 6 – 14.  He asked about a "census" for the convention, as a whole and from Westwego; there was no "census," only a total head count.  *Id.*, p. 130, l. 15 – p. 131, l. 10.  Mr. Huguley could not say who was responsible for the convention, Defendant or "the brothers in Mobile"  *Id.*, p. 131, l. 19 – p. 132, l. 24.  Huguley stated that the local congregation kept a list of elderly and infirm that named Patsy Maddox with about 20 others, but that the list was used only for the congregation elders to shepherd their needs and was not provided to Defendant for convention purposes.  *Id.*, p. 114, l. 21 – p. 115, l. 25; p. 178, l. 4 – p. 179, l. 5; p. 186, l. 19 – p. 196, l. 21.

Mr. Huguley testified that the floor and the "blue" section were reserved for the elderly. *Id.*, p. 132, l. 25 – p. 133, l. 9; p. 143, l. 13 – p. 145, l. 3; p. 166, ll. 7 – 16.   The exhibits (Document 85-6) show the floor seating, pull-out bleachers, and photos with blue seats in a mezzanine area on the main entrance level above the floor.   A visual estimate of that area shows that about half of the space in the arena was dedicated to seating for the elderly and disabled, which militated against Plaintiffs' theory of inadequate seating and established that Patsy Maddox arrived after the arena was full.

Despite counsel's fervent attempts to identify something from Mr. Huguley's testimony that would support his case, his questions merely demonstrated that his case was about creating legal duties out of religious principles:

> Okay. At your church I'm understanding that you probably practiced the Christian principles of taking care of the widows, right?  *Id.*, p. 114, ll. 21-24.
>
> Was Patsy Maddox within that group of people called widows that your church took care of?  *Id.*, p. 115, ll. 3-5.
>
> Did you assist her when she was feeble and frail and unable to get around?  *Id.*, p. 115, ll. 14-15.
>
> So insofar as Patsy Maddox was concerned, she wasn't on the list of people that you considered a widow in need of assistance?  *Id.*, p. 115, ll. 19-22.
>
> So in terms of your organization at the local level, you had not identified Patsy Maddox as somebody that needed assistance, correct?  *Id.*, p. 116, ll. 22-25.
>
> So would it have been the responsibility in your church for your church to see that if Patsy Maddox needed assistance driving or riding to the convention from New Orleans to Mobile, that she had a ride?  *Id.*, p. 123, l. 24 – p. 124 l. 3.

On pages 186 – 189, counsel for Plaintiffs peppered Mr. Huguley with questions about a list of congregation members that the elders identified as needing assistance, as part of their commission to care for those in need:

> What you know is that there was a list kept by your church of the elderly and infirm and Patsy Maddox was on it, correct?  *Id.*, p. 186, ll. 19-21.
>
> You saw the list.  *Id.*, p. 186, l. 23.
>
> You have the list.  *Id.*, p. 186, l. 25.

Where is that list?  *Id.*, p. 187, l. 4.

What did you do with the list?  *Id.*, p. 187, l. 6.

Okay. And when did you post it?  *Id.*, p. 187, l. 10.

This went on for two more pages of deposition transcript.  *Id.*, p. 187, l. 11 – p. 189, l. 9. Counsel then spent the next few pages of transcript questioning which elders were responsible for taking care of the elderly and infirm.  *Id.*, p. 189, line 11 – p. 190, l. 24.

This sampling and the questions referenced herein about elders' compliance with the Scriptural commission to care for the needs of widows and others in the congregation demonstrates a violation of Defendant's and the witness' rights to free exercise of religion.  U. S. Const. Amend. I.   It also violates the prohibition against the establishment of religion, *id.*, because Plaintiffs would make a religious principle enforceable as a legal duty in this Court, which would require this Court to become an ecclesiastical rather than a legal forum.

### 2.  The law forbids discovery into religious conduct.

"[T]he First Amendment severely circumscribes the role that civil courts may play in resolving" religious issues, and "requires that [they] defer to the resolution of [such] issues" by the church.  *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979).  The Constitution precludes courts from adjudicating religious issues that would implicate "secular interests in matters of purely ecclesiastical concern."  *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710, 96 S.Ct. 2372, 2381, 49 L.Ed.2d 151 (1976).  The First Amendment denies courts "jurisdiction to settle purely ecclesiastical disputes;" it prohibits "governmental interference in ecclesiastical matters" without "a compelling governmental interest;" and court "incursions" must avoid interfering with beliefs and internal decisions of the religious society." *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 492, 493 (5th Cir. 1974). "The law is clear: civil courts are barred by the First Amendment from determining ecclesiastical questions." *Id.* at 493.

