1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

5

6  RACHEL MADDOX, SHANNON MADDOX     CA. NO.
                                     12-1641
7

8  VERSUS                           SECTION "N"

9                                    MAG (1)

10 INTEGRO USA, INC., INTEGRO
   INSURANCE BROKERS, CHRISTIAN
11 CONGREGATION OF JEHOVAH'S WITNESSES,
   WATCHTOWER BIBLE AND TRACT SOCIETY
12 OF NEW YORK, JEHOVA'S WITNESSES,
   INC., PATRICK VICTOR, KATHY VICTOR
13

14 * * * * * * * * * * * * * * * * * * * * *

15

16

17

18

19

20

21          Deposition of **WILLIE F. HUGULEY**,

22 taken on Wednesday, April 10, 2013, in the

23 offices of THORNHILL LAW FIRM, 1308 Ninth

24 Street, Slidell, Louisiana 70458.

25

```
1                    I N D E X

2                                         PAGE

3   Caption                                1

4   Appearances                            3

5   Agreement of Counsel                   4

6   Examination

7         TOM W. THORNHILL                  5

8

9

10  Witness' Certificate                   114

11  Reporter's Certificate             115-116

12

13              *    *    *    *

14  EXHIBITS:

15  Exhibit 1     Our Kingdom Ministry       57
    Exhibit 2     Seating Plan              133
16  Exhibit 3     Platform Layout           145
    Exhibit 4     Seating Plan              146
17  Exhibit 5     Photograph                157
    Exhibit 6     Photograph                161
18  Exhibit 7     Photograph                162
    Exhibit 8     Photograph                162
19  Exhibit 9     Photograph                163
    Exhibit 10    Photograph                163
20  Exhibit 11    Photograph                165
    Exhibit 12    Photograph                165
21  Exhibit 13    Photograph                165
    Exhibit 14    Photograph                165
22  Exhibit 15    Photograph                165
    Exhibit 16    Seating Plan              168
23  Exhibit 17    Document 59-12            170

24

25
```

1    **APPEARANCES:**

2

3         Representing the Plaintiff:

4         THORNHILL LAW FIRM
          1308 Ninth Street
5         Slidell, Louisiana 70458

6         BY:  TOM W. THORNHILL

7

8

9

10        Representing the Defendant:

11        LAW OFFICES OF TED M. MITCHELL
          2955 Ridgelake Drive
12        Suite 207
          Metairie, Louisiana 70002
13
          BY:  TED M. MITCHELL
14

15

16   REPORTED BY:   Dana Schoultz
                    Certified Court Reporter
17                  #87111
                    State of Louisiana
18

19

20

21

22

23

24

25

**S T I P U L A T I O N**

It is stipulated and agreed by and between counsel that the deposition of WILLIE F. HUGULEY, is hereby being taken pursuant to Notice under the Federal Rules of Civil Procedure in accordance with the Rules.

The formalities of sealing and certification are hereby waived.  The witness reserves the right to read and sign the deposition.  The party responsible for service of the discovery material shall retain the original.

All objections are to be made in accordance with the Federal Rules of Procedure.

Dana Schoultz, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

1          WILLIE F. HUGULEY, 5504 Trinity

2     Drive, Marrero, Louisiana 70072, after

3     having been duly sworn, was examined and

4     testified on his oath as follows:

5  EXAMINATION BY MR. THORNHILL:

6     Q.   Sir, state your name and address for

7  the record, please.

8     A.   I do.  Willie L. Huguley.

9     Q.   Address?

10    A.   504 Trinity Drive, Marrero,

11 Louisiana 70072.

12    MR. MITCHELL:

13          And now we can off the record if

14 we're going to talk about documents.

15    MR. THORNHILL:

16          No, we'll do it on the record.  What

17 records do you have to produce?

18    MR. MITCHELL:

19          None.

20    MR. THORNHILL:

21          We had an agreement, I thought, we

22 were going to produce records before the

23 depositions.

24    MR. MITCHELL:

25          And last conversation I had was that

1  we would get production from you guys before

2  we produce anything.

3       MR. THORNHILL:

4          I don't recall that.

5       MR. MITCHELL:

6          That's what I said.

7       MR. THORNHILL:

8          I recall that -- so that's your

9  changed position, that you're not producing

10  any documents until we produce anything?

11       MR. MITCHELL:

12          There was no agreement.

13       MR. THORNHILL:

14          So your position is we don't have an

15  agreement.  Okay.  Well, just note for the

16  record that --

17       MR. MITCHELL:

18          There's no record on this.  I'm not

19  going to talk about production of documents

20  on this record.  This record is for this

21  witness' deposition.  Were you taking all

22  this down?

23       MR. THORNHILL:

24          Yes.  This is a deposition.

25       MR. MITCHELL:

```
 1              Yeah.  But we're not talking about
 2   discovery.
 3        MR. THORNHILL:
 4              Yes, we are.  That's what this is,
 5   discovery.
 6        MR. MITCHELL:
 7              Okay.  If we're going to talk about
 8   written discovery in the deposition for this
 9   witness, which is by consent, not by
10   subpoena, all right -- he is not a party to
11   this case.  You didn't subpoena him.  We did
12   this by consent.  And if we're going to talk
13   about written discovery which has not even
14   been due, according to the Rules of Civil
15   Proceed, okay, then I'm going to stop this
16   right now.
17        MR. THORNHILL:
18              It's your choice.  We are here by
19   consent.  We did agree, I thought, to produce
20   documents before the depositions began.
21        MR. MITCHELL:
22              I never agreed to that.  I'm counsel
23   of record.  I never agreed to that.  I said I
24   have outstanding discovery, and if I get
25   responses to my written discovery then I will
```

1  consider responding to your last-minute

2  written discovery.  I didn't get that.  I

3  didn't get anything.

4      MR. THORNHILL:

5          With all due respect, I'm just

6  noting for the record that the three of us

7  gentlemen as lawyers were on the phone and we

8  talked about this and I was under the clear

9  impression that we were going to try to swap

10  discovery before the depositions.  I wrote --

11      MR. MITCHELL:

12          A clear impression is not an

13  agreement.  I said most emphatically that I

14  wanted responses from you before I would

15  consider responses from my client.

16      MR. THORNHILL:

17          With all due respect, I never heard

18  those words.  In fact, what I heard was to

19  the contrary.  Mr. John Miller and I had

20  agreed to swap, you objected, you told him

21  you didn't want to do that, and then finally

22  the discussion was that we would mutually

23  exchange documents before the depositions

24  began.

25      MR. MITCHELL:

```
 1              He's the client.  He's not the
 2   lawyer.  I'm the lawyer of record.
 3        MR. THORNHILL:
 4              Okay.  So let's make sure we've got
 5   the parties right.  You're not a lawyer, are
 6   you, Mr. --
 7        A.   No, I am not.
 8        Q.   -- Willie?
 9        A.   No.
10        Q.   And, John, are you a lawyer?  Are
11   you representing anybody here today?
12        MR. MILLER:
13              I'm not admitted in court to
14   represent anyone.
15        MR. THORNHILL:
16              But are you a lawyer here
17   representing anyone?
18        MR. MILLER:
19              Am I a lawyer, yes; am I
20   representing anyone, no.
21        MR. THORNHILL:
22              Okay.  Mr. Huguley, do you have a
23   lawyer here today?  Did you hire one?
24        A.   I did not hire one.
25        MR. MITCHELL:
```

```
1              I represent Westwego Congregation of
2   Jehovah's Witnesses, Inc.  He's the president
3   of the corporation.
4        MR. THORNHILL:
5              Okay.  That's news to us.
6        MR. MITCHELL:
7              It's in the pleadings.  It's in the
8   record.
9        MR. THORNHILL:
10             Okay.  In terms of the exchange of
11  documents, our understanding was that we
12  would exchange documents and that we could
13  make our depositions productive, and so
14  obviously we'll have to address that question
15  as needed.
16       MR. MITCHELL:
17             None of the documents that you
18  requested as far as I can tell have anything
19  to do with Westwego Congregation or with Mr.
20  Huguley as an individual.
21       MR. THORNHILL:
22             With all due respect, Mr. Mitchell,
23  I haven't seen any documents and your
24  opinion --
25       MR. MITCHELL:
```

```
 1            I'm looking at what you requested.
 2       MR. THORNHILL:
 3            Your opinion about those documents
 4  is of no moment.  I've asked for the
 5  documents, they're discoverable, and I
 6  thought we had an agreement.  Sorry we don't.
 7  Let's move on.
 8  BY MR. THORNHILL:
 9       Q.   Spell your name, your last name.
10       A.   Huguley, H-U-G-U-L-E-Y.
11       Q.   H-U-G-U?
12       A.   Yes.
13       Q.   H-U-G-U-L-E-Y.
14       A.   That's correct.
15       Q.   Okay.  Tell me your age, Mr.
16  Huguley.
17       A.   I'm 66.
18       Q.   And someone said earlier when we
19  were talking among counsel that you were the
20  president of some company.  Can you tell me
21  which company?
22       A.   Well, I'm not the president of a
23  company.  I'm coordinator.
24       Q.   You are the coordinator?
25       A.   Yeah.
```

1      Q.    You're not the president, right?

2      A.    Yeah.

3      Q.    Tell me about your coordination and

4  which company.

5      A.    Well, I'm the coordinator of the

6  English Westwego Congregation.

7      Q.    Are there more than one

8  congregations to Westwego?  Is that why you

9  called it English?

10     A.    Yes.  There's a Spanish Congregation

11  there too.  We share the same hall.

12     Q.    Now, as coordinator, is that an

13  elected position?

14     A.    No.  This is a position that, you

15  know, as far as -- with a body of elders,

16  experienced men in the congregation able to

17  -- with many years of faithful service,

18  that's all.

19     Q.    How is it that you are elected or

20  appointed coordinator of the English Westwego

21  Congregation?

22     A.    Well, we have -- English Christian

23  Congregation select men as far as in position

24  or oversight.

25     Q.    So are you elected or appointed?

1       A.   Appointed.

2       Q.   Who appoints you?

3       A.   The Christian Congregation.

4       Q.   Explain that process.

5       A.   Well, we have brothers who are

6  qualified older men who have many years of

7  faithful service and serve in the capacity of

8  elders appointed in that capacity.  That's

9  all.  We have more than just one men (sic) as

10 far as a body, and this -- only thing, I'm

11 not over no other elders.  We're just all a

12 body of elders.

13      Q.   So you're not a president of any

14 company.

15      A.   No.  I'm a coordinator.

16      Q.   Have you been elected by a board of

17 directors?

18      A.   No.

19      Q.   Have you names of people who you say

20 served to appoint you?

21      A.   Do I have names?

22      Q.   Right.

23      A.   No.

24      Q.   Are there individuals with names who

25 appointed you?

1      A.   No.

2      Q.   All right.  So to become

3  coordinator, explain to me how you are named

4  coordinator.

5      A.   Well, I'm a coordinator.  It's just

6  that -- it's just a position oversight making

7  sure that everything within the Christian

8  Congregation runs smoothly, organized.

9      Q.   Now, when you say everything runs

10  smoothly --

11      A.   Yes.

12      Q.   -- what is it to which you refer?

13      A.   Well, we have meetings that is

14  outlined twice a week.  We have the accredit

15  minister school.  We also have the service

16  meeting.  We also have the congregation bible

17  study and we have Watchtower and public talk.

18      Q.   You have what?

19      A.   Watchtower study.

20      Q.   Watchtower, like a watch that has

21  time pieces on it?

22      A.   Yes, yes.

23      Q.   Okay.

24      A.   And a public talk.  Public talk,

25  speakers come in and give discourses.

1    Q.   What is Watchtower?

2    A.   Watchtower is a study article that

3  we study each week.

4    Q.   And then the last one was a public

5  what?

6    A.   Public discourse.

7    Q.   What is public discourse?

8    A.   Speakers that give 30-minute talks.

9    Q.   Okay.  Forgive me, but I'm still a

10  little bit confused on who appoints you to

11  the position of coordinator to give to you

12  the responsibilities of oversight over what

13  you've identified as six different

14  activities.

15    A.   Well, there's just six meetings,

16  that's all.

17    Q.   Six meetings?

18    A.   Five meetings.

19    Q.   Five meetings now?

20    A.   Yes.

21    Q.   The meetings that you referred to as

22  two times a week, that's one, right?

23    A.   Yeah, three and a one.  So we have

24  Thursday meeting.  It consists of the

25  congregation bible study, also the theocratic

1  minister school and the service meeting.  All

2  these meetings are designed to train and

3  teach us as ministers.

4       Q.   So the first item you pointed to

5  over which you had supervision, I'm going to

6  call it oversight because that's a word that

7  you used, was the meetings two times a week,

8  right?

9       A.   Uh-huh (affirmative response).

10      Q.   And that's the meetings of the

11 church, the Westwego church?

12      A.   So when I'm saying two times a week,

13 I mean two days out of the week.  But we have

14 five meetings a week.  Three meetings come in

15 one night.

16      Q.   So when you said two times a week,

17 you actually meant five meetings.

18      A.   Right.

19      Q.   All right.  Okay, five meetings.

20 And then you mentioned that the second item

21 over which you had oversight was the

22 accredited minister's school.

23      A.   The what?

24      Q.   The accredited minister's school.

25      A.   No.  Theocratic.

```
 1        Q.    Theocratic.  I'm sorry.

 2        A.    Yes.

 3        Q.    Spell that.  I'm sorry.

 4        A.    T-H-E-O-C-R-A-T-I-C.

 5        Q.    What is your profession or

 6   occupation, Mr. Huguley?

 7        A.    Well, I'm a retired postal worker.

 8        Q.    All right.  For how long were you

 9   with the post office?

10        A.    32 years.

11        Q.    What was your position at the post

12   office?

13        A.    Letter carrier.

14        Q.    Where did you work?

15        A.    In Gretna.

16        Q.    Okay.  Now, the church that we're

17   talking about, this congregation, right --

18        A.    Uh-huh (affirmative response).

19        Q.    -- that has a name, right?

20        A.    English Westwego Congregation.

21        Q.    And is that a name given to the

22   general population of people that attend the

23   church under the auspices of a corporate name

24   called Christian Congregation of Jehovah's

25   Witnesses, Inc.?
```

1      A.   Inc.?

2      Q.   Yes.

3      A.   You have to help me appreciate that.

4      Q.   I'm not sure that I understand your

5 comment but --

6      A.   I don't understand your --

7      Q.   Have you ever heard of the name

8 Christian Congregation of Jehovah's

9 Witnesses, Inc.?

10      A.   Christian Congregation, yes, of

11 Jehovah's Witnesses.

12      Q.   And I'd just ask you to listen to my

13 question and if you can first answer yes or

14 no and then please explain.  All right?

15      A.   Okay.

16      Q.   Have you, Willie Huguley, ever heard

17 of the name Christian Congregation of

18 Jehovah's Witnesses, Inc.?

19      A.   Not Inc.

20      Q.   So the answer is no, right, because

21 you've never heard Inc. on that name, right?

22      A.   (Witness nods head affirmatively.)

23      Q.   Is that correct?

24      A.   Right.

25      Q.   Do you know anything about the

1  organization of the corporation known as

2  Christian Congregation of Jehovah's

3  Witnesses, Inc.?

4       A.   Not Inc.

5       Q.   Just listen to my question.

6       A.   I thought I answered it.

7       Q.   Okay.  And I'm assuming that what

8  you're telling me is you don't know anything

9  about any corporation.

10      MR. MITCHELL:

11           I'm going to object to the form of

12  the question.

13      MR. THORNHILL:

14           Is that correct?

15      MR. MITCHELL:

16           Because he can't answer a question

17  on which you assume anything.

18      THE WITNESS:

19           Uh-uh (negative response).

20      MR. THORNHILL:

21           I'll rephrase the question.  Thank

22  you for your objection.  Please note we're

23  operating under the rules in this case and

24  the rules are you object to form only and no

25  discourse otherwise.

1   BY MR. THORNHILL:

2        Q.   Do you, sir, understand the

3   following:  A corporation by the name of

4   Christian Congregation of Jehovah's

5   Witnesses, Inc. is a party to this lawsuit.

6   Do you understand that?

7        A.   Okay.  You're saying that.  I said I

8   didn't know nothing about I-N-K (sic), Inc.

9        Q.   I did say that and I'm asking you if

10  you understand what I said.

11       A.   I heard what you said.

12       Q.   Did you understand it?

13       A.   I heard what you said.

14       Q.   That there is a corporation that is

15  a party to this lawsuit.

16       A.   Yes.

17       Q.   You know that.

18       A.   Okay.

19       Q.   Do you know about that corporation?

20       A.   If it's the Christian Congregation

21  of Jehovah's Witnesses, yes.

22       Q.   Have you seen any articles of

23  incorporation?

24       A.   Any articles?

25       Q.   Articles of incorporation for this

1  Christian Congregation of Jehovah's

2  Witnesses, Inc.

3      A.    Can you explain what you mean have I

4  seen any articles?

5      Q.    I will.  There's a process for

6  forming a juridical entity in the state of

7  Louisiana and other states that allows for

8  submission of documents called a charter or

9  articles of incorporation, and it is to that

10  which I refer when I ask you have you seen

11  the articles or the charter that was

12  submitted to the state for the formation of a

13  juridical entity known as Christian

14  Congregation of Jehovah's Witnesses, Inc.?

15      A.    Let me get back to you on that one.

16      Q.    It's a yes or no, sir.

17      A.    Well, I haven't seen the article

18  itself.

19      Q.    So the answer is no, you haven't,

20  right?

21      A.    Have I seen the article, no.

22      Q.    All right.  Have you seen any

23  minutes of any meetings of the corporation,

24  the corporation being this entity to which

25  I've just referred as Christian Congregation

1  of Jehovah's Witnesses, Inc.?

2      A.    I'm still thrown off by that word

3  Inc. that you're mentioning.

4      Q.    What is it that throws you off about

5  that?

6      A.    You said a corporation with

7  Christian Congregation of Jehovah's

8  Witnesses, Inc.

9      Q.    That's right.

10      A.    I said I haven't seen that.

11      Q.    You haven't seen the charter.  And

12  the second question is have you seen any

13  minutes of meetings of people saying that it

14  was a meeting of the corporation?

15      A.    Well, we have meetings each year

16  concerning the corporation but not under that

17  Inc., Christian Congregation, Inc.

18      Q.    So you're telling me that the

19  Christian Congregation of Jehovah's Witnesses

20  to which you belong and operate under the

21  name of English Westwego Congregation does

22  not hold meetings and keep minutes as a

23  corporation, correct?

24      MR. MITCHELL:

25          Object to the form of the question.

1   BY MR. THORNHILL:

2       Q.   Go ahead, sir.  Is that correct, yes

3   or no?

4       A.   We have meetings.

5       Q.   Of the corporation?

6       A.   English Westwego Congregation.

7       Q.   Simple question.  Do you have

8   meetings and keep minutes of the corporation

9   meeting?

10      MR. MITCHELL:

11           Again I object to the form of the

12  question.  I don't know what it means.  I

13  don't know if the witness knows what it

14  means.

15  BY MR. THORNHILL:

16      Q.   Do you understand, sir?

17      A.   I'm confused as to what you're

18  asking.

19      Q.   Do you know how a corporation

20  operates?

21      A.   Yes.

22      Q.   How does a corporation operate?

23      A.   Well, you have over you people that

24  has things broken down as to how they

25  function, how they carry on affairs,

1 business. That's how a corporation operates.

2     Q. So you're familiar with officers

3 like presidents and vice-presidents, correct?

4     A. Uh-huh (affirmative response).

5     Q. And they elect board members

6 often, right?

7     A. Uh-huh (affirmative response).

8     Q. Do you know anything about the

9 structure and the operation of a company

10 known as Christian Congregation of Jehovah's

11 Witnesses, Inc.?

12     A. We have a corporation but under Inc.

13 I'm still confused as to what you're asking.

14 I never heard that.

15     Q. Okay. So when you say "we have a

16 corporation," to what are you referring?

17     A. Having meetings. We have board

18 members. And so, yes.

19     Q. Okay. Tell me who appointed you as

20 a coordinator of the English Westwego

21 Congregation and the relationship that you

22 serve as coordinator to this corporation,

23 Christian Congregation of Jehovah's

24 Witnesses, Inc.

25     MR. MITCHELL:

1        Object to the form of the question.
2   BY MR. THORNHILL:
3        Q.   Go ahead, sir.
4        A.   Well, everything come down through
5   the Christian Congregation.
6        Q.   When you say everything comes down
7   through the Christian Congregation, please
8   explain that.
9        A.   Well, we appointed as elders and
10  then there are elders that has certain
11  positions within the Christian Congregation.
12  I am the coordinator of the body of elders,
13  nothing more.
14       Q.   Who appoints elders?
15       A.   The Christian Congregation of
16  Jehovah's Witnesses.
17       Q.   Is that an election?
18       A.   It's not an election, appointment.
19  I thought you said that before.
20       Q.   Who makes the appointment?
21       A.   The Christian Congregation.
22       Q.   Is that a person or is that a number
23  of persons?
24       A.   I don't know the number of persons.
25       Q.   Well, my question is, is there an

1  election?   Are there votes like in a

2  democratic society?  You're familiar with

3  voting, the way we vote in the United States

4  and the state of Louisiana, we vote for

5  things?

6      A.   Yes.

7      Q.   Is there an election where there are

8  votes taken?

9      A.   No.   There's an appointment.

10      Q.   Who then makes the decision to

11  appoint elders?

12      A.   The Christian Congregation of

13  Jehovah's Witnesses.

14      Q.   So is that a decision that's

15  expressed in a group meeting whereby

16  acclamation everyone just agrees?

17      A.   I don't know what they do.  It's in

18  their quarters.  It's a decision.  That's

19  what the Christian Congregation has.

20      Q.   So it's a decision made at

21  headquarters.

22      A.   Uh-huh (affirmative response).

23      Q.   By somebody at headquarters.

24      A.   Uh-huh (affirmative response).

25      Q.   Not the people at English Westwego

1    Congregation, correct?

2        A.    Correct.

3        Q.    Who are the people at headquarters

4    that make the decision to appoint the elders?

5        A.    I don't know them by name but it's

6    the Christian Congregation of Jehovah's

7    Witnesses.

8        Q.    Where is the headquarters?

9        A.    New York.

10        Q.    Do you know anybody there?

11        A.    No.

12        Q.    Have you ever talked to anyone

13    there?

14        A.    No.  As far as by names, I don't --

15    I know persons by name but I don't know who

16    appoints.

17        Q.    When you say you know persons by

18    name, are you saying you know other men who

19    are elders?

20        A.    Yes.

21        Q.    Are there women who are elders?

22        A.    No.

23        Q.    Okay.  So I was right by asking you

24    about men only.  I'm not trying to just pick

25    on the men.

1    A.   Uh-huh (affirmative response).

2    Q.   But from what I gather, there are

3  people who are elders and they're chosen by

4  someone in New York; is that correct?