The First Amendment, however, does not categorically insulate religious relationships

from judicial scrutiny.  *Sanders v. Casa View Baptist Church*, 134 F.2d 331, 335 (5th Cir. 1998).

A "counseling relationship between a minister and his or her parishioner," which is protected

from incursion by the judiciary, is not the same as a professional relationship.  *Id.* at 336.  Clergy

who breach the standards of professional counseling are liable despite the Free Exercise Clause,

which is not a shield for clergy torts.  *Id.*, *and Malicki v. Doe*, 814 So.2d 347 (Fla. 2002).

   Plaintiffs' cause of action is commonly called "clergy malpractice," and usually arises

out of a close relationship with improper conduct causing psychological harm.  See *Schmidt v.

Bishop*, 779 F. Supp. 321 (S.D.N.Y. 1991) where a minister exploited the religious bond for sex-

ual favors, but the conflict between church-and-state prevented a claim for "malpractice," or

breach of fiduciary duty, because of the "constitutionally dubious task of setting a standard of

reasonable care for clergymen engaged in counseling."  *Id.* at 324, 326.  Though egregious, the

claim was for pastoral *mis*-conduct,[24] and barred by the First Amendment.  The Court held that

"differing theological views" made it "impractical, and quite possibly unconstitutional to impose

a duty of care on pastoral counselors" because "[s]uch a duty would necessarily be intertwined

with . . . religious philosophy . . . or ecclesiastical teachings."  *Id*. at 328 (quoting *Nally v. Grace

Community Church of the Valley*, 47 Cal.3d 278, 299 (1988)).

   Though the "independently tortious, indeed criminal, sexual abuse allegedly perpetrated

by the defendant, *id.* at 326, was real, so too was the threat to constitutional principles real.  *Id.* at

328.  In practical terms, jury instructions would require the Court to define the clergy's duty of

care according to community standards inherent in religious beliefs; "[t]his is as unconstitutional

as it is impossible."  *Id.*  Plaintiffs' allegations create the same dilemma in this case.

   *Nally* too demonstrates the practical difficulty of enforcing Plaintiffs' theory of liability.

Plaintiffs' son, Kenneth Nally, committed suicide and they sued his church and pastors for "cler-

---

[24] Note that Schmidt's intentional tort claims were time-barred.  *Id.*, 779 F. Supp. at 324.

gyman malpractice," in ***failing to prevent*** the suicide.  *Nally*, at 283.  The church gave only "pastoral" counseling, and was not a source for professional counseling.  *Id.* at 284.  Following hospitalization for a suicide attempt by prescription overdose, after his girlfriend broke-up with him, Nally, who had prior suicidal ideation at UCLA, became despondent, sought pastoral counseling, was recommended for in-patient psychiatric care that he and his parents rejected, met with psychologists and psychiatrists, and ultimately committed suicide after his next girlfriend rejected his marriage proposal.  *Id.* at 285 – 287.  The Plaintiffs blamed the pastors' religious guidance for Nally's suicide because it conflicted with his Catholic background, exacerbated his "pre-existing feelings of guilt, anxiety and depression," and generally did not do what they should have done to prevent his suicide.  *Id.* at 287 – 288.

While the Court of Appeal allowed a cause of action for "negligent failure by a non-therapist counselor to prevent suicide," it could point to no authority for such a duty, or demonstrate causation on the facts.  *Id.* at 292.  The Supreme Court, however, required "a ***legal duty***, imposed by statute, contract or otherwise, owed by the defendant to the person injured."  *Id.*

> Without such a duty, any injury is '*damnum absque injuria*' — injury without wrong.  Thus, in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.

*Id.*  The California test is essentially the same as Louisiana's duty/risk analysis.  "[T]he court must make a policy decision in light of the unique facts and circumstances," and determine "whether . . . any law (statutory, jurisprudential, or arising from general principles of fault) . . . support[s] the claim[ed] . . . duty." *Lemann v. Essen Lane Daiquiris, Inc.*, 05-1095 (La. 3/10/06), 923 So. 2d 627, 633.  *Compare with Nally* at 296 – 297 (causal connection with conduct and the injury, foreseeability of the particular harm, and policy concerns).

The plaintiffs in *Nally* and *Schmidt* alleged a breach of a "special," pastoral relationship

as the proximate cause.  *Nally* at 292 – 293; *Schmidt* at 324.  Whereas in this case, the Plaintiffs, though alleging "custody and control" (see footnote 1, *supra*), cannot show a breached "special" relationship that caused their mother's fall.  *Schmidt* posed little doubt about damages from the pastor's sexual abuse of a twelve year old until she was forty-one and in therapy.  *Id.*  In *Nally*, there was counseling, but there was no *special* relationship to base any duty to prevent suicide, *Nally* at 293 – 296, which shows the similarities between *Nally* and this case.