5    A.   Yes.

6    Q.   Do you know who the people are in

7  New York who make the choices?

8    A.   No.

9    Q.   Tell me the name of the place where

10  these people work.

11    A.   Place of employment?

12    Q.   Yes.  Where do the people work in

13  New York?  What is the name of the company or

14  the name of the organization where the people

15  work in New York, those people being the ones

16  who you say appoint elders?

17    A.   Christian Congregation of Jehovah's

18  Witness in New York.

19    Q.   Okay.  And you don't think it has

20  Inc. on it or anything like that, right?

21    A.   Well, I don't know.  I never seen

22  it.

23    Q.   Right.  To your knowledge.  Now, I'm

24  not asking you to speculate.  I'm asking you

25  to tell me what you know.  It's not a test.

1    I just need the truth from you.  Fair enough?

2        A.   Yes.

3        Q.   You know you're under oath, right?

4        A.   Yes.

5        Q.   The question is, is the entity in

6    New York a corporation?

7        A.   Yes.

8        Q.   It is.

9        A.   Yes.  The English Christian

10   Congregation of Jehovah's Witness.

11       Q.   And so the people who make the

12   appointment of the elders are people who work

13   at the English Christian Congregation of

14   Jehovah's Witnesses.  Did I understand that

15   correct?

16       A.   No.  Repeat that again.

17       Q.   All right.  What is the name of the

18   organization at which people work where

19   there's made an appointment of elders,

20   including you at the church that you're

21   involved with?

22       A.   Well, English Christian Congregation

23   of Jehovah's Witnesses is in New York City.

24   That's who makes the appointment.

25       Q.   All right.  Let me make sure I have

1   the name right, okay?  Bear with me.  It's

2   the English --

3        A.   It's the Christian Congregation of

4   Jehovah's Witnesses in New York City.

5        Q.   In New York City.

6        A.   In New York.

7        Q.   And that's the name of it.

8        A.   Christian Congregation of Jehovah's

9   Witnesses, the corporation.

10        Q.   That is a corporation.

11        A.   Uh-huh (affirmative response).

12        Q.   And it's in New York.

13        A.   Yes.

14        Q.   Right?

15        A.   (Witness nods head affirmatively.)

16        Q.   Do you know any of the officers or

17   directors of that company?

18        A.   No.

19        Q.   You, however, don't think that

20   Christian Congregation of Jehovah's Witnesses

21   in New York City has I-N-C, Inc., behind it,

22   correct?

23        A.   Oh, so now I'm thinking -- now

24   you're saying incorporated.  When you say

25   Inc., I-N-C is Inc.  So I guess it is an

1  incorporation.  But when you say Inc., I know

2  I-N-K is ink, too.  So you're saying

3  incorporated.

4       Q.   Yes, sir.  I-N-C period is an

5  abbreviation for incorporated.

6       A.   Uh-huh (affirmative response).

7       Q.   Does that change your previous

8  answers?

9       A.   Well, they're a corporation.

10       Q.   Who is they?

11       A.   The Christian Congregation of

12  Jehovah's Witnesses, Incorporated.

13       Q.   And they're in New York City.

14       A.   Yes.

15       Q.   All right.  And so that's the

16  people, those people in New York, whoever

17  they are, officers and directors of whom you

18  don't know make some appointment of people in

19  Westwego under the auspices of an English

20  Westwego Congregation, correct?

21       A.   (Witness nods head affirmatively.)

22       Q.   Is that correct?

23       A.   Yes.

24       Q.   All right.  Have you ever talked on

25  the phone to anyone in New York?

1      A.    I have.

2      Q.    How did you become the coordinator

3  of the elders at the English Westwego

4  Congregation?

5      A.    Well, when I did become appointed as

6  an elder, and I have been appointed as an

7  elder for many years, then presiding over

8  here that was there at the time moved to

9  Atlanta and then they had -- so I was

10  submitted, name, would be serving as

11  coordinator.  And so it's up to the

12  corporation to say whether or not that would

13  go through.

14      Q.    Okay.  Forgive me, but I'm not sure

15  that I heard all that.  I'll ask you to speak

16  up.  I may not be hearing well today.

17      A.    I would like a little water, if you

18  don't mind.

19      Q.    Oh, absolutely.  Right behind you

20  are bottles of water, right there on the

21  table.  Everyone is welcome to water, coffee,

22  tea, whatever you would like.  Take your

23  time.  We're in no rush.  We've got all day.

24  Okay.

25            Do you know a gentleman by the name

```
 1   of Stanley Singletary as associated with the

 2   Christian Congregation of Jehovah's Witnesses

 3   in New York?

 4        A.   I don't know him, no.

 5        Q.   You don't.  Okay.  Do you know the

 6   name of anyone who is involved with the

 7   Christian Congregation of Jehovah's Witnesses

 8   in New York?

 9        A.   No.

10        Q.   Do I understand correctly that those

11   of you who attend a church in Westwego attend

12   a church that has the name of the Westwego

13   Congregation of Jehovah's Witnesses, Inc.?

14        A.   Uh-huh (affirmative response).

15        MR. MITCHELL:

16             Object to the form of the question.

17   BY MR. THORNHILL:

18        Q.   Is that correct?

19        A.   I thought you said English Westwego

20   congregation.

21        Q.   Well, you said something about an

22   organization called English Westwego

23   congregation without Inc.  My question to you

24   is are you familiar with the Westwego

25   Congregation of Jehovah's Witnesses, Inc.?
```

1      A.   No.

2      Q.   You've never heard of it.

3      A.   No, not the Westwego Congregation.

4  We're the English Westwego Congregation.

5      Q.   Is that a separate name with a

6  charter?

7      A.   Yes.

8      Q.   So your organization in which you

9  are involved is not the Westwego Congregation

10  of Jehovah's Witnesses, Inc., it is instead,

11  as you understand it, the English Westwego

12  Congregation.

13      A.   Yes.

14      Q.   Right?

15      A.   Yes.

16      Q.   Does it have officers like

17  presidents, vice-presidents?

18      A.   Yes.

19      Q.   All right.  Among the entity that

20  you know as English Westwego Congregation, do

21  those people operate under a charter issued

22  by the state of Louisiana?

23      A.   Yes.

24      Q.   They do.

25      A.   Uh-huh (affirmative response).

1    Q.   Have you seen that charter?

2    A.   Yes.

3    Q.   The answer is yes?

4    A.   Yeah.

5    Q.   And what did it look like?

6    A.   Well, pages outlined the charter.

7    Q.   Did that charter include names of

8  people who were officers?

9    A.   Yes.

10    Q.   What names were in there?

11    A.   Well, my name was in there.

12    Q.   As what?

13    A.   As president.

14    Q.   Of?

15    A.   The English Westwego Congregation of

16  Jehovah's Witnesses.

17    Q.   All right.  And that's a charter

18  separate from Westwego Congregation of

19  Jehovah's Witnesses, Inc., correct?

20    A.   No.  We're all -- that's the charter

21  itself that we filed with the state.

22    Q.   Okay.  And so the charter of the

23  name that you know about is English Westwego

24  Congregation.

25    A.   Yes.

1      Q.    Correct?

2      A.    Yes.

3      Q.    Of Jehovah's Witnesses.

4      A.    Yes.

5      Q.    And does it have I-N-C period at the

6  end?

7      A.    Can I get back with you on that to

8  make sure?

9      Q.    Well, just tell me what you know.

10     A.    Well, as far as I know, I don't know

11 that.

12     Q.    Okay.  You're not sure?

13     A.    Right.

14     Q.    That's fair.  Now, tell me about the

15 Christian Congregation of Jehovah's

16 Witnesses.  When have you had contact with

17 it?

18     A.    Back in 1978.

19     Q.    You had contact with the Christian

20 Congregation of Jehovah's Witnesses, Inc., in

21 New York in 1978?

22     A.    I was studying the bible at that

23 time, learning.

24     Q.    Tell me about your contact with that

25 group.

1        A.    Well, at the time I had a bible

2   study that a person that was one of Jehovah's

3   Witnesses conducted with me, and for several

4   years I learned about bible principles, and

5   so eventually I made a dedication to serve

6   God.

7        Q.    What did that involve?

8        A.    Periodic weekly studies of the bible

9   in depth, prophecy, things such as morals,

10  principles, family life, things that can help

11  me in my ministry to carry out God's will.

12       Q.    When was that?

13       A.    I just said '78.

14       Q.    Was that when you made the

15  commitment?

16       A.    Oh, I was baptized in 1980 and

17  dedicated my life to serve Jehovah.

18       Q.    And was it then when you say that

19  you became an elder?

20       A.    No.

21       Q.    When did you become an elder?

22       A.    That was five years later.

23       Q.    1985?

24       A.    Yes.

25       Q.    Were you given any identification or

1    documents that indicate that you're an elder?

2        A.    No.

3        Q.    Who are the other officers in that

4    entity or group to which you refer to as

5    being separate and generally refer by name as

6    English Westwego Congregation of Jehovah's

7    Witnesses, Inc.?

8        A.    Well, I mentioned to you I was the

9    president of the charter.

10       Q.    Who are the other officers?  That

11   was my question.  I'm sorry, it was a long

12   question.

13       A.    Malbert Helton.

14       Q.    Say it again?

15       A.    Malbert Helton, Sr.

16       Q.    What is his office?

17       A.    Secretary.

18       Q.    Is Malbert M-O-L-B-E-R-T?

19       A.    M-A-L.

20       Q.    M-A-L.  And he is secretary?

21       A.    Yes.

22       Q.    Are you the only two officers?

23       A.    No.  Wilson Rodriguez.

24       Q.    What office does he hold?

25       A.    Well, he was the treasurer.

1      Q.    Okay.  How many members of your

2  church, that I understand you identify and

3  limit to the English Westwego Congregation,

4  would you say there are?

5      A.    Roughly 90.

6      Q.    90?

7      A.    Uh-huh (affirmative response).

8      Q.    Was Patsy Maddox one of those 90?

9      A.    Yes.

10     Q.    Now, the English Westwego

11 Congregation you say is separate from the

12 Spanish Westwego Congregation, right?

13     A.    Right.  We share the same hall.

14     Q.    All right.  And you're not

15 responsible for -- you're not a coordinator

16 for them, you're not an officer in the

17 Spanish Westwego Congregation, correct?

18     A.    No.

19     Q.    Do they have a separate charter?

20     A.    We own the building ourselves.  They

21 share our building.

22     Q.    Thank you for that.  Please answer

23 this question:  Does the Spanish Westwego

24 Congregation have a separate charter?

25     A.    I don't think so.  I don't know.

1     Q.   Okay.  Do you know anybody in the

2  Spanish Congregation?

3     A.   Yes.

4     Q.   Do you ever attend their services?

5     A.   No.

6     Q.   Who do you know in the Spanish

7  Congregation?

8     A.   Well, I know the body of elders.

9     Q.   Who is their body of elders?

10     A.   Juan Sanchez.

11     Q.   Juan or Warren?

12     A.   Juan.  Joy Sanchez and Ramone

13  Sabogne.

14     Q.   S-A-V?

15     A.   S-A-B-O-G-N-E.

16     Q.   B or V, as in Victor?

17     A.   S-A-B-O-G-N-E.

18     Q.   All right.  Those are -- and are

19  they president, vice-president and secretary?

20  What are their offices?

21     A.   I don't know their position.

22     Q.   You don't know their -- but they are

23  the officers.

24     A.   They are the elders in the

25  congregation.

1    Q.    They're the elders.

2    A.    Uh-huh (affirmative response).

3    Q.    Does that organization have any

4  input into the English congregation?

5    A.    We share the same hall.  We work

6  separately but we share the same hall caring

7  for the facilities and everything.

8    Q.    So do you divide the expenses of the

9  facility?

10   A.    Yes.

11   Q.    All right.  I need to take you back

12 to the New York company and the appointment

13 by the New York company.

14   A.    Uh-huh (affirmative response).

15   Q.    What process is followed by the New

16 York corporation called the Christian

17 Congregation of Jehovah's Witnesses, Inc., in

18 making appointments of elders?

19   A.    Now, I thought we went through that.

20   Q.    What process is followed by that

21 group in New York to appoint the elders?

22   A.    Well, we have traveling brothers

23 that come through that recommend.  We have

24 brothers that we see that's qualified for an

25 appointment, have certain qualifications, and

1    so it's submitted to the Christian

2    Congregation.

3         Q.    When you say we have brothers who

4    qualify --

5         A.    Qualify for position of oversight.

6         Q.    Among the 90 people at the English

7    Congregation.

8         A.    Yes, women not included.

9         Q.    Excluding women.

10        A.    Uh-huh (affirmative response).

11        Q.    And are the women included in the

12   90?

13        A.    Women are -- make up the 90.

14        Q.    So they're included but they don't

15   get a vote is what you're saying.

16        A.    Men is appointed as overseers.

17        Q.    Right.  But when you say we,

18   brothers --

19        A.    Well, let me throw out we, then.

20        Q.    I'm sorry?

21        A.    I'll throw out we.

22        Q.    Meaning you strike the response that

23   included we.

24        A.    Okay.

25        Q.    Among the 90 --

1          A.     Uh-huh (affirmative response).

2          Q.     -- right?  I'm just trying to

3    understand what happens --

4          A.     Uh-huh (affirmative response).

5          Q.     -- among the 90 at your English

6    Westwego Congregation.  That includes women,

7    right?

8          A.     Uh-huh (affirmative response).

9          Q.     And you said it included Patsy

10   Maddox.

11         A.     Uh-huh (affirmative response).

12         Q.     Correct?

13         A.     Yes.

14         Q.     All right.  Do you then vote on

15   people who they want to be elders?

16         A.     No.

17         Q.     How do they select brothers who you

18   think they think qualify as elders?

19         A.     No.  You have a body of elders that

20   make the decision and then it's submitted to

21   the Christian Congregation.

22         Q.     So you're saying that the 90 people

23   in the church had nothing to do with the

24   selection of the people that are submitted to

25   the Christian Congregation for appointment as

1  elders.

2      A.   90 don't appoint.

3      Q.   All right.  Okay.  Well, who

4  appoints the brothers that qualify at the

5  English Congregation?

6      A.   The Christian Congregation of

7  Jehovah's Witnesses.

8      Q.   Okay.  For the lack of clarity, let

9  me ask you this.  And it may be a repeat, but

10  let me just make sure I understand.  Are

11  there elders at the Westwego English

12  Congregation who decide on additional elders?

13      A.   Well, there's five elders -- seven

14  elders in our congregation.

15      Q.   Tell me about them.  Who are they?

16      A.   Well, we have Wilson Rodriguez, one,

17  Malbert Helton, Grant Butler.  There's also

18  Richard Grear.

19      Q.   Okay.  You've got Wilson Rodriguez?

20      A.   And Timothy Pollard.

21      Q.   And Timothy what?

22      A.   Pollard.

23      Q.   Spell that.

24      A.   P-O-L-L-A-R-D.

25      Q.   All right.  And you're in the group,

1    right?

2        A.    Yes.

3        Q.    All right.  And so Willie Huguley.

4    As I count them there's six elders in your

5    organization called the English Westwego

6    Christian Congregation of Jehovah's

7    Witnesses, Inc., correct?

8        MR. MITCHELL:

9            Object to the form of the question.

10   BY MR. THORNHILL:

11       Q.    Correct?

12       A.    We have seven elders.

13       Q.    Seven elders.

14       A.    Uh-huh (affirmative response).

15       Q.    How did they get their names

16   submitted to the Christian Congregation of

17   Jehovah's Witnesses, Inc., for appointment in

18   New York as elders in your I'm going to call

19   it church of the English Westwego

20   Congregation?

21       A.    Well, through traveling

22   representatives.

23       Q.    All right.  Who are those traveling

24   representatives?

25       A.    Well, they change.  When they serve

1  in the congregation and they submit it back

2  to the Christian congregation.

3      Q.    They serve in the congregation.

4      A.    They come through a traveling

5  representative from -- that are sent out from

6  the Christian Congregation, traveling

7  brothers.

8      Q.    Do you know any of them?

9      A.    Yes.

10     Q.    Who are they?

11     A.    Well, we have one just serving us

12  now.  That is Brother Stanley Jones.  He's a

13  traveling brother.

14     Q.    Stanley Jones.

15     A.    Uh-huh (affirmative response).

16     Q.    And is he from New York?

17     A.    He's a representative.

18     Q.    He's a representative.

19     A.    Yes.

20     Q.    From where is Stanley Jones?  Where

21  does he live; do you know?

22     A.    Well, he lives in the area where

23  he's serving.  Whatever section he's serving,

24  that's where he lives until he moves on.

25     Q.    Whatever session, you said?

1        A.    Section.

2        Q.    Section.

3        A.    Uh-huh (affirmative response).

4        Q.    All right.  So you're saying he

5    doesn't have a home, he just travels around?

6        A.    Well, sometime they stay with

7    elders, sometime they stay in apartments, but

8    they serve the congregation within their

9    circuit.

10       Q.    Where is Stanley Jones staying now?

11       A.    He has an apartment.  The apartment

12   was at one time on August Lane.

13       Q.    Say it again?

14       A.    The apartment at one time was on

15   August Lane.

16       Q.    Can you spell that, alters?

17       A.    August.

18       Q.    August?

19       A.    Yeah.

20       Q.    Okay.  A-U-G-U-S-T?

21       A.    Yes.

22       Q.    And was that in Westwego?

23       A.    That was in Marrero.

24       Q.    In Marrero.  Okay.  Now, did he,

25   Stanley Jones, appoint any of the six of you

1  who are elders?

2       A.   He doesn't appoint.   The Christian

3  Congregation appoints.

4       Q.   All right.   So Stanley is the person

5  that travels around and identifies people who

6  he thinks ought to be elders.

7       A.   Well, we submit it and then we talk

8  about it.   He's an elder as well.   And then

9  it's submitted to the Christian Congregation.

10      Q.   So does Stanley vet or approve those

11 who are elders in the local church and submit

12 their names to the New York entity called

13 Christian Congregation?

14      A.   The body of elders.   The body of

15 elders within the Christian Congregation.

16 English Westwego submit qualified men, and

17 then the traveling representative send back

18 his report to the Christian Congregation.

19      Q.   And the body of elders for the

20 English Westwego Congregation, the six of you

21 you've identified, give the name of persons

22 that you think to Stanley Jones or someone

23 like him who's a traveling representative of

24 the New York entity, correct?

25      A.   Yes.

1       Q.    All right.  Now, who appointed you

2  as the coordinator of the elders?

3       A.    Who appointed me?

4       Q.    Right.

5       A.    Well, once it's submitted to the

6  Christian Congregation, then that's where the

7  appointment come from.

8       Q.    Your appointment as coordinator --

9       A.    Yes.

10      Q.    -- of the body of elders for the

11 English Westwego Congregation came from New

12 York, correct?

13      A.    Yes.

14      Q.    And when was that?

15      A.    That was during the time of Katrina,

16 2005.

17      Q.    All right.  So before the 2011

18 district convention of the Jehovah's

19 Witnesses in Mobile, Alabama, you were the

20 coordinator of the elders for the English

21 Westwego Congregation.

22      A.    That's correct.

23      Q.    Correct?  Did you have any office or

24 responsibility in the New York entity, the

25 Christian Congregation of Jehovah's

1    Witnesses, Inc., in New York?

2         A.   No.

3         Q.   Have you ever met anyone from the

4    New York company?

5         A.   No.

6         Q.   Did the New York company organize

7    the district convention in 2011?

8         A.   What you mean by New York company?

9    Christian Congregation organized the

10   convention.

11        Q.   Well, let me be broad.  Who did what

12   to organize the district convention of

13   Jehovah's Witnesses in Mobile, Alabama that

14   held meetings on July 1, 2011?

15        A.   Christian Congregation of Jehovah's

16   Witnesses.

17        Q.   But that's not an individual.  So

18   bear with me.  I need names of people and

19   companies that did things, right?

20        A.   Well, you're going to have to get

21   names.  I don't know names.

22        Q.   All right.  That's what I need to

23   know.  So since 2005 when you became a

24   coordinator, right --

25        A.   Uh-huh (affirmative response).

1      Q.    -- it's fair for me to say that

2  you've never met anyone from New York that

3  represents the Christian Congregation of

4  Jehovah's Witnesses.

5      A.    Right.

6      Q.    Is that correct?

7      A.    Uh-huh (affirmative response).

8      Q.    All right.  Now, you said in 1985

9  you became an elder.

10      A.    Uh-huh (affirmative response).

11      Q.    So between 1985 and 2005 did you

12  meet anyone from the New York entity called

13  Christian Congregation of Jehovah's

14  Witnesses?

15      A.    Well, I've been to New York.  I met

16  people.  But position, titles, status, no.

17      Q.    When did you go to New York?

18      A.    I went in '92.

19      Q.    All right.  And what did you do

20  then?

21      A.    Just toured the facilities.

22      Q.    And you don't remember the names of

23  anybody you met, correct?

24      A.    Right.

25      Q.    All right.  Was that a social event

1   or was it a business meeting?

2        A.   Social.

3        Q.   All right.  Did you meet anyone in

4   1992 in New York who said that he was an

5   officer or director or a responsible person

6   acting on behalf of the Christian

7   Congregation of Jehovah's Witnesses, Inc., in

8   New York?

9        A.   No.

10       Q.   Did you meet anyone there who said

11   that he was responsible for organizing

12   district conventions?

13       A.   No.

14       Q.   Now, you told me that the Christian

15   Congregation of Jehovah's Witnesses organized

16   the district convention July 1, 2011, right?

17       A.   Right.

18       Q.   Who did that?

19       A.   Christian Congregation of Jehovah's

20   Witnesses.

21       Q.   People.  What people?

22       A.   Yeah, I don't know names.

23       Q.   All right.  You don't know the name

24   of anyone.

25       A.   No.

1    Q.    Were you involved in organizing the

2  district convention of Jehovah's Witnesses?

3    A.    No.

4    Q.    How did you find out there was going

5  to be a district convention?

6    A.    Well, we get announcement stating

7  the time, place and location.

8    Q.    What are the announcements?

9    A.    Announcement stating that the

10 convention will be held in Mobile, Alabama

11 July the 1st through the 3rd and the place

12 will be Mobile, Alabama, and the location of

13 it, Mitchell Center.

14    Q.    Who made that announcement?

15    A.    Well, the announcement come from the

16 Christian Congregation.

17    Q.    Meaning the group in New York.

18    A.    Yes.

19    Q.    Is there a person in New York who

20 sends that announcement?

21    A.    I don't know a person.  It's just a

22 letter stating -- announcing the date and

23 time of the convention.

24    Q.    Got it.  So there's an entity in New

25 York that sends a letter and says we're going

1    to have a meeting, a district convention,

2    correct?

3         A.    Right.

4         Q.    Now, to that convention is there

5    invited everyone who is a Jehovah's Witness

6    everywhere?