The connection between the pastors' conduct and Nally's suicide was "tenuous at best" because he was under the care of physicians.  *Id.* at 297.   Also, his attempted suicide made his actual suicide foreseeable, but not sufficiently to charge a non-professional with a duty to pre-vent it, especially when such a duty would require regulating religious philosophy and ecclesias-tical teaching.  *Id.* at 297 – 299.  Here, the connection with elders' conduct and Patsy Maddox' fall is "tenuous at best" because she arrived late and the reserved seats were full.  Moreover, Plaintiffs do not allege that the elders *had* custody and control from which a duty arose; they al-lege that the elders should have *taken* custody and control over their mother to prevent any harm to her.  There is no such duty in law or Scriptures.

Plaintiffs' theory of liability demands this Court to ***legally*** enforce the ***Scriptural*** admoni-tion to care for widows, the elderly and the disabled.[46]   How would the Court establish such a duty?  Would it apply the Scriptures and strike out on its own, or would it follow the U. S. Su-preme Court and other courts and stay out of ecclesiastical decisions?  Plaintiffs can point to no legal guidance here.  How elders shepherd their flock is solely a matter for interpretation of Scripture and not a matter of law.  The Court cannot entertain discovery into these areas without engaging in ecclesiastical judgments that the U. S. Constitution forbids it to make.  It must grant the motion to protect Defendant and the witnesses Plaintiffs seek to depose against intrusion into

---

[46] See Huguley, 85-2, pp. 114 – 116; 122 – 125; 186 – 189 concerning religious principles, particularly 1 John 3:17, *id.* p. 123, l. 12,  and the keeping of "lists," *id.*, pp. 186 -189.

their Scripturally-based conduct.

### B.  NO DISCOVERY INTO FINANCES.

#### 1.  Plaintiffs' written discovery into finances.

Included herewith are Defendant's Responses to Plaintiffs' Interrogatories, Requests for Production, and Requests for Admission, with objections (Document 85-5).  Defendant seeks protection from disclosure of the financial information sought in Interrogatories Nos. 6, 12(C), (D) and (E), Requests for Production Nos. 5, 8, 9, Requests for Admission Nos. 12 and 14. Plaintiffs seek to delve into voluntary and anonymous donations and the general financial information of Defendant that (1) have nothing to do with the issues in this case and (2) are constitutionally protected from discovery.

#### 2.  Questions about donations in Huguley's deposition.

Plaintiffs' counsel inquired to whom the donations from the July 2011 convention were paid and for what they were used.  Huguley, 85-2, p. 100, ll. 1 – 25.  He asked about records for congregation donations and local donations, and about receipts or statements for donations over $250.  *Id.*, p. 114, ll. 1 – 20.  On page 129 Counsel referenced "Exhibit 1" (Document 59-1, pp. 11-18 of 18) about the request to make checks payable to "Christian Congregation of Jehovah's Witnesses," if Mr. Huguley's congregation received any of those funds, who decided what to do with them, and whether those who did know were appointed from New York.  *Id.*, p. 129, l. 12 – p. 130, l. 5.  Counsel also asked whether the district convention published amounts raised from donations and who accounted for the donated money. *Id.*, p. 131, ll. 11 – 18.

#### 3.  The law does not allow discovery into finances.

Fed. R. Civ. Pro. 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense."  *Id.*  The Rule specifies that "[r]elevant information need not be admissible at the trial if the discovery appears reasona-

bly calculated to lead to the discovery of admissible evidence." *Id.*  While discovery is treated

broadly and liberally to provide adequate information for litigants, *Herbert v. Lando*, 441 U.S.

153, 176, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979), it has "ultimate and necessary boundaries,"

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253  (1978)

(quoting *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S. Ct. 385, 91 L. Ed. 451 (1947)); and the

"control of discovery is committed to the sound discretion of the trial court." *Freeman v. United*

*States*, 556 F.3d 326, 341 (5th Cir. 2009).

"Discovery should be tailored to the issues involved in the particular case." *Robbins v.*

*Camden City Bd. Of Educ*., 105 F.R.D. 49, 55 (D.N.J. 1985).  That is, relevance and materiality

set the "ultimate and necessary boundaries" of discovery. *Oppenheimer Fund, Inc.*, *supra*.   The

question here is whether Plaintiffs' theory of clergy malpractice warrants discovery into Defend-

ant's finances beyond the deposition questions Willie Huguley has answered and the discovery

responses Defendant has provided to show that no records are kept "by donor" of voluntary do-

nations and that local congregations receive no donation funds from district conventions.  Hu-

guley, 85-2, p. 99, l. 2 – p. 100, l. 23 (funds used for convention costs); p. 111, ll. 16 – 18, p.