7         A.    No.

8         Q.    Or is there just a limited number of

9    people invited?

10        A.    Limited number.

11        Q.    The word district implies geographic

12   district.  Is there a geographic district

13   that was invited July 1, 2011?

14        A.    Well, I know it encompassed part of

15   Louisiana, Alabama and Mississippi.

16        Q.    How do you know that?

17        A.    Well, I know who was there.

18        Q.    You think because of the attendees

19   that you saw at the meeting July 1, 2011 that

20   those who are invited were from parts of

21   Louisiana, Mississippi and Alabama?

22        A.    Yes.

23        Q.    But not all of those states, right?

24        A.    No.   That's why it's a district.

25   You can't have everybody.

1      Q.    Why can't you have everybody?

2      A.    It would be too many people there.

3      Q.    All right.  How many people were

4  there?

5      A.    Well, they probably had roughly -- I

6  can't say exactly how many was there.

7  Usually the circuits are smaller.  Districts

8  are a little larger.  But as far as actual

9  number or count, I can't say.

10     Q.    Were you involved in organizing the

11 district's convention?

12     A.    No, I wasn't.

13     Q.    Do you know who was?

14     A.    No.

15     Q.    Are you familiar with those people

16 who were deciding when the convention would

17 be held?

18     A.    Restate that.

19     Q.    Are you familiar -- do you know the

20 names of -- do you know people who were

21 involved in organizing the district

22 convention?

23     A.    No.

24     Q.    So with respect to the July 1, 2011

25 district convention, you were there, correct?

1        A.   Yes.

2        Q.   But you don't know anyone who was

3   involved in organizing the convention, right?

4        A.   Christian Congregation organized but

5   I don't know by name.

6        Q.   That's right.  And I'm talking about

7   people.  And you told us that somebody in New

8   York, that's part of the Christian

9   Congregation in New York makes the

10  organizational decisions but you don't know

11  who they are, correct?

12       A.   Right.

13       Q.   You and others at the Westwego

14  Congregation receive brochures, I'm assuming,

15  identifying the date and time and the place

16  of the event.

17       A.   Yes.

18       Q.   Correct?  I'm going to show you some

19  documents and ask you if you've ever seen

20  these, and then we'll come back to the

21  organizational structure in a minute.  This

22  is a document that's identified as -- in this

23  case filed by the defendants as Document 59-1

24  filed February 11, 2013, and the heading says

25  "Our Kingdom Ministry April 2011."  And of

```
 1  course we'll put an Exhibit Sticker No. 1 on
 2  it.
 3       MR. MITCHELL:
 4            You want to put a sticker on it?
 5       MR. THORNHILL:
 6            I've marked as Huguley No. 1 a
 7  document which has markings at the top pages
 8  11 through 18 of the previously described
 9  filing by the defendants.
10  BY MR. THORNHILL:
11       Q.  I'll ask you, sir, if you have ever
12  seen this document.
13       A.  "Our Kingdom Ministry," yes.
14       Q.  Say again?
15       A.  "Our Kingdom Ministry," yes.
16       Q.  Did you see this document --
17       A.  Yes.
18       Q.  -- before?
19       A.  April the 11th about the assembly?
20  I seen these documents.  We get documents
21  like that.
22       Q.  Is that the document to which you
23  were referring when you said there is an
24  announcement of the district convention?
25       A.  No.  We have letters that come out
```

1  in January.

2      Q.    Okay.  What do those letters say?

3      A.    Stating the time and place of the

4  convention coming from the Christian

5  Congregation.

6      Q.    All right.  And you've seen those

7  letters.

8      A.    Yes.  We read it all.

9      Q.    All right.  Letters in January of

10  2011 which announce the time and place?

11      A.    Of the convention.

12      Q.    And the location of the convention?

13      A.    Yes.

14      Q.    All right.  Do those letters from

15  the Christian Congregation identify people in

16  your congregation at Westwego, the English

17  Congregation at Westwego, who have

18  responsibilities at the district convention?

19      A.    No.

20      Q.    Does anyone among your group of

21  elders in Westwego serve on a board or a

22  committee that you previously referred to as

23  the circuit?

24      A.    The circuit, no.  Nobody serve on

25  the board.

1        Q.    What geographical area comprises the

2   circuit?

3        A.    Well, they have from Houma to New

4   Orleans.

5        Q.    How many churches?

6        A.    How many Kingdom Halls?  There's

7   only roughly around 21, 22.

8        Q.    22 Kingdom Halls.

9        A.    Yes, sir.  That's the circuit.

10       Q.    Kingdom Hall is basically the same

11   thing as a church, right?

12       A.    No.  We're different.  We don't say

13   churches, we say Kingdom Hall.

14       Q.    Right.  But in terms of other

15   religions --

16       A.     They say church.

17       Q.    -- whether it's Catholic or

18   Protestant, they refer to the building as the

19   church building, right?

20       A.    Uh-huh (affirmative response).

21       Q.    That's what you mean when you say

22   Kingdom Hall, right?

23       A.    Kingdom Hall.

24       Q.    It's not a spiritual reference for

25   you, it's a building.

```
1        A.    Kingdom Hall, it's a building.
2        Q.    There are 22 buildings from Houma to
3   New Orleans, right?
4        A.    Not buildings itself, congregations.
5   Because some, like with the English and
6   Westwego, some congregations may be two or
7   three in one congregation.
8        Q.    Got you.
9        A.    Yeah, one building.
10       Q.    Got you, got you.  That's what I'm
11  getting at.  So as is the case with your
12  English Westwego Congregation and the Spanish
13  Congregation, there's two congregations in
14  one Kingdom Hall.
15       A.    Right.
16       Q.    And when you refer to 22 Kingdom
17  Halls, there may be --
18       A.    22 congregations.
19       Q.    22 congregations is what you meant.
20       A.    In a circuit.
21       Q.    Okay, 22 congregations.  Do you know
22  anybody from those other congregations?
23       A.    Yes.
24       Q.    You meet them at the circuit
25  conventions?
```

```
 1        A.    Yes.

 2        Q.    Now, there is a circuit convention,

 3   right?

 4        A.    No.  Circuit assembly.

 5        Q.    Circuit assembly.  Let's get the

 6   names right.  Do all of the 22 congregations

 7   in the circuit attend the circuit

 8   congregation meeting?

 9        A.    Well, they try to.  Everyone try to

10   make their meetings.

11        Q.    Where is that held generally?

12        A.    Usually in Thibodaux.

13        Q.    In Thibodaux.  Okay.  Have you been

14   to one of those lately?

15        A.    We went there beginning of this

16   year, January 6th.

17        Q.    Did you go in 2011?

18        A.    Yes.

19        Q.    You did?

20        A.    Assemblies, yeah.

21        Q.    So you had a circuit convention.

22        A.    So we usually go to assemblies, at

23   least two circuits and one district a year.

24        Q.    When you say we usually go to --

25        A.    Jehovah's Witnesses have assemblies
```

1  and conventions each year.

2      Q.   So you're saying in 2011 there was

3  an assembly of the 22 congregations in the

4  circuit.

5      A.   Yes.

6      Q.   Were only those 22 congregations

7  there?

8      A.   Well, we have 22 congregations that

9  attend circuit assembly.  Now, there's

10  assemblies going on all over, but in our

11  circuit we have -- attend in Thibodaux.

12      Q.   Right.  In 2011 you had a circuit

13  assembly.

14      A.   Yeah.

15      Q.   All right.  That's not related at

16  all to the district convention, correct?

17      A.   Right.

18      Q.   The district convention is comprised

19  of how many congregations?

20      A.   Well, the district may include other

21  -- I don't know how many.  I can't say.

22      Q.   Okay.  Have you ever been involved

23  in preparing for a circuit assembly?

24      A.   What you mean?

25      Q.   Have you been involved in preparing

1  the organization?

2       A.   Oh, no.

3       Q.   No?  So your responsibilities as an

4  overseer in your Westwego Congregation, the

5  English Westwego Congregation has never

6  included any responsibility for organizing

7  and putting on circuit assemblies, correct?

8  That's correct?

9       A.   That's correct.

10      Q.   Is the same true with respect to the

11  district conventions, that your position as

12  overseer of the elders and the Westwego

13  Congregation has never included any

14  responsibilities for organizing and putting

15  on the district convention?

16      A.   That's correct.

17      Q.   So it follows that in 2011 you

18  didn't have anything to do with the July 2011

19  district convention, correct?

20      A.   That's correct.

21      Q.   Other than having attended, correct?

22      A.   That's all.

23      Q.   Now, did you know anybody who did

24  have responsibility for putting on,

25  organizing and putting on the district

1  convention in 2011?

2      MR. MITCHELL:

3          Object to the form.

4      THE WITNESS:

5          I don't know anyone.   I don't know

6  no more than the Christian Congregation of

7  Jehovah's Witnesses.

8      MR. THORNHILL:

9          What is your objection to form?

10     THE WITNESS:

11         They organized it.

12     MR. THORNHILL:

13         What is your objection to form?

14     MR. MITCHELL:

15         He already answered it.

16     MR. THORNHILL:

17         What is your objection to form?   I

18 want to make sure I can rephrase the

19 question, if you don't mind.

20     MR. MITCHELL:

21         He already answered it.

22     MR. THORNHILL:

23         He answered your objection?

24     MR. MITCHELL:

25         No.   He answered that question.

1  You've asked him that question a few times

2  and so I objected to the form.  You've gone

3  over that, over that and over that.  He's

4  told you many times that he had nothing to do

5  with it and he didn't know anybody that had

6  anything to do with it.  You're beating a

7  dead horse.

8      THE WITNESS:

9          Same thing keep coming.

10 BY MR. THORNHILL:

11     Q.   So, sir, you didn't know anybody

12 involved in the organization --

13     MR. MITCHELL:

14          Here we go again.

15 BY MR. THORNHILL:

16     Q.   -- or in the district convention

17 activities.

18     A.   No.

19     Q.   Do you know if there are people who

20 are appointed in the district convention to

21 serve in different roles, for instance, those

22 who serve in managing food and beverages?

23     A.   I don't have any knowledge of it.  I

24 see people working but I don't know them

25 personally.

1   Q.   Are there served to people at the

2   district convention food and beverage?

3   A.   No.

4   Q.   No drinks?

5   A.   We bring our own lunch.

6   Q.   Okay.  So the answer to the question

7   is there's not served at the district

8   convention any food or any beverages.

9   A.   That's correct.

10   Q.   Right?  Everyone's responsible to

11   bring their own.

12   A.   That's right.

13   Q.   Correct?

14   A.   That's correct.

15   Q.   Do you know if there's anyone

16   identified as responsible for safety at those

17   conventions?

18   A.   Well, they have safety.  They have

19   safety.

20   Q.   They do?

21   A.   Yes.  They have people there for

22   safety.

23   Q.   Have you ever been one of those

24   people --

25   A.   No.

1    Q.    -- at a district convention

2 responsible for safety?

3    A.    No.

4    Q.    Do you know anybody who has been a

5 person responsible for safety at the district

6 convention?

7    A.    No.

8    Q.    Do you know that those people

9 actually exist when you say that they have

10 people?  Apparently you think that they

11 exist, right?

12    A.    Well, there have to be somebody

13 there to oversight.

14    Q.    Right, right.  And who would that

15 be?

16    A.    I don't know.

17    Q.    Does the letter that's received in

18 January of 2011 identifying the upcoming

19 district convention you said was sent from

20 the Christian Congregation of Jehovah's

21 Witnesses in New York, does that letter

22 identify people responsible for safety?

23    A.    No.

24    Q.    When you say there have to be people

25 responsible for safety at the district

1  convention, tell me about why you think that.

2      A.   Well, one thing about it, everything

3  has to -- the scripture at 1 Corinthians

4  14:40 says everything should take place

5  decent and by arrangement.  And so everybody

6  there wants to make sure that everything runs

7  according to plan.  You can't make sure that

8  everything run perfectly but you need some

9  order.

10     Q.   And who is responsible to make sure

11 that that order exists in accordance with 1

12 Corinthians 14:40?

13     A.   Well, you have people that's there

14 that serve as attendants, and they try to

15 make sure that everything runs smoothly.  And

16 what they do, they try to make sure people

17 are properly seated.  They make sure that

18 people are greeted, make sure there's nothing

19 there that -- obstruction that can cause

20 hazards.  Maybe water spills on the floor,

21 maybe people walking about chatting or too

22 noisy or idle.  They're making sure they're

23 seated and trying to accommodate others in

24 the arena.

25     Q.   So there are people that you know of

1   you saw at the district convention in 2011

2   who were responsible for seating, greeting,

3   removing obstructions and hazards?

4        A.   And making sure the building is

5   clean.

6        Q.   Okay.

7        A.   Yeah.  Dealing with parking.  And so

8   inside and outside they have people in

9   position to care for certain functions.

10       Q.   Okay.  So you know that those people

11  exist, you just don't know their name.

12       A.   Right.

13       Q.   And you assume that they're doing

14  these things based upon what you see,

15  although you haven't seen any documents that

16  identify the responsibilities of the

17  attendants of whom you refer, correct?

18       A.   Right.  And then there's people that

19  come that volunteer their time.  So they have

20  a volunteer desk so people that would like to

21  assist in working.  So whatever capacity they

22  can help out, that's what they do.

23       Q.   Now, you mentioned earlier the name

24  of a Watchtower study.

25       A.   Watchtower study.

1      Q.    Do you know anything about an entity

2 called Watchtower?

3      A.    Yes.

4      Q.    Watchtower Bible and Tract Society

5 of New York, Inc., do you know anything about

6 that?

7      A.    Yes.

8      Q.    What do you know about that?

9      A.    Well, as far as with the convention

10 itself, it just provides the talks or

11 program, that's it.

12      Q.    So the Watchtower Bible and Tract

13 Society of New York, Inc., prepares tracts?

14      A.    Programs, literature, things of that

15 nature that --

16      Q.    Such as Exhibit 1?

17      A.    Yes.

18      Q.    They prepare that, right?

19      A.    Yes.

20      Q.    Did they send out the letters in

21 January of 2011 identifying the time and

22 place and location?

23      A.    Well, the Christian Congregation is

24 the one that's make sure that the convention

25 is organized.

1       Q.    Okay.   So that's the New York entity

2    called the Christian Congregation that sends

3    the letter?

4       A.    Yeah.

5       Q.    And the Christian Congregation of

6    New York organizing the convention, correct?

7       A.    Yes.

8       Q.    They appoint the people who are

9    responsible for seating and greeting and

10   removing obstructions, et cetera, right?

11      A.    Well, you said they are responsible

12   for all of that as far as removing -- what I

13   just mentioned about the program, make sure

14   everything run smoothly.

15      Q.    Is that correct?

16      A.    Well, the local brothers there at

17   the convention, they make sure that

18   everything runs smoothly.

19      Q.    And how do you know that?  How do

20   you know that the local brothers there,

21   wherever that is -- in this case is it

22   Mobile, Alabama?

23      A.    Right.

24      Q.    Are there local brothers in Mobile,

25   Alabama who are responsible for organizing

1   the convention and making sure that people

2   are properly seated and greeted and

3   obstructions are removed, et cetera?

4        A.   For those who have position, make

5   sure they are fully aware of what their

6   position are, what they're supposed to do.

7        Q.   Okay.  And how do you know that

8   local brothers are given that responsibility?

9        A.   Well, in times past -- I don't serve

10  as an attendant now, but in times past they

11  have instructed me in those areas as to what

12  to do.

13       Q.   They being the Christian

14  Congregation of Jehovah's Witnesses in New

15  York?

16       A.   Local brothers at the congregation.

17  If I'm serving as an attendant, the local

18  brother would tell me what my assignment

19  would be as far as how to carry out my

20  assignment effectively.

21       Q.   Where did you serve as an attendant

22  for a district convention?

23       A.   Well, that's been so many years ago.

24  I think it was in Biloxi.

25       Q.   Okay.  And when was that generally;

1  do you recall?

2       A.   No.  It's been a few years.

3       Q.   Before Katrina?

4       A.   Way before Katrina.

5       Q.   All right.  Before you became a

6  deacon or an elder in 1985?

7       A.   Well, I served as an attendant

8  before I became an elder, as a ministerial

9  servant, yeah.

10      Q.   So the time you served as an

11  attendant that you recall was before you

12  became an elder.

13      A.   Yes.

14      Q.   And it was before 1985, therefore.

15      A.   Oh, yeah.  I served as an elder in

16  1985.

17      Q.   Since you've been an elder, you

18  haven't served as an attendant.

19      A.   Well, my wife is sickly so I care

20  for her now.

21      Q.   Did I understand correctly that

22  since 1985 you haven't served?

23      A.   Yeah.

24      Q.   Now, you said some local brothers

25  taught you or instructed you on what to do?

1       A.    My brothers instruct as to what to

2   be done as an attendant.

3       Q.    So what did they tell you?

4       A.    Well, basically, if I'm serving as

5   an attendant, make sure that we seat people

6   properly.

7       Q.    And what does that mean?

8       A.    Greet them.  In other words, if you

9   have someone coming into the auditorium, then

10  brothers are serving in certain sections of

11  the auditorium.  Just like maybe your stadium

12  there, brothers are sectioned off in each

13  areas as attendant.  If they needed seats,

14  they may tell you they got three here, they

15  may let four.

16          They seat people, try to get them

17  all seated, and then they tell them this way.

18  And then they make sure they got the count of

19  number of seats that is empty.  And so they

20  give a count to how many was there.  And so

21  if anything -- there's a spill or if there's

22  any problem, maybe an accident, emergency,

23  then they would contact first aid.

24  So these are the things that we're instructed

25  to do as attendants.

1      Q.    So somebody from a local

2    congregation in Biloxi, I take it, way back

3    in the early 1980's, met with you and told

4    you as a prospective attendant to make sure

5    that the people are properly seated.

6          A.    And greeted, yeah.

7          Q.    And greeted.  And did that include

8    any instructions on making sure that the

9    disabled were placed in the disabled section?

10         A.    They have a section for the

11   disabled, yes.

12         Q.    Was it your responsibility as an

13   attendant to make sure people that are

14   disabled and elderly and infirm were placed

15   in an area that was convenient on the ground

16   floor level?

17         A.    If there's areas that's available.

18   Because even with us -- my wife is disabled,

19   too.

20         Q.    Right.

21         A.    I know it's incumbent upon me to get

22   there early to get seats.  And if we're there

23   late, then the ground floor may fill up real

24   fast.  They have a section around the arena

25   they set aside for the elderly and the

1   infirm, and so they leave those seats

2   available for them as well.  And so usually

3   younger people, people with strength don't

4   take those seats.  But if some congregations

5   -- some facilities fill up real fast, so I

6   try to get there early.  Sometimes I'm not

7   successful in doing that.  And so because my

8   wife is disabled, we have a wheelchair she

9   sits in, and so sometimes I don't even get a

10  seat on the ground floor so I look for seats.

11  An attendant is very helpful in trying to

12  find you seats.

13      Q.   That was your experience before 1985

14  when you became an elder, correct?

15      A.   Well, yes.  I see that even now.

16      Q.   Okay.  So your general discussion

17  about seating in your previous response --

18  does that in any way relate to the district

19  convention in 2011 in Mobile?

20      A.   Well, all the convention we have I

21  see the attendants doing the same thing.

22      Q.   But my understanding is that you

23  weren't involved at all in the --

24      A.   No, I don't serve as an attendant

25  now.

1      Q.    You didn't serve as an attendant in

2    the 2011 district convention.

3      A.    Right.

4      Q.    You don't know anybody who served as

5    a convention attendant, correct?

6      A.    No.

7      Q.    In 2011.

8      A.    In 2011?

9      Q.    You didn't know anybody and you

10   didn't serve and you weren't involved,

11   correct?

12     A.    I wasn't involved.

13     Q.    All right.  When you were there, did

14   your wife sit in a wheelchair?

15     A.    Yes.

16     Q.    Did she sit in a disabled section?

17     A.    She was right at the entrance.  So

18   one of the entrance as you entered the

19   coliseum.  She couldn't get on the main floor

20   and she couldn't go up, so they allowed her

21   to sit right there at that entrance.

22     Q.    All right.  And the attendants are

23   responsible to make sure that the people like

24   your wife who are in wheelchairs and

25   otherwise disabled or elderly or infirm have

 1  a place to sit so they don't have to climb

 2  those stairs, correct?

 3       A.   That's correct.

 4       Q.   Now, my understanding is that you

 5  were in attendance in 2011, correct?

 6       A.   I wasn't.

 7       Q.   You were not there in July?

 8       A.   I was there, oh.  I thought you said

 9  serving as an attendant.

10       Q.   No.  In attendance.  Correct?

11       A.   Yes.

12       Q.   Did you see Patsy Maddox there?

13       A.   I didn't see her.  I saw her at the

14  hotel because we was at the same hotel.

15       Q.   But you did not see her at the

16  convention.

17       A.   No.

18       Q.   Did you see her the day that she

19  fell?

20       A.   Afterwards at the hospital.

21       Q.   But at the convention you did not

22  see her.

23       A.   No.

24       Q.   And did you see the fall?

25       A.   No.

1      Q.   Do you know anything about it?  Have
2  you talked to anybody about it?
3      A.   About the fall?
4      Q.   Yeah.
5      A.   Well, I talked to Rachel and Shannon
6  as well.
7      Q.   Well, they weren't there, were they?
8      A.   No.  They came later.
9      Q.   What did you tell them?
10      A.   Oh, I didn't tell them anything, no
11  more than -- one of the people in first aid
12  called them to let them know their mother had
13  an accident.
14      Q.   So someone else called them.
15      A.   First aid.
16      Q.   But then you didn't tell them
17  anything.  You just saw them.
18      A.   Yeah.  I was there but I didn't see
19  no fall, didn't see her.
20      Q.   Right.  But you said you saw Rachel
21  and Shannon.
22      A.   Later on at the hospital.
23      Q.   Right.  But you didn't talk to them.
24      A.   At the hospital I did.
25      Q.   Oh, you did talk to them.

1        A.   Yeah, at the hospital.

2        Q.   So you did tell them something.

3        A.   I said no, I didn't tell them

4    anything because I didn't know anything.   I

5    don't know anything about the accident.

6        Q.   I see.

7        A.   No more than she fell and she was

8    there and I was concerned about her

9    well-being.

10       Q.   Did you hear from anyone about the

11   accident?

12       A.   What you mean did I hear from

13   anyone?

14       Q.   Right.   As I understand it, you

15   didn't actually see or witness the

16   accident --

17       A.   No.

18       Q.   -- right, the fall?

19       A.   Yeah.

20       Q.   You didn't see that.

21       A.   No.

22       Q.   You saw the arena.   You were there.

23       A.   I was there.

24       Q.   You saw where people were supposed

25   to sit if they were infirm, right?

1      A.    Yeah.

2      Q.    But you didn't see Miss Maddox

3  there.