129, ll. 18 – 23 (no conventions donations to congregation); p. 113, l. 17 – p. 114, l. 29 (volun-

tary, no records); Response to Interrogatory No. 12(C) (donations are anonymous, convention

accounts overseer), (D) (donation boxes, no benefits from donations conferred), (E) (announce-

ments about voluntary donations); and Response to Request for Admission No. 12 (voluntary

and anonymous donations, no records of Patsy Maddox donations).

In *Lane v. Capital Acquisitions*, 242 F.R.D. 667 (S.D. Fla. 2005), the court refused to

compel production of the defendant's financial records in aid of the plaintiffs' claim for overtime

wages, wrongful discrimination, and "to determine whether any judgment in this case is recover-

able, and to what extent from whom." *Id.* at 669.  Rejecting the request for financial discovery,

the court said, "With respect to the FLSA claim, Defendants' financial ability to settle this action or satisfy a judgment is not relevant to the issue of whether Defendants improperly failed to pay Plaintiffs for overtime hours." *Id.* So, too, Plaintiffs' demand for Defendant's and non-parties' financial information is wholly unrelated to Plaintiffs' allegations that their mother was injured as a result of negligence in the conduct of a district convention. With regard to the ability to satisfy a judgment, that issue is moot because Plaintiffs added Defendant's insurance company, Old Republic, as a co-defendant under Louisiana's direct-action statute.

The law on pre-judgment discovery of a defendant's finances has been long-settled. *Cf. Ranney-Brown Distributors, Inc. v. E.T. Barwick Indus., Inc.*, 75 F.R.D. 3, 4 (S.D. Ohio 1977) ("[o]rdinarily, Rule 26 will not permit the discovery of facts concerning a defendant's financial status, or ability to satisfy a judgment, since such matters are not relevant, and cannot lead to the discovery of admissible evidence;" plaintiff had a judgment); *see Bogosian v. Gulf Oil Corp.*, 337 F. Supp. 1228, 1230 (E.D. Pa. 1971) (discovery of net worth to pay costs "not proper since they are not relevant to the subject matter of the lawsuit"); *see also Grosek v. Panther Transportation, Inc.*, 251 F.R.D. 162 (M. D. Pa. 2008) (the issue is relevancy).

*Wilson v. Gillis Advertising Co*., 145 F.R.D. 578 (N.D. Ala. 1993), held that the defendant's financial status is not discoverable until after liability is determined. In *Wilson*, the court applied Alabama law, prevented discovery of net worth, and barred plaintiff from presenting financial evidence to the jury before a verdict on punitive damages. *Id.* at 582. Plaintiffs here claim Louisiana remedies but Defendant has demonstrated for the Court in its summary judgment motion (Document 70-3) that Alabama law must control. Federal courts have held that pre-trial discovery of financial information requires some showing of entitlement to punitive damages. *E.g.*, *D'Onofrio v. Sfx Sports Group, Inc*., 247 F.R.D. 43, 52 – 53 (D.D.C. 2008). Some require a *prima facie* showing; others require less, but the question is whether the defendant has

put its financial condition in issue.  *Id.* at 53.  By analogy, Plaintiffs owe a *de minimis* showing of cause to probe into Defendant's and ***non-parties'*** finances, even without Alabama law.

Note too *Woods-Drake v. Lundy*, 667 F.2d 1198 (5th Cir. 1982), in which the *defendant* had to mitigate punitive damages with proof of net worth.  There was no financial discovery; merely a burden-shifting for defendant to produce financial data to reduce damages.

Plaintiffs seek financial data for their theory of liability, which is peculiarly similar to what motivated the Puerto Rican government's desire for Catholic school financial data for its tuition inflation investigation in *Surinach v. Pesquera de Busquets*, 604 F. 2d 73 (1st Cir. 1979).  The First Circuit barred Puerto Rico from digging into religious school finances because it "failed to show that it [had] pursued its secular objectives in [a] manner which [was] least intrusive upon religious concerns."  *Id.* at 80.  Likewise, Plaintiffs have not shown why their secular discovery objectives in a premises liability case would justify intruding into the finances of religious organizations when their theory of liability is based on a proposed judicial intrusion into religious conduct.