4      A.    I didn't see her at the assembly.

5      Q.    And you didn't hear anything about

6  the exchange between Miss Maddox and her

7  request to sit in the area that was

8  designated for disabled, correct?

9      A.    No.

10     Q.    You didn't hear any of that.

11     A.    No.

12     Q.    And you haven't heard from anyone

13  anything about that, correct?

14     A.    I didn't hear nothing.

15     Q.    You haven't heard anybody tell you

16  what happened in an exchange between Patsy

17  Maddox and the ushers, correct?

18     A.    No.

19     Q.    You don't know anything about that,

20  correct?

21     A.    Yeah.  I didn't see her so how could

22  I have heard that?

23     Q.    Well, you could have heard from

24  others afterwards like Mr. Patrick Victor.

25     A.    No.

```
 1          Q.   Did you talk to him afterwards?

 2          A.   No.

 3          Q.   Did you talk to his wife, Kathy

 4    Victor?

 5          A.   They was at the hospital.

 6          Q.   Did you talk to them?

 7          MR. MITCHELL:

 8               Let me object to the form of this

 9    whole thing, but go ahead and answer to the

10    extent you can.

11    BY MR. THORNHILL:

12          Q.   Did you?

13          A.   I saw them at the hospital.

14          Q.   Right.  Did you talk to them about

15    what happened?

16          A.   Well, the only thing -- yes, we

17    talked, but mainly she was talking to Rachel.

18          Q.   She being whom?

19          A.   Pat and Kathy talked to Rachel at

20    the hospital.

21          Q.   Pat and Kathy Victor?

22          A.   Yes.

23          Q.   Talked to Rachel.

24          A.   Yes, Rachel and Shannon.

25          Q.   But did they tell you or did you
```

overhear them tell Rachel about what

happened?

    A.   Well, only thing I heard, and she

denies it now, that Rachel said her mother

usually pass out.  And I was trying to find

out what happened.  And so I mentioned it to

her again and she denies it, but even she had

fallen in the bathtub.  So I'm wondering did

that contribute to the fall, because I don't

know how she fell.  So I'm asking about her

well-being, her physical well-being.

    Q.   Okay.  First let's break this down a

little bit, if you don't mind.  You were at

the hospital.

    A.   Uh-huh (affirmative response).

    Q.   You overheard the Victors talking to

Rachel.

    A.   Yeah.

    Q.   What did the Victors say?

    A.   Just trying to see how her mother

was.

    Q.   The Victors were asking Rachel how

Rachel's mother is?

    A.   Nobody never went in to see her.  It

was late that night and the nurses and doctor

1  was still in there, and so no one went in to

2  see them.  And then later the nurse came out,

3  I'd say it must have been close to 11, around

4  that time, and called Rachel in to see her

5  mother, but yet I never seen her.

6      Q.  Did the Victors talk to Rachel?

7      A.  Yes.

8      Q.  Were you present?

9      A.  Yes.

10     Q.  Did you hear what the Victors said?

11     A.  No.  I wasn't concerned about that.

12  What they talked about, I don't know.  That

13  was irrelevant.  I know she was concerned

14  about her health.

15     Q.  You may think it's irrelevant.  I

16  just need to know if you heard what she said.

17     A.  No.

18     Q.  Did you hear what Rachel said to

19  them?

20     A.  No.

21     Q.  Did Rachel talk to you that night?

22     A.  She just spoke to me.  It wasn't

23  nothing pertaining to her mother.

24     Q.  So when did you say or did Rachel

25  say that Miss Patsy Maddox usually passes

1   out?

2        A.   Well, I asked her that question.

3        Q.   Okay.  Did Rachel say something to

4   make you ask that question?  In other words,

5   did she say, "My mother usually passes out"?

6        A.   I just tried to find out what

7   happened, because I knew she fell.  And then

8   she said, "My mother usually pass out."  And

9   so I'm trying to figure out why, you know,

10  because nothing -- I never knew that myself,

11  what caused that.  Did she just trip?  Did

12  she pass out, give out?  I don't know.  So

13  I'm just inquiring.

14       Q.   So did you ask Rachel if her mother

15  passed out?

16       A.   She gave that.

17       Q.   So you didn't say anything about --

18       A.   Now she denies it, that she said it.

19       Q.   Okay.  So you've talked to Rachel

20  more than once?

21       A.   I talked to her at the hospital too

22  and when she came back to New Orleans.

23       Q.   Okay.  You talked to Rachel more

24  than once then, right?

25       A.   Yeah.

1    Q.    At the hospital you asked her what

2  happened and she said, "My mother usually

3  passes out"?

4    A.    She mentioned about her mother's

5  condition.

6    Q.    What was her mother's condition?

7    A.    Well, she was talking about her

8  health, you know, as far as passing out, she

9  black out.  And so she had fallen.  So I'm

10 concerned did that contribute to the fall.  I

11 don't know.  I'm not saying she fell.  She

12 could have tripped.  I don't know.  I'm

13 asking.

14    Q.    So you talked to Rachel at the

15 hospital and you think that she said in

16 response to your question what happened --

17    A.    Uh-huh (affirmative response).

18    Q.    Of course Rachel wasn't there,

19 right?

20    A.    Uh-uh (negative response).

21    Q.    So Rachel doesn't know what

22 happened, right?

23    A.    Yeah.

24    Q.    Correct?

25    A.    Yeah.

1        Q.    And you think Rachel said to you

2   then that Rachel has a mother who is known to

3   pass out?

4        MR. MITCHELL:

5             Object to the form of the question.

6   Go ahead and answer it if you can.

7   BY MR. THORNHILL:

8        Q.    Correct?

9        A.    I'm saying she invited the

10  information that her mother had a condition

11  that she sometime pass out.

12       Q.    She invited the information?

13       A.    Yes.  I didn't -- I don't know if

14  she had passed out.  But now I said she

15  denies that she said that because I asked her

16  again.

17       Q.    When?

18       A.    At the hospital when she moved to

19  New Orleans, her mother.

20       Q.    Okay.

21       A.    You know.  Some people are very

22  secretive, they don't want to disclose much.

23  I don't know.  I just wanted to know what

24  actually took place, you know, if her mother

25  was sickly or had problems with equilibrium

1   or balance.  See, that never was disclosed to

2   me, you know, so I don't know.

3        Q.   Do you know anything about Patsy

4   Maddox's health?

5        A.   Well, I know she was frail.  Before,

6   at one time she seemed like she couldn't do

7   much, and then when her husband died she

8   seemed like she became more independent.  She

9   start driving.  She start doing things.  She

10  start coming to meetings.  So it looked like

11  she had a -- I would still say she wasn't --

12  she might still be sickly but she was able to

13  do more after her husband's death than she

14  did when her husband was alive.

15       Q.   When you say that she was frail, I

16  mean, you knew her.

17       A.   I know she was thin.

18       Q.   You went to church with her.

19       A.   Yeah.

20       Q.   Right.  So you saw her.

21       A.   Uh-huh (affirmative response).

22       Q.   And you described her as thin,

23  right?

24       A.   Uh-huh (affirmative response).

25       Q.   Less than 100 pounds.

1          A.    Yes.   I don't know how much she

2    weighed.

3          Q.    Did you ever see her car?

4          A.    (Witness nods head affirmatively.)

5          Q.    Did you see that disabled sticker

6    that she had on her car?

7          A.    I didn't pay no attention to that.

8          Q.    Right.  Did you have at the Kingdom

9    Hall a place for the disabled to park?

10          A.    We have disabled parking.

11          Q.    Right.  And so did she park there?

12          A.    She parked just about wherever she

13    wanted to.  She didn't park there.  She

14    parked wherever she felt like parking.

15          Q.    Okay.  So you never saw the disabled

16    sticker but you knew she was frail, right?

17          A.    Yeah.

18          Q.    And then you said that was before

19    her husband died.  When did her husband die?

20          A.    Well, I can't recall the date but I

21    know it was several years.  I'm thinking less

22    than 10 or roughly.

23          Q.    Right, right.  And you said she was

24    having trouble getting around.

25          A.    At that point.  After his death she

1   seemed to be -- start doing a little bit more

2   for herself.

3        Q.   She was still thin and frail.

4        A.   Because she was still living at home

5   by herself.

6        Q.   Right, right, right.  Well, did you

7   know how she got to Mobile?

8        A.   Well, she came with the Victors.

9        Q.   Okay.  Did she ride with them?

10        A.   Yes.

11        Q.   Did they drive her car?

12        A.   No.  She rode with them.

13        Q.   She rode with them.

14        A.   And that's what I'm assuming, she

15   rode with them.

16        Q.   You assume that.  You didn't see

17   that.

18        A.   No.

19        Q.   So the Victors may have driven her

20   car, you just don't know about it.

21        A.   I think they rode with her.  I'm not

22   sure.

23        Q.   You're not sure.  So maybe they rode

24   with her, maybe she rode with them.

25        A.   I don't know.

```
 1        Q.    You just don't know.   Okay.   Now,
 2   other than this Our Kingdom Ministry Exhibit
 3   No. 1 and the letter that you referred to
 4   having been received in January of 2011, were
 5   there any other documents that you know of
 6   that were issued announcing, advertising,
 7   promoting or any other way describing that
 8   which was intended as a district convention
 9   in July of 2011?
10        A.    Well, what we get is through the
11   Kingdom Ministry, and so they will inform you
12   by reminders.
13        Q.    So there were other documents.
14        A.    I'm just assuming.   I'm talking
15   about I don't know if there was still others
16   but some like this one --
17        Q.    Right.
18        A.    -- that's reminders.   So if it came,
19   it came through the Kingdom Ministry.
20        Q.    And is that the Watchtower Bible and
21   Tract Group that sends it out?
22        A.    They send out information.
23        Q.    Do they send out this document like
24   Exhibit 1 or does that come from the
25   Christian Congregation in New York?
```

1          A.    Well, I know the Watchtower send out

2    books, magazines, literature that we receive.

3          Q.    Now, forgive me for asking this.

4    Just to make sure that I know, is the

5    Christian Congregation of Jehovah's Witnesses

6    the Mormons?  Is that the Mormons?

7          A.    No.

8          Q.    No, that's not the Mormons, right?

9          A.    Uh-uh (negative response).

10         Q.    I just wanted to make sure.  The New

11   York group is home office.

12         A.    Yes.

13         Q.    And it's headquarters.

14         A.    Yes.

15         Q.    It's the place where the decisions

16   are made to select the elders for each of the

17   local congregations, correct?

18         A.    Christian Congregation, yes.

19         Q.    Correct?

20         A.    (Witness nods head affirmatively.)

21         Q.    Does it also select the locations

22   for the district convention?

23         A.    Yes.

24         Q.    Does it select the location for the

25   circuit assemblies?

1    A.   Well, they have these facilities

2 checked out and then I guess they get back to

3 them.  I don't know the procedure or protocol

4 on that.

5    Q.   Okay.  Now, do you know anything

6 about the relationship between the Watchtower

7 Bible and Tract Society of New York, Inc.,

8 and the Christian Congregation of Jehovah's

9 Witnesses, Inc., in New York?

10    A.   Well, I know with the convention,

11 the program is through the Watchtower, as far

12 as the talks and everything, the discourses,

13 and the Christian Congregation as far as with

14 the convention itself.

15    Q.   So the convention program is through

16 Watchtower.

17    A.   The program, yes, the public talks,

18 the spiritual feeding that we receive through

19 the Watchtower.

20    Q.   Does it select the people who speak?

21    A.   The Christian Congregation do that.

22 Watchtower just provide the program.

23    Q.   So the people in New York select

24 those who speak at the convention.

25    A.   The Christian Congregation of

1  Jehovah's Witnesses, yeah.

2       Q.   In New York.

3       A.   Yes.

4       Q.   Selects them, correct?

5       A.   Uh-huh (affirmative response).

6       Q.   Now, did you ever read this

7  document, this Exhibit No. 1 styled "Our

8  Kingdom Ministry April 2011"?

9       A.   Yeah.  I read all the Kingdom

10  Ministries.

11       Q.   You read it all?  Okay.  Have you

12  read anything about that which is described

13  as intended for the district convention in

14  these documents?

15       A.   Yes.  I read the Kingdom Ministries.

16       Q.   Is there anything else that you know

17  of?  You said the letter's in January,

18  reminders, neither of which we have, and now

19  this Kingdom Ministry document.  Were there

20  similar Kingdom Ministry documents for other

21  months?

22       A.   I'm not sure.

23       Q.   Or does this come out once?

24       A.   They make reminders when it gets

25  close to the convention.

1      Q.    When you say "they," you mean the

2  Christian Congregation group in New York

3  sends out something to you in -- is it sent

4  to your house?

5      A.    No.   All congregations get the

6  Kingdom Ministry, keeping us informed as to

7  -- about the program.

8      Q.    So do you get a stack of them in the

9  mail from New York?

10     A.    Yeah.

11     Q.    And you distribute through the local

12  church --

13     A.    Yes.

14     Q.    -- these programs?

15     A.    Yes.

16     Q.    Okay.   There's reference in this

17  document on page 4 to program times, parking,

18  seat saving, noon meal, donations, accidents

19  and emergencies, et cetera.   Have you, as the

20  overseer of the English Westwego

21  Congregation, been involved any of those

22  topics for the district conventions,

23  identifying program times, parking, seat

24  saving, the noon meal, donations, accidents

25  and emergencies, medications, et cetera?

1      A.   What do you mean being involved?

2      Q.   Have you served as a person

3  responsible for any of those categories of

4  activities?

5      A.   No.

6      Q.   Do you know if there's any program

7  at the New York entity, the Christian

8  Congregation in New York, that speaks to each

9  of those categories?  Is there somebody in

10 New York that you know is generally

11 responsible for managing the risks associated

12 with seating, for instance, at a district

13 convention?

14     A.   I don't know.

15     Q.   When you say the local brothers,

16 wherever this convention is being held, have

17 responsibilities to instruct others who are

18 attendants, do you know if those local

19 brothers are trained anywhere?

20     A.   I'm not sure, but I know that they

21 have to have experience to be able to

22 delegate and tell a person how to carry out

23 their function.

24     Q.   Tell me about that.  What is the

25 experience?

```
 1        A.    Well, many has served in that
 2   capacity as attendant.   They know what it's
 3   about, security, parking.
 4        Q.    And so when they talk to those who
 5   are actually attendants, those experienced
 6   people have the responsibility as
 7   representatives of the New York entity
 8   holding the district convention to tell
 9   people about the risks associated with
10   parking and seating and those kind of things,
11   right?
12        A.    They will alert them as to what to
13   do.
14        Q.    Okay.   Do you know what they might
15   have told them to do?
16        A.    I don't know.   I'm not certain as an
17   attendant.
18        Q.    Right.   In the past did you know?
19        A.    Well, the thing of it, they just
20   told us basically what my function was, what
21   I needed to do to make sure that everything
22   run smoothly, and I already mentioned that to
23   you.
24        Q.    Now, there is in this case, as I
25   understand it, those of you who are elders in
```

1  local congregations.  When you refer to

2  brothers at, let's say, Mobile who are

3  responsible for handling the attendants,

4  local brothers you said in Mobile would

5  instruct the attendants, correct?

6      A.   Yes.

7      Q.   Do you know any of those people in

8  Mobile?

9      A.   No.

10     Q.   Did you know anyone who was

11 responsible for instructing attendants at the

12 July 2011 district convention?

13     A.   No.

14     Q.   Now, in your position and in your

15 experience, do you know who pays for the

16 district convention?  Who rents the facility,

17 for instance?

18     A.   Who rents the facilities?

19     Q.   Yes.

20     A.   Well, I guess -- I'm not sure.  I

21 can't answer.

22     Q.   Okay.  Is it fair for me to say that

23 if there's a lease that's executed by the

24 Christian Congregation out of New York, that

25 that lease is something you're unfamiliar

99

1   with?

2       A.   Well, I don't know who pays it.  I

3   know they make announcement the first day and

4   third day about contributions, so I guess

5   they get it through that.

6       Q.   So you think that the contributions

7   of those attending pay for the cost of the

8   lease?

9       A.   Everything volunteer, donation,

10  yeah.

11      Q.   But donations would cover that,

12  correct?

13      A.   Yes.

14      Q.   And if there's a written lease

15  between the New York entity, the Christian

16  Congregation of Jehovah's Witnesses in New

17  York and the Mitchell Center, do you know

18  anything about it?

19      A.   No.

20      Q.   You haven't seen it, correct?

21      A.   Well, I seen the Mitchell Center.

22      Q.   The lease, I mean.

23      A.   No.

24      Q.   The lease document.

25      A.   No.

100

1    Q.   You haven't seen that.  And it's my

2  understanding that you know that the

3  donations go to the district for satisfying

4  the expenses of the district convention,

5  correct?

6    A.   I don't know all that entails with

7  that.

8    Q.   Have you ever been involved in the

9  accounting or the --

10   A.   No.

11   Q.   You don't know anything about that.

12   A.   No.

13   Q.   So the money that's collected at

14  these district conventions, where does that

15  money go?

16   A.   I know they offset costs.

17   Q.   You know that?  How do you know

18  that?

19   A.   Well, they have to.  You got a

20  convention.  It has to.  You have everything

21  -- you're leasing the building and everything

22  has to be paid.  So I don't know where the

23  money goes.  I don't distribute it.

24   Q.   Right.  And when you say you know

25  that, you assume that.  You've never seen any

1   documents --

2       A.   No.

3       Q.   -- or checks or you've never been

4   involved in the decision making at the

5   district level, correct?

6       A.   No, I haven't.

7       Q.   Are there people who are above the

8   elders in the local church that serve at the

9   circuit level and the district level?  So

10  they're elected by the churches to be circuit

11  custodians or overseers and then above that

12  district overseers?

13      A.   No brother's really over no one

14  else, but a person can have a position.  That

15  don't mean that he's higher than someone

16  else.

17      Q.   Got you.  As a matter of religious

18  principle, everybody's on the same plane,

19  right?

20      A.   Yes.

21      Q.   But I'm thinking in terms of

22  organization.  And forgive me if I give it

23  structure top to bottom or bottom to top, but

24  my objective is to find out if you know

25  anybody that serves at the circuit level or

1    the district level.

2         A.    Finish your question.

3         Q.    That's my objective.

4         A.    Okay.

5         Q.    Do you know anybody who serves at

6    the circuit level or the district level?

7         A.    No.

8         Q.    Have you heard of anybody that

9    serves at those levels?

10        A.    As far as what?  Make yourself

11   clear.

12        Q.    Anything.  Apparently there's an

13   organization.  There's a circuit level,

14   right?

15        A.    Uh-huh (affirmative response).

16        Q.    And you've identified that there are

17   people from Houma to New Orleans that

18   comprise the circuit level, 22 congregations?

19        A.    Oh, so you're going back to circuit

20   now.  You're confusing me.

21        Q.    I'm just trying to understand the

22   organization of this entity.  And I'll draw

23   on the board for you and we can take a

24   picture of it if you'd like or you can draw

25   if you like.

```
 1        A.    No.   You draw it.

 2        Q.    I'll help you with it.  At the level

 3   you're talking about, you've got the English

 4   Congregation, right?

 5        A.    Uh-huh (affirmative response).

 6        Q.    And the English Congregation is the

 7   one over which you are currently the

 8   president, right?

 9        A.    Coordinator.

10        Q.    All right.  And you also said you

11   were the president.

12        A.    Well, the president, yes.  We elect

13   the board members, yes.

14        Q.    So you're both, congregation

15   president and coordinator, right?

16        A.    Right.

17        Q.    All right.  And above that, just for

18   ease of organization -- because the English

19   congregation is in Westwego, right?

20        A.    Uh-huh (affirmative response).

21        Q.    So you've got Westwego and then

22   Westwego is part of a circuit, right?

23        A.    Yes.

24        Q.    And that circuit comprises 22

25   congregations.
```

1       A.   Right.

2       Q.   And you have circuit assemblies.

3       A.   Uh-huh (affirmative response).

4       Q.   So for ease of diagramming, I'm

5  going to put a big box around the English

6  congregation because there are other churches

7  in the circuit, right?

8       A.   Yes, sir, Kingdom Halls.

9       Q.   Well, you said that there were 22

10 congregations.

11      A.   Yes.

12      Q.   Fewer Kingdom Halls than there are

13 congregations.

14      A.   Fewer buildings, yeah.

15      Q.   Right.  So you said there were 22

16 congregations in the circuit.

17      A.   Yes.

18      Q.   And one of them was the English

19 Congregation at Westwego.

20      A.   That's correct.

21      Q.   That's the one that you're over.  So

22 my question to you is --

23      A.   Not the one I'm over, the one I'm

24 in.

25      Q.   Say it again?

```
 1          A.    The one that I'm in.  I'm in the
 2  English Westwego Congregation.
 3          Q.    Right.  You're the overseer, right?
 4          A.    Yes.
 5          Q.    That's what it's called, the
 6  overseer.
 7          A.    Yes.
 8          Q.    So you're over that.
 9          A.    I'm not over it.  I'm one of the
10  elders in the congregation.
11          Q.    But your title is overseer.
12          A.    Yes, elder or overseer.
13          Q.    Elder or overseer.
14          A.    (Witness nods head affirmatively.)
15          Q.    And you're the president of the
16  organization, though.
17          A.    Right.  But I'm not over the other
18  elders.
19          Q.    All of you serve collectively at the
20  same level, but your position and
21  responsibility is as president.
22          A.    Yes.
23          Q.    Now, in the other 22 congregations,
24  21 or 22 congregations, there are similar
25  people like you, correct, elders.
```

1    A.    Right.

2    Q.    In fact, you identified three of

3  them for the Spanish Congregation at

4  Westwego, correct?

5    A.    Yes.   They're not in our circuit.

6  They're with the Spanish.

7    Q.    Right.   Now, how many circuits --

8    MR. MITCHELL:

9         Hold it.   You missed what his answer

10  was.   Spanish is in a different circuit

11  altogether.

12    THE WITNESS:

13         Yes.   The Spanish also have their

14  circuit.

15    MR. MITCHELL:

16         That's not included.

17    MR. THORNHILL:

18         The Spanish groups have their own

19  circuit.

20    MR. MITCHELL:

21         Own circuit, own district.

22  BY MR. THORNHILL:

23    Q.    Got it.   The circuit in which the

24  English group is involved is only

25  English-speaking people.

```
 1        A.   Right.

 2        Q.   No Spanish-speaking people.

 3        A.   Right.

 4        Q.   So the Spanish-denominated

 5   organizations, they have to go elsewhere,

 6   correct?

 7        MR. MITCHELL:

 8             Let me just -- I can't take it

 9   anymore.

10        MR. THORNHILL:

11             Is that a bad phrase?

12        MR. MITCHELL:

13             No.  I can't take it anymore.  I

14   have to explain something to you.

15        MR. THORNHILL:

16             You can't.

17        MR. MITCHELL:

18             Go off the record.

19        MR. THORNHILL:

20             No, we can't go off the record.  I'm

21   sorry.

22        MR. MITCHELL:

23             You're just wasting tons of your own

24   time.  I'm sorry.

25        MR. THORNHILL:
```

1        Well, I'm just asking for the --

2    MR. MITCHELL:

3        It's in the record.  You've got the

4 record.