Plaintiffs have not made a case for premises liability, but instead have accused Defendant and *former* defendants of breaching an overarching *religious* duty to have *prevented* an accident with no physical cause.  With no legal duty to establish liability, they seek this Court's authority to regulate religious conduct, claiming that *if* elders had done more in fulfilling their religious commission, *then* their mother would not have fallen.  In *Grosek* the court allowed financial discovery in a claim for punitive damages arising out of a car wreck because it *was* relevant.  251 F.R.D. at 163, 166, 167.  However, there was no financial discovery of non-parties without a business relationship.  *Id.* at 166.  Importantly, too, was the finding that defendant made no showing of "hardship."  *Id.* at 167.  Whereas, here Defendant has shown demonstrably that Plaintiffs seek (1) to probe into its and non-parties' finances on a (2) quest for evidence of an

"integrated, hierarchical structure;" where there is none; (3) to then find further evidence in their quest for a "duty" based upon Holy Scripture they allege was breached, (4) for which they would need further discovery to prove causation, (5) after which they would ultimately ask this Court to enforce as law a duty built upon a theory of religious liability for which they presently have no facts.  Plaintiffs' case is a theory in search of facts.  They do not have a *prima facie* case under any recognized cause of action.  They would ask this Court to fashion a cause of action to create a duty to justify their discovery.  This is defined as "bootstrapping" and does not establish the requisite relevancy under Fed. R. Civ. Pro. 26(b)(1), but it is bootstrapping that requires violating both religion clauses of the First Amendment.

### C.  NO REPETITIVE OR HARASSING QUESTIONS.

A limited review of the Huguley transcript demonstrates abuse of the deposition process.  Defendant's Opposition to Plaintiffs' Motion to Compel Huguley's deposition is adopted and incorporated here by reference to add that material here as well.  Additionally note, for example, with the others herein, *supra*, counsel's questions about Mr. Huguley's appointment as coordinator of the body of elders: "… is that an elected position?"  Huguley, 85-2, p. 12, ll. 12-13. "How is it that you are elected or appointed coordinator …?" *Id.*, p. 12, ll. 19-21. "Who appoints you? Explain that process." *Id.*, p. 13, ll. 2 and 4. "So to become coordinator, explain to me how you are named coordinator." *Id.*, p. 14, ll. 2-4. "Tell me who appointed you as a coordinator of the English Westwego Congregation and the relationship that you serve as coordinator of this corporation, Christian Congregation of Jehovah's Witnesses, Inc." *Id.*, p. 24, ll. 19-24.  "How did you become the coordinator of the elders at the English Westwego Congregation?"  *Id.*, p. 32, ll. 2-4. "All right. Now, who appointed you as the coordinator of the elders?"  *Id.*, p. 49, ll. 1-2.  "Your appointment as coordinator of the body of elders for the English Westwego Congregation came from New York, correct?"  *Id.*, p. 49, ll. 8 & 10-12.  "So before the 2011 district convention of

the Jehovah's Witnesses in Mobile, Alabama, you were the coordinator of the elders for the English Westwego Congregation." *Id.*, p. 49, ll. 17-21. "And the English Congregation is the one over which you are currently the president, right?" "And you also said you were president." "So you're both, congregation president and coordinator, right?" *Id.* p. 103, ll. 6-8, 10-11, 14-15. Fed R. Civ. Pro. 26(c) authorizes this Court to protect Mr. Huguley and others from such abusive tactics, order that Mr. Huguley's deposition is over, and instruct Plaintiffs' counsel.

## V.  CONCLUSION

For all the foregoing reasons, Defendant Christian Congregation of Jehovah's Witnesses, Inc., requests that this Honorable Court issue an order (1) barring Plaintiffs from inquiring into the religious conduct of elders in the English Congregation of Jehovah's Witnesses, Westwego, Louisiana, or other Jehovah's Witnesses about the tenets of their faith, which are wholly irrelevant to these proceedings, (2) prohibiting Plaintiffs from further deposing Willie Huguley, (3) prohibiting Plaintiffs from inquiring into Defendant's finances, and (4) instructing Plaintiffs' counsel to cease repetitive and harassing questioning tactics in depositions.

Dated: 6 May 2013.

<div style="margin-left:40%">

Respectfully submitted,
By /s/Ted M. Mitchell
Ted M. Mitchell        La. Bar No. 20964
2955 Ridgelake Drive, Suite 207
Metairie, LA 70002-3618
504-236-3966—voice
504-273-2220—fax

</div>

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been electronically filed with the Clerk of Court using the CM/ECF system this 6th day May 2013 and notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system or by mail.

<div style="text-align:center">/s/Ted M. Mitchell</div>