5    MR. THORNHILL:

6        The record's wrong.

7    MR. MITCHELL:

8        No, it's not.

9    MR. THORNHILL:

10       Quit arguing with me and let me get

11 it from the witness instead of you.

12   MR. MITCHELL:

13       All right.  You're going to waste

14 tons of time.

15 BY MR. THORNHILL:

16   Q.   All right, thank you.  You've got 22

17 congregations in the circuit.  They're all

18 English speaking, right?

19   A.   Right.

20   Q.   How many in a district?  How many

21 circuits in a district?

22   A.   I don't know.  I just told you that.

23   Q.   Okay.  Who decides how many circuits

24 are in a district?

25   A.   It has to come back to headquarters.

109

1        Q.    Okay.  And so that's the Christian

2    Congregation in New York.

3        A.    Yes, sir.

4        Q.    Now, does this represent the

5    organization of that which you know as the

6    Christian Congregation of Jehovah's Witnesses

7    with the New York entity, district level,

8    circuit level, and then each individual

9    congregation?

10       A.    We have the Christian Congregation

11   of Jehovah's Witness headquarters in New

12   York.

13       Q.    That's the headquarters, right?

14       A.    Yes.

15       Q.    And does this chart represent the

16   organizational structure?

17       A.    Yes.

18       Q.    All right.  Now, in terms of

19   decision making, insofar as you know, all

20   decisions about who does what at district

21   conventions comes from New York?

22       A.    Yes.

23       Q.    Correct?

24       A.    As far as conventions, the English

25   Congregation set that up.

1      Q.    Sets it up.

2      A.    Uh-huh (affirmative response).

3      Q.    Do they train people to be involved

4  in the district conventions, or in cases

5  where you've been involved have you seen that

6  there were people trained to be able to tell

7  you what to do?

8      MR. MITCHELL:

9           I have to object to the form of the

10  question.

11      THE WITNESS:

12           Uh-huh (affirmative response).

13  BY MR. THORNHILL:

14      Q.    Split it into two.  Do you know if

15  there are people at the Christian

16  Congregation of Jehovah's Witnesses in New

17  York who train folks to be involved in

18  district conventions?

19      A.    I don't know.

20      Q.    You don't know.

21      A.    No.

22      Q.    But you know there's somebody who

23  was at one time before 1985, when you were

24  involved as an attendant, who told you what

25  to do.

1    A.    Yes.

2    Q.    And that included things like where

3  to properly seat people who are elderly and

4  infirm, how to greet them, how to take care

5  of obstructions, how to address hazards and

6  keep the building clean, right?

7    A.    (Witness nods head affirmatively.)

8    Q.    Anything else?

9    A.    No.

10    Q.    Is there a budget for your circuit?

11    A.    I don't know all that.

12    Q.    Is there a budget for the district?

13    A.    I don't know all that.

14    Q.    Is there a budget for your church?

15    A.    No.

16    Q.    Does the church receive any of the

17  money from the district convention?

18    A.    No.

19    Q.    So the donations that are made at

20  the district convention go to the people who

21  are organizing the district convention,

22  correct?

23    A.    I don't have no understanding or

24  knowledge of how it's operated.

25    Q.    Who does?

1          A.   Well, I guess it go back to the

2   Christian Congregation.

3          Q.   Somebody in New York.

4          A.   Uh-huh (affirmative response).

5          Q.   How much money is paid to the

6   Watchtower Bible and Tract Society of New

7   York for the documents that are provided for

8   the convention?

9          A.   I don't know.

10          Q.   Do any of those documents address

11   safety?

12          A.   Well, you have announcements like

13   that but that's brief.  But I don't have no

14   manual on it.

15          Q.   You don't have a name.

16          A.   A manual.

17          Q.   A manual.  Is there a manual?

18          A.   I don't know.

19          Q.   All right.  Is there a stated

20   purpose or reason for the district

21   convention?

22          A.   Yes.

23          Q.   What is it?

24          A.   Mainly to strengthen you

25   spiritually, to train you to be good, moral

1   citizen.  Also to help you as far as in your

2   bible understanding.  And we are ministers.

3   We go out and preach the good news, and so we

4   have an obligation to train and teach people

5   the proper way.  And so the convention itself

6   strengthen us in those areas.

7        Q.   With respect to the district

8   convention, any identified purpose beyond

9   training that you just said you know about --

10  that's biblical training, right?

11       A.   Yeah.

12       Q.   Is there any purpose besides that?

13       A.   Well, I know one good thing.  I

14  always appreciated being together with people

15  of like faith to be able to encourage and

16  uplift one another.

17       Q.   When someone makes a donation at a

18  district convention, is that donation

19  recorded and kept in the way of -- if you

20  attend -- let me use you as an example and

21  rephrase it this way.  If you were to attend

22  the district convention --

23       A.   I do attend.

24       Q.   -- and you were to write a check

25  that day as a donation and that check's for

1   more than $250, are there records kept by

2   someone of those donations?

3       A.   No.   They're voluntary donations.

4       Q.   And so if people make donations of

5   more than $250 at the district convention,

6   that money is not accounted for by anyone,

7   and perhaps you, as a donor, are given a

8   receipt or statement of your contributions.

9       A.   I don't ask for a receipt so I don't

10  know.

11      Q.   You've never seen that.  In your

12  position as president of the English Westwego

13  Congregation, do you account for people's

14  donations?

15      A.   No.

16      Q.   You don't either.

17      A.   Uh-uh (negative response).

18      Q.   There's no record keeping at all,

19  correct, on the money.

20      A.   No.   Voluntary donations.

21      Q.   Okay.  At your church I'm

22  understanding that you probably practiced the

23  Christian principles of taking care of the

24  widows, right?

25      A.   Uh-huh (affirmative response).

```
 1        Q.    Right?

 2        A.    Uh-huh (affirmative response).

 3        Q.    Was Patsy Maddox within that group

 4  of people called widows that your church took

 5  care of?

 6        A.    Yes.

 7        Q.    She was?

 8        A.    Yes.

 9        Q.    What did you do for her?

10        A.    Well, we visit her, we shepherd her.

11  We encouraging her, try to strengthen her.

12  If there's anything that she would need done,

13  we try to assist her in that area.

14        Q.    Did you assist her when she was

15  feeble and frail and unable to get around?

16        A.    Well, at the time she was getting

17  around.  She lived independent, even apart

18  from her children.  So she had them as well.

19        Q.    So insofar as Patsy Maddox was

20  concerned, she wasn't on the list of people

21  that you considered a widow in need of

22  assistance?

23        A.    I know she was a widow.  As far as

24  being independent, she was.

25        Q.    Right.
```

116

1      A.   She was very independent.

2      Q.   But she still had trouble getting

3   around.   I mean, you saw that.

4      A.   Well, I saw her driving, going where

5   she want to go, shopping, whatever she want

6   to do.

7      Q.   But in terms of walking around the

8   church and being able to involve herself, she

9   was still frail and unable to get around very

10  good, wasn't she?

11     A.   Even though I use the term frail,

12  I'm looking at her thinness, but she was

13  quite mobile, yeah.

14     Q.   So you didn't think she needed any

15  help.

16     A.   Well, I don't know.   I can't say.

17     Q.   Oh, you didn't know.

18     A.   She's just a few years older than I

19  was.   And so we talked, we walked about, we

20  sat, we laughed.   And so trying to assess her

21  in that way, I can't say.

22     Q.   So in terms of your organization at

23  the local level, you had not identified Patsy

24  Maddox as somebody that needed assistance,

25  correct?

1        A.   Well, she lived independent but we

2   shepherd her as one of the elderly and the

3   infirm.

4        Q.   Did you ever go to her house?

5        A.   Yes.

6        Q.   Did you ever go with her where she'd

7   drive?  Were you in a car with her where she

8   drove?

9        A.   No.

10       Q.   How far was it from her house to the

11  church house?

12       A.   Well, probably -- she lived in

13  Avondale.  She had to be about less than five

14  miles.

15       Q.   Okay.  And did she attend regularly?

16       A.   No.

17       Q.   No.

18       A.   Only when she could she did.

19       Q.   Now, in one of your earlier

20  statements you said you were thinking that

21  maybe she had fallen in the bathtub?

22       A.   I thought I heard Rachel say that.

23       Q.   You thought you heard Rachel say

24  that?

25       A.   Yeah, at the hospital.

1          Q.    Do you know when you thought you

2    heard her say that in terms of a time frame?

3    Was that while you were at the hospital?

4          A.    No.

5          Q.    No, it wasn't at the hospital?

6          A.    Now, you got to repeat that.   You

7    said a time frame as to --

8          Q.    The time frame as to when you heard

9    what you think you heard, that Rachel said

10   her mother fell in the bathtub.

11         A.    Oh, we was at the hospital together.

12         Q.    Right, right.

13         A.    Uh-huh (affirmative response).

14         Q.    To what time frame was Rachel

15   referring that her mother fell in the

16   bathtub?

17         A.    So I'm not sure when she fell, but

18   she said she seemed to, you know, fall.   And

19   so I asked her about that question, and she

20   said, "No, I didn't say that."   So I don't

21   know.   So I left it alone.

22         Q.    So you asked her that at the

23   hospital?

24         A.    She told me at the hospital that she

25   fell.   And so but then afterward -- because

1   we're looking at her mother being there at

2   the convention and she had fallen.  I don't

3   know if she assess maybe whether she should

4   have been there or not.  I don't know why she

5   said that, but then she came back and said

6   she didn't say that.  So I left the question

7   alone.

8        Q.   When you think you heard Rachel say

9   that her mother may have fallen in the

10  bathtub at some point in time, do you know

11  what time she was thinking about?

12       A.   No.

13       Q.   When it was that she thought her

14  mother may have fallen?

15       A.   No.

16       Q.   Or you thought she said, although

17  she later said she didn't say that, correct?

18       A.   Right.

19       Q.   Is that correct?

20       A.   Yeah.

21       Q.   All right.  Was anybody else with

22  you when you had the conversation with Rachel

23  and you think you heard her say that, you

24  know, her mother at some time or another had

25  fallen in the bathtub?

1        A.    Well, we was all at the hospital.

2   Whether they heard it or not, I don't know.

3        Q.    Okay.  Did you discuss that with

4   anyone?

5        A.    No.

6        Q.    Did you discuss with anyone those

7   things that you just mentioned to me as

8   causes of her mother falling?  You said that

9   you thought you heard that Rachel said her

10  mother usually passes out and had fallen in

11  the bathtub.  Did you discuss that with

12  anyone else?

13       A.    No.

14       Q.    You did not.

15       A.    Yes.  So I talked to her about that.

16       Q.    Right.  And my question to you is

17  did you talk to anyone else about that?

18       A.    And I asked her -- my daughter was

19  with me.  I asked her did she hear that.

20       Q.    And did she?

21       A.    Well, I'm not sure she did or not so

22  I didn't --

23       Q.    What did your daughter tell you?

24       A.    I can't remember then whether she

25  said she did or not.

```
 1         Q.    When did you ask your daughter if
 2  she heard that?
 3         A.    We was talking after.  We went
 4  outside, and so we just talked about it.  So
 5  I don't know if she said she heard it or not.
 6  But I can ask her.  I can get back with you
 7  on it.
 8         Q.    What is your daughter's name?
 9         A.    Usheika.
10         Q.    Spell that.
11         A.    U-S-H-E-I-K-A.
12         Q.    And her last name?
13         A.    Huguley.
14         Q.    How old is she?
15         A.    She's 42.
16         Q.    Is she married?
17         A.    No.
18         Q.    Not married.  So you don't know if
19  she heard.
20         A.    No.  But I can check.
21         Q.    And you did discuss it with her.
22  When you mentioned to your daughter, "Did you
23  hear that?" what did your daughter say?
24         A.    I don't remember.  I have to check
25  with her.
```

1     Q.   But you don't recall her having
2  said, Yeah, I heard that, correct?
3     A.   I don't know.  I'll check with you.
4  I can find out.
5     MR. MILLER:
6          Asking a repetitive question.
7     MR. MITCHELL:
8          Off the record a second.
9  (OFF-THE-RECORD DISCUSSION)
10    MR. THORNHILL:
11         Let's take a five-minute break.
12 (BRIEF RECESS)
13 BY MR. THORNHILL:
14    Q.   Has the Christian Congregation of
15 Jehovah's Witnesses, Inc., in New York, to
16 your knowledge, ever involved itself in
17 training people on crowd management?
18    A.   Not to my knowledge.
19    Q.   Do you know anything about the
20 insurance that is obtained for the district
21 convention activities?
22    A.   No, I don't.
23    Q.   Who are elderly publishers?
24    A.   Well, people that's of age.
25    Q.   This document, Exhibit No. 1, speaks

1  to, "Are there elderly publishers or others

2  in the congregation who need assistance in

3  order to attend the convention?"

4       A.   Uh-huh (affirmative response).

5       Q.   You read that in this document when

6  you received it?

7       A.   Yeah.

8       Q.   And that was directed to those who

9  were elders in your congregation, correct?

10      A.   Elderly, yeah.

11      Q.   And then a second question, "Are you

12  in a position to help them, 1 John 3:17 and

13  18.  Elders, especially group overseers,

14  should see that such publishers receive the

15  needed assistance."

16      A.   Uh-huh (affirmative response).

17      Q.   To what is that referring?

18      A.   Well, if anyone in the

19  congregation's trying to get to the

20  convention, may not have transportation, may

21  not have finances or whatever it may be, that

22  are in need, roaming or whatever the case may

23  be, see how you can assist them.

24      Q.   So would it have been the

25  responsibility in your church for your church

1  to see that if Patsy Maddox needed assistance

2  driving or riding to the convention from New

3  Orleans to Mobile, that she had a ride?

4      A.   Well, you check with each publisher.

5  Each group overseer check with those in their

6  group just to find out if they're going and

7  do they need any assistance.

8      Q.   And did you do that?

9      A.   I didn't have a group at the time.

10     Q.   Okay.  Who had the group in which

11 Patsy Maddox was involved?

12     A.   Well, her group overseer would have

13 been Grant Butler, so he would have inquired

14 about her.

15     Q.   Did you speak to Grant Butler about

16 whether he inquired about her?

17     A.   No, I did not.

18     Q.   Do you know if he was involved in

19 her being able to go there?

20     A.   No.

21     Q.   Do you know if he was involved in

22 assisting her while she was there?

23     A.   No.

24     Q.   But it would have been Grant who

25 should have contacted her to find out if she

1  needed assistance, correct?

2       A.   According to group overseers, they

3  check with those in that group.

4       Q.   How many in Grant's group?

5       A.   Oh, I'm not sure about that actual

6  count.

7       Q.   Now, this document No. 1 talks about

8  territories.  It says, "Congregations should

9  set a goal to distribute their allotment of

10 invitations and cover as much of their

11 territory as possible."  Is your congregation

12 designated a territory?

13      A.   Yes.  We cover all of Westwego, part

14 of Marrero, Avondale and Bridge City.

15      Q.   Is there a geographic territory?

16      A.   Yes, it is.  It's broken up.  That's

17 the territory we serve in the ministry.

18      Q.   Right.  And it's a geographic

19 territory that I'm understanding you identify

20 as associated with the English Westwego

21 Congregation.

22      A.   Yes.

23      Q.   And that geographic territory is

24 information that's provided to others,

25 correct?

1        A.    Yes.

2        Q.    You provide that to the Christian

3   Congregation of overseers.   The Christian

4   Congregation of Jehovah's Witnesses in New

5   York, do you tell them that your territory is

6   as you just described?

7        A.    No, we don't tell them.   They

8   section off territories that would cover.

9        Q.    I see.   So the Christian

10  Congregation of Jehovah's Witnesses, Inc., in

11  New York tells you what your territory is for

12  your local church, correct?

13       A.    Yes.

14       Q.    All right.   And have you seen the

15  documents from New York telling you of the

16  organization for your church --

17       A.    No.

18       Q.    -- identifying the boundaries?   Have

19  you seen that?

20       A.    Well, some have maps defining their

21  area that they do cover.   We don't have a map

22  in Westwego, but I know the areas that we do

23  cover, if the area's sometime extended or

24  narrow.   So we know exactly how much area we

25  cover.

```
 1        Q.   Are the maps that you refer to maps
 2   given to the people who are the elders
 3   responsible for different groups or different
 4   territories?
 5        A.   Well, in our congregation we have 32
 6   territories broken up, and we serve those.
 7   But it's still covering just part of
 8   Avondale, part of Marrero, Westwego and
 9   Bridge City.
10        Q.   So the 32 territories that you refer
11   to were assigned to your church by --
12        A.   We broke it up into smaller groups
13   so we can work it.
14        Q.   Okay.  So I was going to ask you if
15   the 32 territories were assigned by the New
16   York Congregation.
17        A.   No.
18        Q.   No.  But the New York --
19        A.   Assigned territory we work.
20        Q.   A group?
21        A.   Yeah.
22        Q.   It gave you boundaries and you
23   divided up within those boundaries the 32 --
24        A.   Territories.
25        Q.   -- territories.
```

1        A.    Making them smaller, yeah.

2        Q.    Making them smaller.  So if someone

3    lives outside of your territory, they would

4    go to another congregation.

5        A.    Outside your territory?

6        Q.    Right.

7        A.    Well, it's up to them where they

8    choose to go, but you should go to the

9    congregation you live within.

10       Q.    Right.

11       A.    So, yeah.

12       Q.    Well, that's what your group of

13   elders tell the people who attend your

14   church, that there is a territory that is

15   defined by the New York Christian

16   Congregation of Jehovah's Witnesses, Inc.,

17   and that territory is the one which should

18   attend your English Congregation.

19       A.    Yes.  But that doesn't mean that a

20   person has to go there.  You can go anywhere

21   you want.

22       Q.    Right.

23       A.    But we would love to see that they

24   go to the territory that they live within.

25       Q.    In this case Patsy Maddox was

1  assigned to a territory or was within a

2  territory that Grant Butler had some

3  responsibility for and Grant's one of your

4  elders, correct?

5      A.   So Patsy lives within the Westwego

6  territory and so we got other elders live

7  within the same area that Butler lives in.

8  So normally we, as a congregation say which

9  congregation -- which book study or bible

10  study group that they are assigned to.

11      Q.   Okay.  Now, in this case I'm

12  understanding through various people that

13  there may not have been adequate numbers of

14  seats for the disabled identified or marked

15  off in the Mitchell Center.  Do you know

16  anything about that?

17      A.   No.

18      Q.   This document instruction on how to

19  make donations says the checks should be made

20  payable to the Christian Congregation of

21  Jehovah's Witnesses.  Does your church in

22  Westwego receive any of that money?

23      A.   No.

24      Q.   Who are the people at the district

25  convention who decide what to do with the

1   money?

2        A.    I don't know.

3        Q.    Are they appointed by the New York

4   entity?

5        A.    I don't know.

6        Q.    Are you familiar with any of the

7   material that's published by the New York

8   entity on identifying risks associated with

9   attendants at the convention?  Are you

10  familiar with any of the material that's

11  published by the New York congregation of

12  Jehovah's Witnesses that identifies risks

13  associated with attending the convention?

14       A.    No.

15       Q.    Now, is there a census taken of the

16  people who attend the convention from the

17  Westwego English Congregation?

18       A.    No.

19       Q.    Do you know by name, number how many

20  people from your congregation attend?

21       A.    No.

22       Q.    Is there a census taken of the

23  number of people that attend the convention?

24  Is there a head count?

25       A.    They get a count.

1      Q.    When you were an attendant, did you

2   involve yourself in making the count?

3      A.    Those in my section, I would count

4   them and then they collect it.

5      Q.    Right.  Did you identify the people

6   or were the people who attended the

7   convention when you were an attendant

8   identified by demographic age or demographic

9   markings of any kind?

10     A.    No.

11     Q.    Is there published by the district

12  convention any information on the dollars

13  raised, the amount of the donations at that

14  convention?

15     A.    No.

16     Q.    Do you know who might be responsible

17  for accounting for that money?

18     A.    No.

19     Q.    As you understand it, did the

20  Christian Congregation of Jehovah's Witnesses

21  in New York provide the oversight for the

22  activities at the convention?

23     A.    Do they provide for the activities?

24     Q.    Yes.

25     A.    Well, they -- the English Christian

1   Congregation of Jehovah's Witnesses, they set

2   up the program.  They set up the convention.

3   So as far as the program itself, the talks,

4   the speakers, the talks itself, the

5   literature, everything that's discussed is

6   through the Watchtower.  But through the

7   program itself, elders who give talks is

8   through the Christian Congregation.

9       Q.    And is it your understanding that

10  the Christian Congregation of Jehovah's

11  Witnesses in New York has custody and control

12  of the activities at the convention and the

13  space where it's held?

14      A.    I'm not sure, but the brothers there

15  at the convention in Mobile, I think they're

16  the ones.  So the Christian Congregation set

17  it up but the brothers are there to make sure

18  that everything runs smoothly.

19      Q.    So you think the Christian

20  Congregation of Jehovah's Witnesses in New

21  York tells the brothers in Mobile what to do.

22      A.    I'm not sure how it's run.

23      Q.    Right.

24      A.    So I can't say.

25      Q.    Okay.  Did you see while you were at

1   the convention July 1, 2011 the area

2   designated for the elderly, disabled, infirm?

3        A.   Yes.

4        Q.   You did see it?

5        A.   (Witness nods head affirmatively.)

6        Q.   Do you know where it was?

7        A.   Well, they got a section there at

8   the -- on the ground floor, then they got

9   section in the blue section as well.

10       Q.   Okay.  If I were to show you

11  photographs and a layout of documents that

12  show the arena, would you be able to identify

13  that?

14       A.   Let me see.

15       Q.   I probably need to mark all these

16  just for ease of identification.  Let me do

17  that.  Let's start with this first one that

18  we'll mark as No. 2, and it is concourse and

19  arena level seating plan, according to the

20  identifier.  It will be Huguley 2.  Your

21  lawyer's taking a look at it now.  When he

22  finishes you can look at it.  Just for the

23  record, these are documents that the

24  defendant's produced.

25       MR. MITCHELL:

134

```
 1                    Can I see the other ones for
 2    reference?
 3         MR. THORNHILL:
 4                    These are documents that you
 5    produced to us.
 6         MR. MITCHELL:
 7                    I know.
 8         MR. THORNHILL:
 9                    I would appreciate it if you would
10    not instruct the witness.
11         MR. MILLER:
12                    We're talking to each other, not to
13    him.
14         MR. THORNHILL:
15                    Well, he can hear what you're
16    saying.  I'm not deaf.  I can hear it.  Come
17    on, guys.
18         MR. MILLER:
19                    So you know what we're talking
20    about?
21         MR. THORNHILL:
22                    I can hear what you're saying.
23         MR. MITCHELL:
24                    All right.
25         MR. THORNHILL:
```

1          May I have all the documents,

2  please?

3       MR. MITCHELL:

4            Sure.  You want the witness to have

5  this one you marked?

6       MR. THORNHILL:

7            May I have all the documents,

8  please?

9       MR. MITCHELL:

10           All the documents, okay.

11      MR. THORNHILL:

12           We'll get these numbered so we can

13  go over them in some order.

14  BY MR. THORNHILL:

15      Q.   Okay.  I'll give you a document

16  that's been marked as Huguley No. 2.  Are you

17  familiar with the layout of the Mitchell

18  Center?

19      A.   Yes.

20      Q.   Have you seen this document before?

21      A.   Yes.  The way it's laid out, yeah.

22      Q.   Have you seen this document before?

23      A.   This one here?

24      Q.   Yes.

25      A.   This is the first time seeing this

136

```
 1  one.
 2       Q.   Did you go over any documents in
 3  preparation for your deposition today?
 4       A.   No.
 5       Q.   Did you have discussions with people
 6  in preparation --
 7       A.   Not this layout.
 8       Q.   Did you have discussions with people
 9  in preparation for your deposition?
10       A.   As far as just talking to someone?
11       Q.   Did you have discussions with
12  anyone?
13       A.   I didn't have no coaching, no.  Is
14  that what you're asking?
15       Q.   No.  I'm asking you if you had
16  discussions with anybody in preparation for
17  your deposition.
18       A.   No.
19       Q.   You didn't talk to anybody?
20       A.   I talked to the lawyers.
21       Q.   Okay.
22       A.   That's who represents me, right?
23       Q.   Well, I know nothing about that.
24       A.   Oh, okay.
25       Q.   I know that there's some entities
```

1  that are sued in a lawsuit and one of them or

2  two of them is lawyers for those entities.

3  That's what I mean.

4       A.   Oh, okay.

5       Q.   And do you have a lawyer?

6       A.   Well, I'm being represented even

7  now.

8       Q.   Okay.  By these gentlemen?

9       A.   Yes.

10       Q.   All right.  Other than talking to

11  them, did you talk to anyone in preparation

12  for your deposition today?

13       A.   No.

14       Q.   Did you look at any documents --

15       A.   No.

16       Q.   -- at any other time --

17       A.   No.

18       Q.   -- in preparation for this?

19       A.   No.

20       Q.   No.  All right.  Have you looked at

21  these documents that showed the layout of the

22  convention center before?

23       A.   No.  I seen something like this with

24  our cleaning assignment, what area we have to

25  clean, so I know the layout of the

1   auditorium.

2        Q.   And when did you see that?

3        A.   Well, when they sent information

4   referring to our cleaning, what section we

5   have to clean.  And so they would mark it

6   where -- if Westwego has a cleaning section,

7   we'll clean a certain area.

8        Q.   Who sent you that?

9        A.   Well, it could have come from the --

10  not necessarily headquarters.  It could have

11  come from someone who is over cleaning

12  because they assigned to clean the

13  auditorium.

14       Q.   Who was over cleaning?

15       A.   I don't know the name.

16       Q.   But you had some role in cleaning.

17       A.   Well, we clean the section.  We

18  don't have to know people by name.  We just

19  follow our assignment.  We got assignment to

20  clean, and that's what we do.

21       Q.   All right.  Someone assigned to the

22  Westwego organization or the Westwego

23  Congregation, the responsibility to clean

24  certain sections, correct?

25       A.   Yes.

1          Q.    And you know that.   That's why you

2     saw something like that.

3          A.    I saw a layout like this.

4          Q.    Did the Westwego organization have

5     any other responsibilities with respect to

6     the convention besides cleaning?

7          A.    No.

8          Q.    Seating?

9          A.    No.

10         Q.    Attendants?

11         A.    No.   They ask at the volunteer

12    service desk if a person wants to serve as an

13    attendant.   So, you know, we all have the

14    opportunity to serve if we want to.   Out of

15    all the congregation, if you decide you want

16    to volunteer your time, you can do so.

17         Q.    Did anyone, to your knowledge,

18    volunteer to serve as an attendant?

19         A.    Not to my knowledge.

20         Q.    You're talking about an usher,

21    right?

22         A.    Well, attendant.

23         Q.    Now, an attendant is an usher?

24         A.    Well, you say usher.   I don't use

25    the term usher.

1      Q.    Why don't you use the term usher?

2   You don't know what that term means?

3      A.    Churches use usher, we use

4   attendant.

5      Q.    Is that the same thing, usher,

6   attendant?

7      A.    I use attendant.

8      Q.    What does an attendant do?

9      A.    I just mentioned attendant serving

10  friends in the congregation, seating

11  arrangement, making sure everything --

12  safety.  Making sure a person's walking, not

13  to be noisy with children running.  Attendant

14  has responsibilities.

15     Q.    Are those responsibilities described

16  somewhere?

17     A.    No.

18     Q.    Who gives them the responsibilities?

19     A.    I thought we covered that.

20     Q.    Is that the Christian Congregation

21  in New York?

22     A.    The brothers within the -- at the

23  facility, the experienced brothers let

24  brothers know that has positions what their

25  duties are.

1        Q.   Okay.

2        A.   I thought we covered that but maybe

3   I --

4        Q.   I just want to make sure I

5   understood.

6        A.   Okay.

7        Q.   I thought you didn't have anything

8   to do with the convention.  You're telling me

9   you did, you cleaned up.  So bear with me.

10       A.   Okay.  We have assignments.

11       Q.   On the same page?  Other than

12   cleaning, did you have assignments?

13       A.   No.

14       Q.   Did anyone in your church have

15   assignments?

16       A.   No.  We're just cleaning.  As far as

17   I know, that's all we did, just cleaning.

18       Q.   Do you know anyone in your church

19   who volunteered as an attendant?

20       A.   I can get back with you to find out

21   who served as an attendant.  I don't know if

22   -- during that day they might have had -- I

23   have to get back with you.  I'm not going to

24   say for something I don't know.

25       Q.   So you think that there may have

1   been some people from your church who were

2   severing as attendants?

3       A.   Yeah.

4       Q.   They did serve in the convention but

5   you're not sure of the day, correct?

6       A.   I'm going to make sure they served

7   as an attendant before I say there were

8   attendants.  I'm not sure there were

9   attendants there.

10      Q.   You're not sure if anybody from your

11  congregation served as an attendant.

12      A.   Yeah.  They have attendants there.

13  I want to make sure that someone from our

14  congregation served.

15      Q.   You vaguely recall that there was

16  somebody?

17      A.   I know I didn't serve.

18      Q.   I got that.  But you vaguely recall

19  that there was somebody from your

20  congregation that served as an attendant.

21      A.   Right.

22      Q.   Who was that?

23      A.   Well, I'm thinking perhaps Grear,

24  Richard Grear.

25      Q.   Richard Grear?

1          A.   I'm not sure.

2          Q.   He's not an elder?

3          A.   Yes, he is.

4          Q.   He is an elder.

5          A.   Uh-huh (affirmative response).

6          Q.   Okay.  And do you know -- as you're

7   thinking that he might have served, do you

8   know what day?

9          A.   I don't know.

10          Q.   You don't know if it was on the day

11   that Patsy Maddox fell.

12          A.   Right.

13          Q.   All right.  Where were the areas

14   designated for elderly, infirm, disabled?

15          A.   I know it's the bottom level here

16   (indicating).

17          Q.   I'm going to give you this pen and

18   you can mark where you think it was.  Mark it

19   on Exhibit 2, now.

20          A.   So this is the stage.  So they would

21   have the seating at least, if I'm correct on

22   that.  I think this is the blue section.  Is

23   this the blue section?

24          Q.   Sir, I don't know.  We have photos

25   later that you can look at if you would like.

1        A.   The blue section is what I'm trying

2   to specify because there's a section right

3   before the stage considered the blue section

4   that the elderly -- I think that's the blue

5   section, but I'm not sure.

6        MR. MITCHELL:

7             You understand it better than I do.

8        THE WITNESS:

9             Because I can't tell by this black

10  and white.

11  BY MR. THORNHILL:

12       Q.   So you marked that as what, disabled

13  areas?

14       A.   I'm looking at it.  For the elderly.

15       Q.   For the elderly, infirm, disabled.

16       A.   Yeah.  I'm thinking this blue

17  section, if this is blue.

18       Q.   The record's not going to show where

19  you're pointing to, so you have to mark it.

20       A.   Well --

21       Q.   Mark it as blue.

22       A.   Okay.  If this is blue.  I don't

23  know if it's blue or not.

24       Q.   Okay.

25       A.   But I'm assuming it's blue.

1      Q.    All right.  Have you seen this

2   diagram, No. 3, before?

3      A.    No.  Is that the blue?

4      MR. MITCHELL:

5            I can't answer for you.  Don't ask

6   me a question.  I can't help you.

7   BY MR. THORNHILL:

8      Q.    The Exhibit No. 3 that talks about

9   the Mitchell Center platform layout end

10   stage, do you know anything about that?

11      A.    No.

12      Q.    Do you know where the platform was?

13      A.    Yeah.  That's the platform right

14   there.

15      Q.    Shown on No. 2 you identified as

16   being that which is marked as platform?

17      A.    Uh-huh (affirmative response).

18      Q.    Correct?

19      A.    Uh-huh (affirmative response).

20      Q.    Okay.  And you circled it.  Good.

21   So you don't know anything about No. 3,

22   correct?

23      A.    Uh-uh (negative response).

24      Q.    Do you know where these documents

25   came from?  Were they sent to you and others

1  at various churches for use in connection

2  with the district convention?

3       A.   It wasn't sent to me.

4       Q.   So you don't know.

5       A.   It wasn't sent to me.

6       Q.   Correct?

7       A.   I don't know. It wasn't sent to me

8  so I don't know where it come from.  I don't

9  know.

10      Q.   You don't know that it came from New

11 York?

12      A.   No, I don't know.

13      Q.   Okay.  How about No. 4?

14 MR. MITCHELL:

15           Before you go on to No. 4, I want to

16 say something.  Let the record reflect that

17 No. 3 references the Mitchell Center platform

18 layout and end stage for July 6th through 8th

19 and 13th through 15th for 2012, not for 2011,

20 but --

21     MR. THORNHILL:

22          That's the documents you produced.

23     MR. MITCHELL:

24          Right.  I just wanted to make the

25 record clear.

1      MR. THORNHILL:

2          And I would move to strike your

3  testimony, with all due respect.  You're not

4  the witness.

5      MR. MITCHELL:

6          I'm a lawyer.  I'm making the record

7  clear, that's all.

8      MR. THORNHILL:

9          I understand you're a lawyer and you

10  produced these documents to me and you've

11  agreed to that and these are the documents

12  that we have, right?

13  BY MR. THORNHILL:

14      Q.   So Exhibit No. 4, have you ever seen

15  that before?

16      A.   Not the document itself.

17      Q.   All right.  Do you know anything

18  about that layout?  Does that help you better

19  understand where the elderly, infirm and

20  disabled should be seated?

21      A.   Not this one.  The one I just marked

22  give more clarity than this.

23      Q.   No. 2?

24      A.   Yeah.  Because you got upper and

25  lower.  Here you just got this section.

148

Q.    And on No. 4 you're saying that it
doesn't appear to distinguish between upper
and lower.

A.    I'm talking about right here.  Is
this this section here?

Q.    I can't answer that question for
you.  I don't know.

A.    I don't know either, not based on
this.

Q.    Incidentally, where did Patsy Maddox
fall?

A.    I don't know.

Q.    I'm looking at No. 2, No. 3 and No.
4.  Where did Patsy Maddox fall?

A.    I don't know.

Q.    Was she carried out in an ambulance?

A.    I didn't see her taken out, but I
know they called 911, so they must have had
paramedics that came in and took her,
emergency.

Q.    Did your church or any other church
involved in the district convention provide
first aid?

A.    We didn't provide first aid.  They
had first aid at the convention.

1      Q.    So that was provided by the
2  convention center itself.
3      A.    (Witness nods head affirmatively.)
4      Q.    To your knowledge.  But you don't
5  really know that, right?
6      A.    Well, I know they have first aid
7  there.
8      Q.    And how do you know that?
9      A.    Well, first aid is there.  I see it.
10     Q.    You mean you saw a station.
11     A.    Yeah.
12     Q.    Did you see any people?
13     A.    Yeah.  I saw them come to the aid.
14     Q.    You saw them come to the aid of
15  whom?
16     A.    They were there.  I seen people come
17  to the aid.  When the emergency vehicle came,
18  then I saw people there working along with
19  them.  But as far as name tags saying I work
20  at first aid, I didn't see that.
21     Q.    Okay.  So you saw somebody come to
22  the aid of Patsy Maddox?
23     A.    Yes.
24     Q.    So you didn't see her fall, but
25  immediately afterwards you saw some people

1  come to the aid of her?

2       A.   Because I wasn't near her.  So when

3  I went up there and found out what happened

4  -- I saw people even they calling 911 and I

5  saw people talking that it was a bad spill.

6  And I didn't even know it was her.  But they

7  did have people in first aid come to her.

8       Q.   Immediately after this happened you

9  went to where people were surrounding Patsy,

10 you didn't know it was Patsy, but you saw

11 people calling 911 and heard them talking

12 about someone.

13      A.   Before they called 911 first aid

14 came.

15      Q.   Okay.

16      A.   First aid came out to attend to her.

17      Q.   And you saw first aid come before

18 911 was called.

19      A.   I wasn't there, but when I got there

20 I know people were there attending to her.

21      Q.   But you saw them come.  You went to

22 where they were --

23      A.   Yeah.

24      Q.   -- because you saw first aid go

25 there, right?

1      A.   Yeah.

2      Q.   Is that correct?  Just tell me what

3  happened.  That's all I want to know.

4      A.   Well, I didn't see the ordeal what

5  happened, but when I went there I know people

6  there on the scene before the emergency

7  vehicles arrived.

8      Q.   Who did you know on the scene?

9      A.   People that worked in first aid.

10     Q.   Okay.  But you didn't know the

11  names.

12     A.   No.

13     Q.   You just saw that they were with

14  first aid, correct?

15     A.   Yeah.

16     Q.   Did you know anybody in the

17  congregation who was there?

18     A.   No.

19     Q.   So you went there immediately after

20  Patsy Maddox fell.  Who did you see?

21     A.   Well, I saw one of the brothers that

22  was there, and I know he called Shannon and

23  Rachel.  That was Richard Grear.

24     Q.   Richard Grear called Shannon while

25  you were there.

1        A.    Yeah.

2        Q.    Anybody else?

3        A.    No, I can't recall nobody else.

4        Q.    What did Richard Grear say to

5   Shannon and Rachel?

6        A.    That their mother had fell and to

7   come here.

8        Q.    Anything else?

9        A.    That's it.

10       Q.    Did Grear see the fall?

11       A.    No.

12       Q.    Did you see anybody else that you

13   knew at the location where people were

14   milling around?

15       A.    Well, later they came.   Brother

16   Helton came later, Malbert Helton.   And so --

17       Q.    Meaning he wasn't at the location

18   with Grear when you first got there but

19   Helton came?

20       A.    Yeah.   Everybody found out what

21   happened and we all assembled.

22       Q.    When everybody found out what

23   happened, what did they find out?

24       A.    That someone had fallen.

25       Q.    Anything else?

1        A.    That's it.

2        Q.    Okay.  You found out that -- anybody

3    else at this location where you go to when

4    Patsy Maddox fell?  You said you saw first

5    aid, Richard Grear, and afterwards, I don't

6    know how long afterwards, but sometime

7    afterwards right -- how long afterwards --

8        A.    I don't know.

9        Q.    -- Malbert Helton came.

10       A.    Right.  We all were there.

11       Q.    Anybody else that you saw right

12   there?

13       A.    No.

14       Q.    Did anybody say, I saw it?

15       A.    No.

16       Q.    Did anybody say, This is what

17   happened?

18       A.    No.

19       Q.    When you said you were looking to

20   find out what happened, what did you find

21   out?

22       A.    Well, I didn't find out anything

23   because I'm still puzzled.

24       Q.    Okay.  Did anybody say that she

25   passed out?

1        A.    No.

2        Q.    Was there a gentleman by the name of

3   Victor right there, Pat and Kathy Victor?

4        A.    Yeah.

5        Q.    Were they there?  Did you talk to

6   them?

7        A.    Yeah.

8        Q.    What did they say?

9        A.    No, they didn't tell me what

10  happened.  Everything must have happened

11  quickly.  I don't know what happened.  I'm

12  still puzzled as to what happened.

13       Q.    I'm just trying to find out what

14  people told you when you went up there.

15       A.    Nobody told me.  I still don't know.

16  nobody could tell me anything.

17       Q.    Well, you said it must have happened

18  quickly --

19       A.    Yeah.

20       Q.    -- because --

21       A.    Nobody knows.  Seem like only thing

22  I heard was a thud, a fall.

23       Q.    Nobody knew?

24       A.    Somebody might have seen but no one

25  came forward to say what happened.  I don't

1   know what happened.

2       Q.   So the Victors didn't come forward

3   and say this is what happened.

4       A.   Yeah.  They don't know what

5   happened, I guess.  I don't know what

6   happened.

7       Q.   Why do you think they don't know

8   what happened?

9       A.   I don't know.

10      Q.   Have you seen their declaration in

11  this case?

12      A.   No.

13      Q.   Have you seen the documents that

14  were written by the defendants based upon

15  that which they were told by the Victors?

16      A.   No.

17      Q.   Have you seen any of the documents

18  in this case?

19      A.   No.  I don't need to.  Why?

20      Q.   I just wondered.

21      A.   No.

22      Q.   You haven't seen any of the

23  documents?

24      A.   Uh-uh (negative response).

25      Q.   Okay.  So you knew that the Victors

1  were there?

2       A.   Yes.

3       Q.   And someone said all they heard was

4  a thud.  Who said that?

5       A.   Well, a lot of people in the

6  auditorium, they was talking about the noise.

7  It was loud.

8       Q.   It was loud when she fell?

9       A.   Uh-huh (affirmative response).

10      Q.   What did it sound like?  Did anybody

11 describe it for you?

12      A.   No.  Just a loud noise.

13      Q.   A loud noise when she fell.

14      A.   Uh-huh (affirmative response).

15      Q.   Do you know from what level she

16 fell?

17      A.   Well, as far as I know she was at

18 the platform and they said it was like three

19 steps down from the little platform she fell,

20 like she missed a step and went down to the

21 platform (indicating).

22      Q.   Where is that?  You're pointing to a

23 specific area.

24      A.   I don't know what -- you can't tell

25 by this here.

1    Q.   I'll show you a document that's
2  marked as No. 5.
3    A.   So I wasn't there so I don't even
4  know, but I can only assess what was said.
5    Q.   Did you not see her laying on the
6  ground?
7    A.   Yeah, she was laying -- now, they
8  brought her down.  They wouldn't let no one
9  get to the level where she had fallen because
10  people gathered around.  So evidently they
11  kept people down.  I didn't see her when they
12  brought her out.  So they took her right on
13  out.  So the paramedics I guess with the
14  first aid, they was all working together.
15    Q.   Now, you said you thought she missed
16  a step.  Do you know that to be true?
17    A.   Well, I'm not sure.
18    Q.   You heard that, though.
19    A.   I don't know if she -- what
20  happened, but I know that from the platform
21  they said she looked like she went down and
22  fell.  I don't know, so I can't describe what
23  actually happened.  I didn't see it.
24    Q.   Somebody said she missed a step,
25  right?

1        A.    Well, I don't know what happened.

2  So they said she fell from the platform down.

3        Q.    How far down?

4        A.    They said it was three steps down.

5        Q.    From the platform down to the next

6  level was three steps.

7        A.    Yes.

8        Q.    And that's where she fell?

9        A.    That's what was said.

10        Q.    This is Exhibit No. 5.  Take a look

11  at that.  Do you recognize that area depicted

12  in that photograph?

13        A.    But if she was -- I know up on this

14  area here it seemed like it got where the

15  rails at --

16        Q.    You're going to have to mark it with

17  a pen.

18        A.    Now, I don't know if it's this

19  section she was in, but I know that's --

20  because you don't have the entire arena.  I

21  don't know where she was sitting.

22        Q.    Do you know where you were seated,

23  looking at Exhibit No. 2?

24        A.    Yeah.  If this is the stage, I was

25  seated over here, in this section here.

1      Q.   Put an H where you were seated, H

2  for Huguley.

3      A.   (Witness complies.)

4      Q.   All right.  Where did you see Patsy

5  Maddox fall?

6      A.   Well, it must have been somewhere

7  around here (indicating).

8      Q.   Where did you see the people?  Just

9  mark it.

10      A.   I don't know.

11      MR. MITCHELL:

12          Wait a minute.

13      THE WITNESS:

14          I don't know the particular area but

15  I know it's on the second level.

16      MR. MITCHELL:

17          You said where did you see Patsy

18  Maddox fall.  He testified he didn't see

19  Patsy Maddox fall.

20  BY MR. THORNHILL:

21      Q.   That's correct.  Where did you see

22  Patsy Maddox laying?  You said you saw her

23  laying on the ground.

24      A.   I told you I couldn't get there.  I

25  couldn't see her.

1        Q.    Where was that you saw her laying on

2   the ground that you couldn't get to?

3        A.    It must have been somewhere -- I

4   don't know where this was but -- I don't know

5   if it was on this side or that side, but it

6   was on this second level.  So I can't tell by

7   this section.

8        Q.    Put an M and a question mark where

9   you think it was, one of two corners, one of

10  two corners of --

11       A.    What is the front of the auditorium?

12       Q.    You'll have to take a look at it and

13  see.  It shows entrance.

14       A.    I don't know.

15       Q.    In respect to the platform and where

16  you've identified you were seated, where did

17  you see Patsy Maddox laying on the ground?

18  It was at the opposite end of the convention

19  center from where you were seated and the

20  platform was located, right?

21       A.    Where, over here?

22       Q.    Right.  You put an H next to the

23  platform area.

24       A.    That's where I'm at.

25       Q.    That's where you are.  And you said

1   you saw the people congregated around Patsy

2   Maddox laying on the ground on the opposite

3   end but you don't know which corner of the

4   opposite end of the convention center, right?

5        A.   I'm thinking it's around here.  I'm

6   not sure, though.  I'm not sure.

7        Q.   To the best of your recollection,

8   mark where you think it was that you saw her

9   laying on the ground.

10       A.   To be frank with you, honestly I

11  can't say by this.  I don't know.

12       Q.   I'll show you Exhibit No. 6.  You've

13  got 5 and 6 in front of you.  Do you

14  recognize those areas of the convention

15  center?

16       A.   It's the same, huh?

17       Q.   I don't know.

18       A.   It's the same, the same photo, same

19  shot.

20       Q.   It was produced by your side.  I

21  don't know.  I'm just telling you that was

22  produced.  Do you recognize from looking at

23  those photos the area where you think Patsy

24  Maddox would have fallen and was laying?

25       A.   I don't know.

1    Q.    Correct?

2    A.    Yeah, I don't know.

3    Q.    Is it in one of the corners depicted

4  in that photograph?

5    A.    Could have been.  I don't know

6  where.

7    Q.    I'll show you 7 and 8 produced by

8  your side, or the defendants from New York.

9  May I see the pen and mark them real quick?

10    A.    This doesn't tell me anything.  This

11  doesn't tell me anything.

12    Q.    7 and 8, documents 7 and 8, you

13  can't tell anything is what you're saying?

14    A.    Right.

15    Q.    On documents 5 and 6 we see some

16  seats that are blue and some that are red and

17  then some that are blue again.  Where is it

18  that you think Patsy Maddox was in the blue?

19    A.    Okay.

20  MR. MITCHELL:

21        Object to the form of the question.

22  THE WITNESS:

23        I don't even know where she was

24  sitting so -- they have sections for the

25  elderly.  Whether she sat there in that

1  section, I don't know.

2  BY MR. THORNHILL:

3       Q.   Now, the blue seats are above the

4  floor level of the arena, correct?

5       A.   Yeah.

6       Q.   Was it above the floor level of the

7  arena where Miss Patsy Maddox fell or did she

8  fall on the floor level?

9       A.   She didn't fall on the floor level.

10 She must have been up on the upper level.

11 But I don't know where she fell, so I can't

12 say.

13      Q    So you didn't see the three steps

14 you earlier described.

15      A.   No.

16      Q.   But you know that they were in the

17 blue; is that correct?

18      MR. MITCHELL:

19           Again object to the form of the

20 question.

21      THE WITNESS:

22           Like I say, I don't know.  I don't

23 know where she fell.

24 BY MR. THORNHILL:

25      Q.   Okay.  Here's 9 and 10 that your

1  side produced.  It shows you blue seats and

2  the arena level.  Does that help you?

3       MR. MITCHELL:

4            I need to object to the form of the

5  question just for the record, but go ahead

6  and answer it to the extent you can.

7       THE WITNESS:

8            I can't say where she was seated on

9  this.

10 BY MR. THORNHILL:

11      Q.   So those photos don't help you

12 recollect --

13      A.   No.

14      Q.   -- where she was --

15      A.   Uh-uh (negative response).

16      Q.   -- when she fell?  I mean, you saw

17 her on the ground, didn't you?

18      A.   No, I didn't see her.

19      MR. MILLER:

20            You're getting argumentative.

21      MR. THORNHILL:

22            You just saw people on the ground.

23      THE WITNESS:

24            I saw people standing but I don't

25 know where she fell.

1   BY MR. THORNHILL:

2       Q.   No. 11 and 12, does that help you

3   identify the area where the people were

4   standing around Patsy Maddox on the ground?

5       MR. MITCHELL:

6            Object to the form of the question.

7   BY MR. THORNHILL:

8       Q.   Does it help you?

9       A.   None of this help me.

10      Q.   Take your time.

11      A.   Just looking at the stadium I can't

12  even tell where, because a lot of times you

13  get confused when you're in the stadium as to

14  where you're seating.  That's why you check

15  the marker.  I don't know where she was

16  sitting.

17      Q.   Okay.  I'll give you 13 and 14.

18  Those are more photos produced by your side

19  that show the arena.  Does that help you

20  identify the areas where you saw the people

21  standing around Patsy after she fell?

22      A.   It just look like the rest you just

23  gave me.

24      Q.   I'll show you No. 15.  Does that

25  help you identify the areas?

1      MR. MITCHELL:

2          Object to the form of the question,

3  use of the pleural.

4  BY MR. THORNHILL:

5      Q.   It doesn't help you?

6      A.   No.

7      Q.   Now, in these photographs, like in

8  Nos. 7, 8, 9, 10, 11, 12, 13, 14, there's

9  blue seats and red seats.

10     A.   Right.

11     Q.   Do any of those identify for you the

12  areas at the level where Patsy Maddox fell?

13     A.   Well, the blue seats is for the

14  elderly and the infirm.  Was she sitting

15  there, I don't know.  I think she was up just

16  maybe just above that.  I'm not sure.

17     Q.   And --

18     A.   I'm not sure if -- I'm trying to see

19  the platform.  I know it wasn't on this

20  level.

21     Q.   So there's steps between the blue

22  and the red where people walk upward; is that

23  correct?

24     A.   Yeah.

25     Q.   Is that a yes?

1       A.    Say what, now?

2       Q.    There's steps between the blue level

3  and the red level in which people walk

4  upward, correct?

5       A.    I think you have to go back out the

6  corridor and come up.  It appears that it

7  might have been -- I'm not sure.  It might be

8  that level.  I'm not sure.

9       Q.    Which level?

10      A.    I can't say.  I can't even really

11  say.  I don't want to point out something

12  that I'm not sure of.

13      Q.    But to the best of your

14  recollection, it was a blue immediately below

15  the red seats where you saw her surrounded by

16  people; is that correct?

17      A.    Right.

18      Q.    Mark that.

19      A.    But I don't know what area.

20      Q.    Just mark the level as you

21  understand it.  You're marking on 14.  Put an

22  M there to indicate Maddox.

23      A.    I don't know where she fell, but I

24  think that's the platform with the three

25  steps.  But --

1        Q.    You put an M there.   Okay, good.

2   I'm going to show you a document that's been

3   marked as 16.   Now, this at the bottom says

4   "Upper Level Seating Plan."   Have you ever

5   seen that before?

6        A.    No.

7        Q.    Okay.   So as you look at 2 and 16,

8   the lower level says concourse and arena

9   level seating plan, is No. 2, and then the

10  upper level seating plan is No. 16.   Does

11  that help you in any way to identify the

12  areas where you saw people standing around --

13       MR. MITCHELL:

14            Object to form.

15  BY MR. THORNHILL:

16       Q.    -- after Patsy fell?

17       A.    I can't say.

18       Q.    I'll give you 2, 4 and 16.   They're

19  the three seating plans --

20       MR. MITCHELL:

21            Object to form.

22  BY MR. THORNHILL:

23       Q.    -- according to the markings on the

24  documents produced by defendants.   You tell

25  me are you able to identify the area where

1  you saw Patsy being surrounded by people

2  after her fall?

3       A.   No.  No, I can't.

4       Q.   Okay.  Now, did you ever talk to

5  Patsy Maddox after she fell?

6       A.   No.

7       Q.   So she never told you anything.

8       A.   No.

9       Q.   All right.  Did you ever talk to

10  Patsy Maddox at any time to know or have her

11  tell you that she knew that those who were

12  attendants would find her appropriate

13  seating?

14       A.   No.

15       Q.   Was it general knowledge in your

16  church that attendants were assigned the

17  responsibility of finding for people

18  appropriate seating?

19       A.   No.

20       MR. MITCHELL:

21            Object to the form of that last

22  question.

23       THE WITNESS:

24            Because we find our own seats.

25  BY MR. THORNHILL:

170

1        Q.   Okay.  Do you know of any
2    conversation or information provided by Patsy
3    Maddox to you or to others that would support
4    the statement that Patsy Maddox knew that
5    there was a risk associated with the seating?
6        A.   No.
7        Q.   Have you read any of the statements
8    of the Victors in this case?
9        A.   No.
10       Q.   Has anyone told you that Patsy
11   Maddox refused to be seated by the
12   attendants?
13       A.   No.
14       Q.   There's certain statements of fact
15   found signed by counsel for the defendants in
16   this case that were submitted, and I ask you,
17   sir, have you ever seen any of these
18   statements of fact?  And I'll mark this as
19   No. 17.  This is record Document 59-2, filed
20   February 11, 2013.  No. 17, right?  It's a
21   document signed by a gentleman named Ted
22   Mitchell, who I assume is you, Ted.
23       MR. MITCHELL:
24            Yes.
25       THE WITNESS:

```
 1              And what is your question?
 2  BY MR. THORNHILL:
 3       Q.   My question is, sir, read through
 4  those statements, you don't have to read them
 5  all into the record, and you tell me if you
 6  have any information that you can offer with
 7  respect to any of the statements made to tell
 8  us where they came from, whether you've heard
 9  them, anything.  We'll make this short and
10  sweet.  Just read it through and you tell me
11  if you know anything about those statements,
12  where this information came from and why it
13  would be made, if you know anything about it.
14  All right?
15       MR. MITCHELL:
16           I'm going to object to the form of
17  the question.  I object to the repetitive
18  nature of the question.  Go ahead and answer
19  the question to the extent you can.
20       MR. THORNHILL:
21           Move to strike your objections as
22  not being to form.
23  BY MR. THORNHILL:
24       Q.   We can go one by one.  Say No. 1, I
25  know nothing or, yes, I know something and
```

1  tell me what you know.

2       MR. MITCHELL:

3            I'd prefer if he went one by one.

4  BY MR. THORNHILL:

5       Q.   Just take the time, then.  Read

6  statement No. 1 into the record.

7       A.   "Patsy Maddox attended the July 1,

8  2011 district convention of Jehovah's

9  Witnesses in Mobile, Alabama."  Yes.

10           "Patsy Maddox fell while attending

11 convention," 2.  Yes.

12           "Patsy Maddox suffered injuries when

13 she fell at the convention."  Yes.

14      Q.   That's No. 3, right?

15      A.   Yes.

16      Q.   No. 4?

17      A.   4, "Patsy Maddox died after she fell

18 at the convention."  No.

19      Q.   You didn't know she died afterwards

20 or you do know she died?

21      A.   She didn't die at the convention,

22 no.

23      Q.   What does that statement say?

24 After, right?

25      A.   "Patsy Maddox died after she fell at

```
 1   the convention."  So at the convention she
 2   did not die.
 3        Q.   She died after the convention.
 4        A.   After the convention, yeah.
 5        Q.   So she did die after she fell,
 6   right?
 7        A.   Well --
 8        Q.   Did you go to her funeral?
 9        A.   Oh, yes, I went.
10        Q.   You went?
11        A.   Yeah.
12        Q.   You went to her funeral.
13        A.   Yes.
14        Q.   Did you preach her funeral?
15        A.   No.
16        Q.   Okay.
17        A.   Yeah.
18        Q.   So she died after the -- is that a
19   true statement?
20        A.   Yeah.
21        Q.   All right.  Go to No. 5.
22        A.   "Christian Congregation leased the
23   Mitchell Center at the University of South
24   Alabama where it provided oversight in
25   organizing the convention."  Yes.
```

1        Q.    That's a true statement, correct?

2        A.    Yeah.  "Pursuant to the lease,

3   Christian Congregation had custody and

4   control of the convention premises."  I'm not

5   sure about that.

6        Q.    Okay.  Next one?

7        A.    "Christian Congregation designated

8   the floor and the seats immediately adjacent

9   to the floor of the Mitchell Center as

10  seating for elderly and disabled attendees

11  and those who traveled with them."  Floor and

12  the seats immediately adjacent to the floor.

13  That's the blue section, yes.

14          "The Mitchell Center is a new

15  facility built by the University of South

16  Alabama which met all the relevant building

17  and safety codes for an arena in which public

18  events would be held" --

19       Q.    Do you know that?

20       A.    -- "including the stair and railing

21  design and construction."  To the best of my

22  knowledge, yes.

23       Q.    But you don't know one way the

24  other, correct?

25       A.    "There were no defects in the stairs

1  or railings at the Mitchell Center." I don't

2  know.

3        Q.   Okay.

4        A.   "There were no defects in the

5  seating arrangements made by the Christian

6  Congregation."  As far as I know, nothing.

7        Q.   But you don't know that either, do

8  you?

9        A.   No. 11, "Patsy Maddox had been one

10 of Jehovah's Witnesses for decades."  Yes.

11            "Patsy Maddox had attended numerous

12 district conventions, circuit assemblies,

13 special assemblies and other large gatherings

14 of Jehovah's Witnesses."  Yes.  In times

15 past, yes.

16            And, No. 13, "Patsy Maddox knew that

17 seating was reserved for the elderly and

18 disabled on the floor and seating adjacent to

19 the floor of every large gathering of

20 Jehovah's Witnesses."

21       Q.   She never told you that, huh?

22       A.   No.  But she know where seating is.

23       Q.   How does she know that?

24       A.   Well, they got it marked off.  They

25 got a sign saying seating for the elderly.

1    Q.   Oh, they did?   Where were those

2  signs posted?

3    A.   Well, usually they have signs on the

4  floor of just seating, and sometime they just

5  rope off certain sections for the seating of

6  the elderly and infirm.

7    Q.   Were there any sections roped off at

8  the July 1, 2011?

9    A.   I can't recall.

10   Q.   You didn't see any ropes, did you?

11   A.   No, I can't recall that.

12   Q.   But you didn't see any ropes, did

13 you?

14   A.   I can't recall that.   Did you hear

15 me?

16   Q.   I heard what you said.

17   A.   I can't recall that.   No. 14, "Patsy

18 Maddox knew that if seating was not available

19 for the elderly or disabled, those

20 administering any particular gathering of

21 Jehovah's Witnesses would find appropriate

22 seating for those in need."

23   Q.   She didn't know that, did she?

24   A.   Well, I know that they do find

25 seating for those in need.

1        Q.   You don't know what Patsy knew, did

2   you?

3        A.   Well, I can't say what she knew.

4        Q.   Right.

5        A.   But I know that she's been around

6   long enough to know that if we come late it's

7   hard to find seats, then they would make

8   arrangements.  "Patsy Maddox," 15, "was 69

9   years of age on 1 July 2011."  I assume that

10  she was that age.

11       Q.   But you don't know that, correct?

12       A.   Well, I know when she died she was

13  70, so it must have been roughly around that

14  area.

15       Q.   How do you know she was 70?

16       A.   Well, it was on the obituary.  16,

17  "Patsy Maddox ambulated freely without

18  assistance, did not walk with a cane, did not

19  limp; she had no history of falling, did not

20  present a risk of falling or show any outward

21  signs of infirmity."  And so she didn't walk

22  with a cane.  She didn't limp.  She had no

23  history of falling.  I'm not sure about that

24  because that's in question.  Did not present

25  a risk of falling.  So she walked -- she was

1  steady in her walk.  And showed any outward

2  signs of infirmity.  She was frail so I don't

3  -- as far as she was part of our infirm list.

4        Q.   She was on the list as infirm?

5        A.   Yes.

6        Q.   Your church kept a list?

7        A.   We had a list of those who was

8  elderly and infirm.

9        Q.   Did you provide that to the district

10  convention?

11        A.   Huh?

12        Q.   Was that list provided to the

13  district convention?

14        A.   Oh, well, we don't know who's going

15  to be there at the district convention.

16        Q.   But you had a list at your church,

17  you just don't know if it was provided to the

18  district convention at that time, correct?

19        A.   Well, nobody never provide that to

20  the district convention.

21        Q.   Oh, you didn't.  Okay.  The district

22  convention, does it know that those people

23  know that there's a list kept by each of the

24  churches?

25        A.   Not to my knowledge.

1    Q.   But you did have a list and she was

2  on the list of infirm, correct?

3    A.   She was part of the elderly and

4  infirm.

5    Q.   Elderly and infirm.

6    A.   17, "Patsy Maddox lived alone, cared

7  for herself and drove her own car."  Correct.

8          18, "Patsy Maddox knew that there

9  was always a risk that seating would be

10 filled on the floor or in the seats adjacent

11 to the floor" --

12   Q.   You don't know what Patsy knew, do

13 you?

14   A.   -- "at any gathering of Jehovah's

15 Witnesses once the music started, which

16 announced the beginning of the gathering's

17 program and gave notice to attendees to take

18 their seats."  And we do have to try to find

19 seats if they're there late.  So she know

20 that.

21   Q.   Do you know what she knew?  Did she

22 tell you what she knew?

23   A.   Oh, no.

24   Q.   Do you know when she got there?

25   A.   Huh?

1    Q.   Do you know when Patsy Maddox

2  arrived?

3    A.   I didn't see her come in so I don't

4  know.

5    Q.   Right.  So you don't know and you

6  don't know what she knew, correct?

7    A.   So 19, "Patsy Maddox" --

8    Q.   Sir, let me stop you.

9    A.   Yeah.

10    Q.   Do you know what Patsy Maddox

11  knew --

12    A.   No.

13    Q.   -- about arriving late or finding

14  seats or anything like that?  She never told

15  you and you don't know, do you?

16    A.   Well, I assume over the years she

17  would have.

18    Q.   I know you're assuming that.

19    A.   Yeah.

20    Q.   But I'm not asking you to assume

21  anything.  I'm asking you what you know.  Yes

22  or no, do you know?

23    A.   No.

24    Q.   You don't know.  Okay.

25    A.   19, "Patsy Maddox and the couple

1  with whom she was traveling, Patrick and

2  Kathleen Victor, arrived after the convention

3  music ended and the program was beginning."

4  I didn't know that.

5           20, "Patsy Maddox knew that because

6  the music had stopped when she arrived those

7  gathered would be seated and ready to

8  participate in the day's program of worship."

9      Q.   You don't know what she knew, did

10 you?

11     A.   I can't say what she knew.

12     Q.   Right.

13     A.   Okay.  21, "When the attendant told

14 her group there was no seating available on

15 the floor, Patrick Victor offered to look for

16 other seats, to take seats on the upper level

17 where they would have to climb stairs, or to

18 take the group back to their motel and return

19 the next day."  So I had no knowledge of it.

20          "Patsy Maddox declined the options

21 except the one to climb the stairs and take

22 seats in upper level."

23     Q.   You don't know that, do you?

24     A.   23, "At the lunch break Patsy Maddox

25 descended and ascended the stairs to leave

1   her seat and returned to it."  I have no

2   knowledge.

3          24, "Near the end of the final

4   program, the group descended the stairs but

5   Patsy Maddox fell for no apparent reason.  No

6   one was touching her.  She was carrying

7   nothing. She just fell, which caused her

8   injury, requiring medical attention in the

9   hospital."  So I wasn't there, so I couldn't

10  say.

11         "No one was responsible for Patsy

12  Maddox's choice of seating."  So I still have

13  no knowledge of it but, you know, I assume

14  that she would want to stay for the

15  convention.  If there was no seat, she could

16  have left.

17         26, "No one compelled Patsy Maddox

18  to choose her seat or area in which to sit at

19  the convention on July 1, 2011."  And you

20  don't -- you're not compelled to sit.

21      Q.   But you don't know that, right?

22      A.   Yeah.  But I know you can't make a

23  person or force a person.

24      Q.   Well, you're assuming that, right?

25      A.   Yeah.  I'm saying nobody can force

1  me to sit anywhere.

2      Q.   Right.  But in the case of Patsy

3  Maddox, you don't know if she inquired about

4  having seating in the elderly and disabled

5  section and whether she was refused, correct?

6      A.   I didn't talk with her.

7      Q.   So you don't know if when she went

8  there and she asked for seating in the

9  elderly and disabled section she was refused

10  and told there were no seats, correct?

11      A.   No, I'm not aware of it.

12      Q.   Okay.

13      A.   "Patsy Maddox was not in anyone's

14  care or keeping on July 1, 2011."

15      Q.   You don't know that, do you?

16      A.   Well, one thing about it, I know she

17  was independent.

18      Q.   Well, she was with somebody, right?

19  Somebody with your church was helping her,

20  right?

21      A.   When we say in the care of, she

22  could function on her own.  She was mobile.

23  She was quite mobile.

24      Q.   Right.

25      A.   28.

1      Q.    Go ahead.

2      A.    "Patsy Maddox was a free and

3  independent person who made her own decisions

4  about when and how she would attend

5  convention on July 1, 2011.  For example, she

6  made her own motel reservation and had her

7  own motel accommodation for the convention."

8  I know that.

9      Q.    You know she did?

10      A.    She had her own room.  She stayed at

11  the hotel I stayed in.

12      Q.    Do you know that she made her own

13  reservations?

14      A.    So she had to.  They didn't give it

15  to her free.

16      Q.    I don't know.  Did she make her own

17  reservations?  Do you know that, yes or no?

18      A.    She had to.  She had a room.

19      Q.    I understand she had a room.

20      A.    Nobody gave her one.  Nobody paid

21  for it.

22      Q.    Right.  But did she make her own

23  reservation?

24      A.    She had to.

25      Q.    Why would she have to?

1        A.    Well, she had a room.

2        Q.    Could somebody else have made a

3   reservation for her?

4        A.    Well, if Shannon and Rachel didn't

5   make it, nobody else made the reservation for

6   her.

7        Q.    How do you know no one else made the

8   reservation for her?  That's my question to

9   you.  Do you know that to be true or no?

10       A.    Well, I don't know that, then.

11       Q.    Okay.

12       A.    But I know she had her own hotel.

13       Q.    But there were like 15 facts in that

14  statement.  Do you know all those to be true?

15       A.    No.  "Patsy Maddox displayed no

16  mental or physical inability to ascend or

17  descend the steps where she fell.  She simply

18  failed to do so and suffered injuries as a

19  result."  She was -- I didn't see her having

20  problems.  I'm not a doctor, but I know she

21  was able to walk.  As far as physical

22  inability, I don't know.  Mental inability, I

23  know she was mentally sound, okay?  But it

24  says descend the step where she fell, she

25  simply fell (sic) to do so and suffered

```
 1  injury as a result.
 2       Q.   Your lawyer's pointing to a word on
 3  the document.
 4       MR. MITCHELL:
 5            You mispronounced a word.
 6       THE WITNESS:
 7            What's that?
 8       MR. MITCHELL:
 9            This one.
10       THE WITNESS:
11            Oh, she simply failed to do so.
12  Okay.  I'm looking -- failed to do so and
13  suffered injury as a result.
14  BY MR. THORNHILL:
15       Q.   You don't know that.  You didn't see
16  the accident.  You don't know what happened,
17  right?
18       A.   No, I didn't see it.
19       Q.   What you know is that there was a
20  list kept by your church of the elderly and
21  infirm and Patsy Maddox was on it, correct?
22       A.   Yes, she was on it.
23       Q.   You saw the list.
24       A.   Yes.
25       Q.   You have the list.
```

1        A.    Well, I had a list made up of

2   serving those in your group, the elderly and

3   infirm.

4        Q.    Where is that list?

5        A.    I don't have the list with me.

6        Q.    What did you do with the list?

7        A.    Well, the list was posted -- we post

8   it on the information board as far as those

9   who are sick and elderly.

10       Q.    Okay.  And when did you post it?

11       A.    I don't know the date I posted it.

12       Q.    It was before this fall.

13       A.    Well, yes, it's been -- we been

14  caring for the elderly and infirm.  We been

15  caring for the elderly and infirm, not just

16  during that time of the 2011 convention.

17       Q.    But during the time of the 2011

18  convention, Patsy Maddox was on the list of

19  elderly and infirm --

20       A.    Uh-huh (affirmative response).

21       Q.    -- for your church.

22       A.    Uh-huh (affirmative response).

23       Q.    And there was a list.  It was posted

24  on the information board --

25       A.    Uh-huh (affirmative response).

1      Q.    -- at that time, correct?

2      A.    Uh-huh (affirmative response).

3      Q.    Uh-huh is yes?

4      A.    Yes.

5      Q.    Okay.  They can't take down uh-huh.

6  It's yes or no.

7      A.    Yes.

8      Q.    So, yes, right, there's an

9  information board in your church.  Is it

10  still there?

11      A.    Yes.

12      Q.    Okay.  And you know where it is?

13      A.    Yes.

14      Q.    And you post things on it?

15      A.    Yes.

16      Q.    Did you post the elderly and infirm

17  list?

18      A.    Yes.

19      Q.    Did you make up the elderly and

20  infirm list?

21      A.    Yes.

22      Q.    And was that the elderly and infirm

23  list on which Patsy Maddox was listed on July

24  1st of 2011?

25      A.    Yes.

1      Q.   And did you know and did others in
2  the church which you attend, the
3  English-speaking Westwego Congregation, did
4  they see this elderly and infirm list as
5  well?
6      A.   Yes.
7      Q.   Who in the congregation among the
8  elders had responsibility for taking care of
9  the elderly and infirm on that list?
10     A.   I already mentioned group overseers.
11     Q.   Richard Grear.
12     A.   No.  Group overseer, Grant Butler.
13     Q.   Grant Butler.
14     A.   Was in her group, yeah.
15     Q.   So she was in Grant Butler's group?
16     A.   Yes.
17     Q.   And Grant Butler was responsible for
18  making sure that she is one of the elderly
19  and infirm in your church who was taken care
20  of, right?
21     A.   Well, he would check with her to
22  make sure if she was going to the convention,
23  every elderly and infirm, to make sure they
24  have a ride or transportation or financial
25  need or room in need or whatever it might be.

1    Q.   Okay.  Did he do that in this case?

2    A.   I don't know.

3    Q.   But that was his job.

4    A.   Well, we all do that.

5    Q.   I got it.  And that's the job if he

6  is the designated elder, correct?

7    A.   Yeah.

8    Q.   Over Patsy Maddox.

9    A.   Not just Patsy Maddox.  He had other

10  elder and probably infirm in his group.

11    Q.   Got it.  But he was to check with

12  her to make sure she had a ride and had

13  whatever she needed, correct?

14    A.   He would consult with them.

15    Q.   Right?

16    A.   He would consult with them.

17    Q.   Right.  And that's what he was

18  supposed to do.

19    A.   He'd consult with them.

20    Q.   Right.  And he did as far as you

21  know.

22    A.   As far as I know.

23    Q.   Right.  You haven't ever heard

24  anything to the contrary.

25    A.   No.

1          Q.    But you don't know for sure that he
2    did.
3          A.    I don't know.
4          Q.    But that was his job.
5          A.    As far as job, we all as elders have
6    responsibilities to look after the elderly
7    and infirm.
8          Q.    And that was one of his
9    responsibilities, to look after Patsy Maddox.
10         A.    Not just Patsy Maddox but all those
11   who are elderly and infirm in his group.
12         A.    Right.
13         Q.    Do you know how many he had in his
14   group?
15         A.    I'm not sure.
16         Q.    How many were on the list?
17         A.    They had several on the list,
18   several.
19         Q.    Five? 10? 15?
20         A.    Oh, probably more than that.
21         Q.    20?
22         A.    Yeah, close to that.
23         Q.    How many of those elderly and infirm
24   on your list from your church attended the
25   convention; do you know?

1        A.    They had quite a few.

2        Q.    Could you estimate?   Five? 10?

3        A.    I don't know.

4        Q.    20?

5        A.    I don't know, but they had quite a

6   few.   Some were able to get rides with others

7   as well.   But it's their choice as to

8   arrangement that they would make.   If I came

9   to them and asked them did they have

10  arrangement, then they said, "Well, I made

11  arrangements."   So Patsy Maddox made

12  arrangements.

13       Q.    You're assuming that or you know

14  that?

15       A.    I know that.

16       Q.    You know she made arrangements with

17  the Victors?

18       A.    Yes.

19       Q.    You talked to the Victors.   That's

20  how you know that, right?

21       A.    They said they was going to pick her

22  up, that's all.

23       Q.    They told you they were going to

24  pick up Patsy Maddox?

25       A.    Right.

1    Q.   Did they drive Patsy's car or their

2  car?

3    A.   I'm not sure.  I thought we said

4  that.

5    Q.   Yeah.  And so did Patsy Maddox speak

6  to Grant Butler, to your knowledge?

7    A.   Not to my knowledge.

8    Q.   Did Grant Butler speak to the

9  Victors, to your knowledge?

10   A.   Not to my knowledge.

11   Q.   Now, if I were to ask you to produce

12 to me the list of elderly and infirm about

13 which we've been talking where Patsy Maddox

14 was listed in 2011 at the time of this injury

15 and fall, would you be able to do that?

16   A.   Well, I could give you a list but in

17 her case now her name, since she's deceased,

18 she's not on the list.

19   Q.   But for 2011, do you have copies of

20 the 2011 list --

21   A.   No.

22   Q.   -- where she was listed as of July

23 2011?

24   A.   No, I do not.

25   Q.   You took her name off after she

1  died?

2      A.   Right.

3      Q.   What other assistance was offered to

4  the elderly and infirm by your church?

5      A.   Could we call a time out right now?

6  I need to use the restroom.

7      Q.   Sure.   Because we're almost

8  finished.

9  (BRIEF RECESS)

10  BY MR. THORNHILL:

11     Q.   I believe we were at the point where

12  we were talking about the list for the

13  elderly and infirm for 2011, particularly the

14  July 1, 2011 time frame when Patsy Maddox was

15  going to the district convention.   And I

16  believe I followed up on that with asking if

17  there were other responsibilities for elders

18  to those who were elderly and infirm on that

19  list besides making sure that people had a

20  ride.

21     A.   To the convention.

22     Q.   Making sure people had a ride was

23  one thing.   Ride and accommodations or needed

24  any assistance.   That's part of what they

25  were supposed to do, right?

1      A.    Right.

2      Q.    Supposed to take care of the elderly

3  and infirm, provide those three things,

4  right?

5      A.    Just check with them and see if they

6  are going and if they are going, try to make

7  accommodations.

8      Q.    Were there any other groups of

9  people that the elders were asked to

10  specifically ask and find out if they were

11  going to the convention?

12      A.    No.

13      Q.    Only the elderly and infirm.

14      A.    We talked with the elderly and

15  infirm because others make their own

16  accommodations.

17      Q.    Were there any other services

18  provided by the elders to the elderly and

19  infirm in 2011 besides the assistance in

20  seeing that they could go to the convention?

21      A.    Were there any other assistance?

22      Q.    Were there any other services or

23  assistance that was provided by the elders to

24  the elderly and infirm in 2011?

25      A.    No.  Just usually throughout the

1  year we always shepherd the elderly, make

2  sure they're cared for.

3      Q.   Was the list to which you refer as

4  the list of elderly and infirm in 2011 a list

5  that was used for any other purpose or was it

6  only used for the purposes of the convention?

7      A.   Not just for the convention only.

8      Q.   It was used for other purposes.

9      A.   Those that are in your group of the

10 elderly and infirm, you check on them and

11 make sure that they're well cared for, see

12 how they're doing.

13     Q.   Right.  And so it's an obligation of

14 the elders, in this case Grant Butler to

15 Patsy Maddox, to make sure that she was okay

16 during the year.

17     A.   Well, I would assume he did check on

18 her, shepherd her, care for her.

19     Q.   You're just assuming because that's

20 the job of everybody, right?

21     A.   As an elder, yes.

22     Q.   Do you know of any factual

23 investigation that has been made of what

24 happened at the Mitchell Center?

25     A.   No.

1      Q.   Has anyone told you about any

2  factual inquiries or statements that were

3  taken or anything else?

4      A.   No.

5      Q.   From the discussions that you've had

6  with people, am I correct that you know that

7  the Victors were with Patsy Maddox at the

8  time that she fell?

9      A.   Well, they were there, yes.

10      Q.   Did they see it?

11      A.   I don't know.

12      Q.   Did they see the fall?

13      A.   I don't know.  I wasn't there.

14      Q.   Okay.  And from the information

15  you've gathered, you don't know if they did.

16      A.   I don't know.

17      Q.   You haven't talked to them or anyone

18  else who told you that they said they saw it.

19      A.   No.  I don't know if they saw the

20  fall but they were with her.

21      Q.   All right.  Did anyone tell you

22  anything about whether or not the Victors

23  were holding the arm of Patsy or Patsy was

24  holding the arm of the Victors at the time of

25  the fall?

1    A.    I don't know.

2    Q.    Okay.  Are the Victors involved in

3  positions of leadership at your church?

4    A.    No.

5    Q.    In these statements that you read

6  and answered yes or no about what you knew,

7  this is under document No. 17, there's an

8  Item No. 18 that says, "Patsy Maddox new that

9  there was always a risk that seating would be

10  filled on the floor or in the seats adjacent

11  to the floor at any gathering of Jehovah's

12  Witnesses once the music started, which

13  announced the beginning of the gatherings

14  program and gave notice to the attendees to

15  take their seats."  Do you remember reading

16  that statement?

17    A.    Yeah.

18    Q.    All right.  Is there some training

19  that people who are Jehovah's Witnesses

20  receive that tell them that the music

21  starting is the commencement or the beginning

22  of the gathering's program?

23    A.    I know they always say at the start

24  of the program, "Why don't we start taking

25  seats."

1          Q.    Your lawyer's pulling document No.

2    1 from the stack of documents.  And you think

3    in that document No. 1 there's some reference

4    to the music beginning as being the time when

5    the gathering's program will commence?

6          A.    Yes.

7          Q.    Is that correct?

8          A.    Yes.

9          Q.    And your lawyer's pointing to page

10   4.  Is this what you're talking about,

11   program times?

12         A.    Yes.

13         Q.    Your lawyer wants to be helpful.

14   He's pointing out in the document this

15   reference to program times.

16         A.    Yeah.

17         Q.    Is that what you're talking about?

18         A.    Yes.

19         Q.    You've read that before?

20         A.    Yes.

21         Q.    And so you think that that paragraph

22   -- read that which you think refers to the

23   music beginning as being the time when the

24   program commences.

25         A.    "The program will begin at 9:20 a.m.

```
 1   all three days.  The doors will open at 8:00
 2   a.m.  When the introductory music is
 3   announced, all of us should go to our seats
 4   so that the program can begin in a dignified
 5   manner."
 6        Q.   And that's what you were referring
 7   to.
 8        A.   Yes.
 9        Q.   So you know that, right?
10        A.   Yes.
11        Q.   And you think Patsy read that and
12   she knew this.
13        A.   Oh, she knew.
14        Q.   I'm sorry?
15        A.   If she read it, she knew that.
16        Q.   If she read it, she knew that.
17        A.   Yes.
18        Q.   And we don't know she read it,
19   right?
20        A.   No.  But she reads everything.
21        Q.   You think she does?  That's her
22   habit?  You knew her well.  She read
23   everything, right?  She was a reader.
24        A.   She likes to read.
25        Q.   But you assumed that she read that,
```

1  correct?

2      A.   Oh, I know she -- because she wasn't

3  -- she was very much aware of, you know, her

4  responsibilities.  She read everything.

5      Q.   Okay.  So she knew that the program

6  was commencing when the music started.

7      A.   Yes.

8      Q.   All right, I got that.  And you

9  think that based upon your assumption of her

10  reading everything, right?

11      A.   Right.

12      MR. MITCHELL:

13          Well, you alleged it in the

14  petition, Counsel.

15      MR. THORNHILL:

16          We'll let you testify later.  We'll

17  get to that.

18      MR. MITCHELL:

19          Instead of my objection that you're

20  being argumentative I just figured I'd say

21  that.

22      MR. THORNHILL:

23          Well, your objection is noted.  I

24  move to strike it because it's not to form.

25  BY MR. THORNHILL:

1      Q.    This statement, though, that Patsy

2  Maddox knew that there was always a risk that

3  seating would be filled on the floor or in

4  the seats adjacent to the floor at any

5  gathering of Jehovah's Witnesses --

6      A.    Well, I know the accident occurred

7  so she must be aware of that.

8      Q.    So you assume that based upon her

9  experience in going to large gatherings of

10 Jehovah's Witnesses, that Patsy Maddox knew

11 that there was a risk that the seating would

12 be filled.

13     A.    That the seating would be filled?

14     Q.    Right.  This says that the seating

15 would be filled on the floor or in the seats

16 adjacent to the floor.

17     A.    So I can't speak for her.

18     Q.    Right.

19     A.    I can't speak for her.  But I know

20 when you go to assemblies they fill up

21 quickly.

22     Q.    And you knew, as the president of

23 the Westwego English Congregation, that there

24 was a risk that the seating would be filled

25 on the floor and the seats adjacent to the

1  floor at any gathering of Jehovah's

2  Witnesses, right?

3       A.   Yes.

4       Q.   You knew that, right?

5       A    Yeah.

6       Q.   And others in your position of

7  leadership knew that, correct?

8       A.   Uh-huh (affirmative response).

9       Q.   Is that correct?

10      A.   Yes.

11      Q.   And those people who were running

12  this district convention for the Christian

13  Congregation of Jehovah's Witnesses in New

14  York, they knew that, didn't they?

15      A.   Well, they would have to.  But the

16  fact is is that people -- you know, you have

17  -- you accommodate large gathering, large

18  crowd, and sometime people come and may not

19  be assigned to that convention and you may

20  have excess people coming.

21      Q.   Well, that risk's of all the seats

22  being filled by people who are not elderly

23  and infirm, right?

24      A.   People can take a seat but I didn't

25  say at this convention that that took place.

1    Q.   Was it the job of the people who

2  were the attendants to see that those who

3  were elderly and infirm got a seat and if

4  there were people not elderly and infirm they

5  should be asked to get up and allow the

6  elderly and infirm to sit in the designated

7  areas, correct?

8    A.   When the program begins, the

9  program's not going to be interrupted.  So

10 that's why that stipulation there everybody

11 find their seats.  So even after we arrive at

12 a convention -- they tell us to arrive early

13 to get seats.  So the attendants, once they

14 realize the seats are full, they make a

15 motion that it is filled, the section is

16 filled.  And so I don't see them going

17 pulling people out of their seats.  I don't

18 see that.

19    Q.   Okay.  I think I understood your

20 question but I'm not sure it was responsive

21 to my question.

22    A.   Okay.

23    Q.   And I'm not sure that you had an

24 answer.  Yours was a question, right?

25    A.   Yeah, the program begins at a

1   certain time, and when the seats are full,

2   then the attendant will let it be known that

3   there's no more seats available here.

4        Q.   Right.  So even if they're elderly

5   and infirm they don't get a seat there?

6        A.   Well, they have other areas where

7   they can seat, where they can sit.  So that's

8   why they just don't have the bottom floor but

9   they have the blue section around as well.

10       Q.   All right.  But in this case you

11  think that the attendants, and you've been an

12  attendant before, knew that there was a risk

13  that the seating would be filled on the floor

14  or on the seats adjacent to the floor at any

15  gathering of Jehovah's Witnesses.

16       A.   The seats are not always filled, but

17  then if it calls for -- say in the case of

18  them, if they're three together, do they want

19  to sit together or do they want to separate?

20  You might find one seat or you might find two

21  seats.  You might not find three seats.  So

22  it's up to them.  They make the choice

23  whether they're going to sit there or they

24  may have to relocate.  And since they were

25  together, they might have thought they could

1  sit together.

2      Q.   But all that's speculation, right?

3      A.   Yeah.   But that's what I'm -- I feel

4  like the way you worded the question, you

5  know, you're thinking about a person coming

6  into the convention to get a seat.   Patsy

7  Maddox is elderly but the Victors are not,

8  and they're all traveling together.

9      Q.   And so Patsy Maddox, because she was

10  being escorted by the Victors, is not

11  entitled to a seat in the elderly --

12      A.   She can.

13      Q.   She could.

14      A.   But they wouldn't be.

15      Q.   But you don't know if there was any

16  -- let me put it this way.

17      A.   I don't know.

18      Q.   I understand you don't know.   I know

19  you're just talking in general, right?   You

20  don't know any of these things.   You're just

21  kind of making it up, right?   You're

22  wondering what's going on and you think

23  that's what's going on but you really don't

24  know, correct?

25      MR. MITCHELL:

1          Are you asking for a lay opinion

2     here, Counsel, or are you just -- what are

3     you doing?

4          MR. THORNHILL:

5               I'm asking what he knows.

6          MR. MITCHELL:

7               You're asking him what he knows.

8     You're asking for an opinion.

9          MR. THORNHILL:

10               If you have an objection, make it.

11     Otherwise --

12          MR. MITCHELL:

13               No.  I'm objecting to the form but I

14     also --

15          MR. THORNHILL:

16               That's it.  Stop.

17          MR. MITCHELL:

18               We can just stop.

19          MR. THORNHILL:

20               Are you able --

21          MR. MITCHELL:

22               Hold it, hold it.

23          MR. THORNHILL:

24               Are you able to answer the question?

25          MR. MITCHELL:

1          Hold it.  We can just stop this
2  altogether and leave.
3      MR. THORNHILL:
4          Stop your screaming.  Stop your
5  screaming.
6      MR. MITCHELL:
7          Are you listening to me?
8      MR. THORNHILL:
9          Not until you stop your screaming.
10     MR. MITCHELL:
11         Are you going to listen to me?
12     MR. THORNHILL:
13         If you stop your screaming I will.
14     MR. MITCHELL:
15         I have stopped.  I interrupted you
16 because you kept on talking when I was trying
17 to ask you a question.
18     MR. THORNHILL:
19         I'm not here to answer questions.
20     MR. MITCHELL:
21         Then we're going.
22     MR. THORNHILL:
23         I'm here to ask questions.
24     MR. MITCHELL:
25         Then we're just going.  That's it.

1  Now, you can either interact with me --
2  that's why I raised my voice, because you're
3  going to keep on going.  Now, do you want to
4  continue the deposition or do you want to
5  talk to me?
6       MR. THORNHILL:
7            Mr. Mitchell, I want to finish the
8  deposition.
9       MR. MILLER:
10            Are you sure?  I'm ready to go.
11  I've watched this man badger the witness --
12       MR. THORNHILL:
13            Object.
14       MR. MILLER:
15            -- and be rude to everyone in this
16  room.
17       MR. THORNHILL:
18            Object.
19       MR. MITCHELL:
20            No.  I'm having a conversation with
21  my client.
22       MR. MILLER:
23            I don't think it's necessary for us
24  to stay.
25       MR. MITCHELL:

```
1              Okay, let's go.  I'll listen to my
2   client.
3       MR. THORNHILL:
4              Note my objection --
5       MR. MITCHELL:
6              We're here as a courtesy.
7       MR. THORNHILL:
8              -- to continue the deposition.
9       MR. MITCHELL:
10             I'll put on the record we're here as
11  a courtesy.  This is by consent.  The witness
12  represents a party that was dismissed from
13  this case.
14      MR. THORNHILL:
15             He doesn't represent a party that's
16  dismissed.
17      MR. MITCHELL:
18             He's the president of Westwego
19  Congregation of Jehovah's Witnesses,
20  Incorporated.
21      MR. THORNHILL:
22             He doesn't represent a party that's
23  been dismissed.  He said he's just an
24  overseer.
25      MR. MITCHELL:
```

```
 1            He is the president of the Westwego
 2   Congregation of Jehovah's Witnesses, Inc., a
 3   defendant named by the plaintiffs that was
 4   dismissed from this case.  He doesn't have to
 5   be here.  He was not subpoenaed.  He is also
 6   a private citizen.  You have raked him over
 7   the coals.  I have been kind enough to come
 8   here by consent, and we don't have to be here
 9   because you didn't subpoena him.  You waited
10   until the last minute.  You've asked for a
11   continuance of the trial so you can get the
12   discovery done that you should have done
13   months ago.
14            So we've had enough.  I tried to
15   cooperate with you.  You treated me as if he
16   had been subpoenaed here today.  You treated
17   me as if you didn't have to cooperate with
18   me.  So that's enough, we're done.
19       MR. THORNHILL:
20            Mr. Mitchell, there's no distinction
21   between somebody who's under oath and
22   answering questions that's subpoenaed and
23   somebody who is not subpoenaed.
24       MR. MITCHELL:
25            Well, that's fine.  But he doesn't
```

1 | have to be here.
2 |      MR. MILLER:
3 |           Is Greg still on or is it off?
4 |      MR. MITCHELL:
5 |           As far as I'm concerned it's off.
6 | There's no subpoenae, so I don't have to
7 | come.  You can notice him if you want to but
8 | if you didn't subpoena him, we're not going
9 | to be here.
10 |      MR. MILLER:
11 |           So you don't intend to go to Mobile
12 | Friday?
13 |      MR. THORNHILL:
14 |           Let's go off the record now.
15 |                *   *   *   *   *
16 |                (End of Deposition)
17 |                *   *   *   *   *
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |

# WITNESS' ATTESTATION

        I have read or have had the foregoing
testimony read to me and hereby certify that
it is a true and correct transcription of my
testimony, with the exception of any attached
corrections or changes.










                    _____

                              WILLEY F. HUGULEY


(CHECK ONE)


(      )  NO CORRECTIONS
(      )  CORRECTIONS; ERRATA SHEET (S)
 ENCLOSED

214

**C E R T I F I C A T E**

1

2          I, DANA SCHOULTZ, Certified Court

3   Reporter in and for the State of Louisiana,

4   as the officer before whom this testimony was

5   taken, do hereby certify that WILLIE F.

6   HUGULEY, after having been duly sworn by me

7   upon authority of R.S. 37:2554, did testify

8   as hereinbefore set forth in the foregoing

9   two hundred thirteen (213) pages;

10          That this testimony was reported by me

11   in the Stenotype reporting method, was

12   prepared and transcribed by me or under my

13   personal direction and supervision, and is a

14   true and correct transcript to the best of my

15   ability and understanding;

16          That the transcript has been prepared

17   in compliance with transcript format

18   guidelines required by statute or by rules of

19   the board;

20          That I have acated in compliance with

21   the prohibition on contractual relationships,

22   as defined by Louisiana Code of Civil

23   Procedure Aritcle 1434 and in rules and

24   advisory opinions of the board;

25          That I am not related to counsel or to

1  the parties herein, nor am I otherwise

2  interested in the outcome of this matter.

3

4

5  _____

6            DANA SCHOULTZ, #87111

7            Certified Court Reporter

8            State of Louisiana

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25